UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| BAD RIVER BAND OF LAKE SUPERIOR CHIPPEWA,<br><br>*Plaintiff*<br><br>-v.-<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>*Defendant*<br><br>and<br><br>ENBRIDGE ENERGY, LIMITED PARTNERSHIP,<br><br>*Intervenor-Defendant* | Civil Case No: 26-cv-01171-TNM<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

GLOSSARY ..... viii

INTRODUCTION ..... 1

LEGAL BACKGROUND ..... 1

FACTUAL BACKGROUND ..... 3

I. THE BAD RIVER BAND ..... 3

II. THE LINE 5 REROUTE PROJECT ..... 5

A. The Bad River Band's Concerns About the Reroute Project ..... 6

B. The Band's Water Quality Standards ..... 9

C. The Line 5 Reroute Project's Impacts to Ceded Territory ..... 10

STANDARD OF REVIEW ..... 11

ARGUMENT ..... 11

I. THE CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT BY FAILING TO EVALUATE ALL ENVIRONMENTAL IMPACTS OF THE PROJECT ..... 12

A. The Corps Failed to Take a Hard Look at Impacts to the Band's Access to Ceded Territory ..... 13

B. The Corps Failed to Take a Hard Look at Impacts from Oil Spills on Treaty-Protected Resources ..... 16

C. The Corps Failed to Take a Hard Look at Impacts of Blasting on the Band's Treaty-Protected Resources ..... 18

D. The Corps Violated NEPA by Removing Any Consideration of Environmental Justice Impacts ..... 21

II. THE CORPS VIOLATED THE CLEAN WATER ACT BY FAILING TO COMPLY WITH THE SECTION 404(B)(1) GUIDELINES ..... 22

A. The Corps Did Not Evaluate the Impacts of Construction Blasting in Wetlands Under the Guidelines ....23

B. The Corps Arbitrarily Limited the Review of HDD Impacts ....28

C. The Corps Failed to Consider All Project Impacts in Making Factual Determinations Under the Guidelines ....30

III. THE CORPS VIOLATED THE CLEAN WATER ACT BY FAILING TO ENSURE THE PROJECT COMPLIED WITH THE BAND'S ON-RESERVATION WATER QUALITY STANDARDS ....35

A. The Corps Failed to Consider Relevant Evidence and Failed to Provide a Reasoned Explanation for Its Decision ....36

IV. THE PERMIT DECISIONS SHOULD BE VACATED ....43

V. CONCLUSION ....45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ....................................................................................44

**Atchafalaya Basinkeeper, Inc. v. Spellmon, et al.*,
No. 24-00381, 2026 WL 917509 (M.D. La. March 31, 2026) ..........................................27, 28

*Bad River Band of Lake Superior Chippewa v. Enbridge Energy, Inc*.,
626 F.Supp.3d 1030 (W.D. Wis. 2022) ..........................................................................5

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983)........................................................................................................11

**Butte Cty., Cal. v. Hogan*,
613 F.3d 190 (D.C. Cir. 2010)..................................................................................36, 38

*City of Albuquerque v. Browner*,
97 F.3d 415 (10th Cir. 1996) ........................................................................................39

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009)....................................................................................37, 44

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
144 S. Ct. 2440 (2024) ..................................................................................................43

*Ctr. for Biological Diversity v. FAA*,
804 F. Supp. 3d 86 (D.D.C. 2025)..................................................................................15

*Ctr. for Biological Diversity v. Regan*,
734 F.Supp.3d 1 (D.D.C. 2024)......................................................................................45

*Ctr. for Biological Diversity v. USFS*,
No. CV 22-91-M-DLC, 2025 WL 3268655 (D. Mont. Nov. 24, 2025) .................................17

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) ...............................................................................43, 44

*Ctr. for Food Safety v. Salazar*,
898 F. Supp. 2d 130 (D.D.C. 2012)................................................................................12

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004)........................................................................................................12

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021)....................45

**Env't Def. v. U.S. Army Corps of Engineers*,
515 F. Supp.2d 69 (D.D.C. 2007)....................22, 23, 25

*Fox Bay Partners v. U.S. Corps of Engineers*,
831 F.Supp. 605 (N.D. Ill. 1993)....................28

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018)....................36, 38

*Indian River Cnty., Fla. v. U.S. Dep't of Transportation*,
945 F.3d 515 (D.C. Cir. 2019)....................12

*Int'l Union, United Mine Workers of Am. v. MSHA*,
626 F.3d 84 (D.C. Cir. 2010)....................37

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wis.*,
653 F. Supp. 1420 (W.D. Wis. 1987)....................3

*Lakeland Bus Lines, Inc. v. NLRB*,
347 F.3d 955 (D.C. Cir. 2003)....................36

*Landry v. Fed. Deposit Ins. Corp.*,
204 F.3d 1125 (D.C. Cir. 2000)....................36

**Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................11, 22, 36, 43

*Nat. Res. Def. Council v. Hughes*,
437 F. Supp. 981 (D.D.C. 1977)....................21

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001)....................20

*Norfolk S. Ry. Co. v. Surface Transp. Bd.*,
72 F4th 297 (D.C. Cir. 2023)....................24

**Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*,
931 F. Supp. 1515 (W.D. Wash. 1996)....................13, 15

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)....................1

*SecurityPoint Holdings v. TSA*,
867 F.3d 180 (D.C. Cir. 2017)....................43

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*,
605 U.S. 168 (2025)....................12

**Stand Up for California! v. U.S. Dep't of the Interior*,
204 F. Supp. 3d 212 (D.D.C. 2016)....................15

**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017)....................13

**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)....................12, 13

**State of Idaho By & Through Idaho Pub. Utilities Comm'n v. ICC*,
35 F.3d 585 (D.C. Cir. 1994)....................18, 20

*Stewart v. Potts*,
996 F. Supp. 668 (S.D. Tx. 1998)....................24

**Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010)....................13, 15

*Tourus Records, Inc. v. DEA*,
259 F.3d 731 (D.C. Cir. 2001)....................36, 39

*Washington Area Bicyclist Ass'n v. Burgum*,
2026 WL 1078218 (D.D.C. Apr. 21, 2026)....................45

*Wisconsin v. Bearhart*,
212 Wis.2d 642 (Wis. App. 1997)....................11

*Wisconsin v. Newago*,
134 Wis. 2d 420, 422 N.W. 2d 107 (Wis. App. 1986)....................10

*Wisconsin v. EPA*,
266 F.3d 741 (7th Cir. 2001)....................40

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C.
§ 706(2)....................3, 43
§ 706(2)(A)....................3, 11

Clean Water Act, 33 U.S.C.
§ 1311(a) .......... 2
§ 1341(a)(1) .......... 2
§ 1341(a)(2) .......... 2
§ 1344 .......... 2
§ 1344(b) .......... 3
§ 1377(e) .......... 9

National Environmental Policy Act, 42 U.S.C.
§ 4331(b) .......... 2
§ 4336 .......... 12
§ 4336(b)(1) .......... 2
§ 4336(b)(2) .......... 2

Rivers and Harbors Act, 33 U.S.C.
§ 403 .......... 28

**State Statutes**

Wis. Stat. Ann. § 939.50(h) (West) .......... 10

Wis. Stat. Ann. § 943.143(2) (West 2019) .......... 10

**Rules & Regulations**

33 C.F.R.
§ 320.4 .......... 27
§ 323.2(c) .......... 23
§ 323.2(d)(1) .......... 24
§ 323.2(d)(1)(iii) .......... 24
§ 323.4 .......... 24

40 C.F.R.
part 230 .......... 3
§ 121.2 .......... 2
§ 121.13 .......... 2
§ 121.14 .......... 2
§ 121.15(d) .......... 2
§ 121.15(e) .......... 2
§ 230.6 .......... 30
§ 230.10 .......... 3
§ 230.10(b)(1) .......... 2
§ 230.10(c) .......... 22, 30
§ 230.11 .......... 3
§ 230.11(a) .......... 31
§ 230.11(b) .......... 32, 33
§ 230.11(g) .......... 26, 28
§ 230.11(h) .......... 28

§ 230.11(h)(1) ....................26, 28
§ 230.12(b) ....................30
§230.20(a) ....................32
§230.20(b) ....................31, 32
§ 230.30 ....................34
§ 230.30(a) ....................34
§ 230.50(a) ....................33

*Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558 (Sep. 27, 2023) ....................2

**Treatises**

Treaty of LaPointe, Signed Sept. 30, 1854, Ratified Jan. 10, 1855, 10 Stat. 1109 ....................4

Treaty with the Chippewa, 7 Stat. 536 (1837) ....................3

Treaty with the Chippewa, 7 Stat. 591 (1842) ....................3

# GLOSSARY

| | |
|---|---|
| **NEPA** | National Environmental Policy Act |
| **CWA** | Clean Water Act |
| **APA** | Administrative Procedures Act |
| **Corps** | U.S. Army Corps of Engineers |
| **Band** | Bad River Band of Lake Superior Chippewa |
| **1837 Treaty** | Treaty with the Chippewa, 7 Stat. 536 (1837) |
| **1842 Treaty** | Treaty with the Chippewa, 7 Stat. 591 (1842) |
| **1854 Treaty** | Treaty of LaPointe, 10 Stat. 1109 (1854) |
| **MNRD** | Mashkiiziibii Natural Resources Department |
| **WDNR** | Wisconsin Natural Resources Department |
| **GLIFWC** | Great Lakes Indian Fish and Wildlife Commission |
| **Project** | Proposed Line 5 Segment Reroute Project |
| **HDD** | Horizontal Directional Drilling |
| **ATWs** | Additional Temporary Workspaces |
| **IR** | Inadvertent Release or Inadvertent Return |
| **TAS** | Treatment As a State |
| **DCDD** | Draft Combined Decision Document (2024) |
| **WQC** | Water Quality Certification |
| **WQS** | Water Quality Standards |
| **BMPs** | Best Management Practices |

## INTRODUCTION

The Bad River Band of Lake Superior Chippewa (Band), a sovereign federally recognized Tribal Nation, filed this lawsuit to protect its homeland and its members. Enbridge Energy's Line 5 Wisconsin Segment Relocation Project (Project) is a proposed pipeline around and directly upstream of the Band's Reservation in Northern Wisconsin. This Project threatens the area where the Band and its members practice treaty-protected traditional cultural and subsistence lifeways and threatens the robust ecosystem that has supported those lifeways for generations. The Band has a responsibility to its members to preserve the natural and cultural resources of its traditional homeland.

The U.S. Army Corps of Engineers (Corps) violated the National Environmental Policy Act (NEPA), the Clean Water Act (CWA), and the Administrative Procedure Act (APA) when it issued Enbridge a permit, AR000013–19, to construct the Project. The Corps failed to evaluate multiple environmental impacts of Project construction, including to waters and wetlands within the Project route. The Corps' failures are substantive, and the agency left many of the Project's significant effects unevaluated. The Corps also failed to fully evaluate the Project's effects on the Band's water quality within the Reservation, the entirety of which is immediately downstream from the Project. As a result of these deficiencies, the Corps' decision to approve the Project is contrary to law. The Band asks this Court to vacate the Corps' permit to construct the Project and requests all other relief as necessary to comply with the law.

## LEGAL BACKGROUND

NEPA "declares a broad national commitment to protecting and promoting environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989), and imposes upon federal agencies the "continuing responsibility…to use all practicable means" to manage the environment so as to "preserve important historic, cultural, and natural aspects of

our national heritage," 42 U.S.C. § 4331(b). NEPA prohibits uninformed agency action and requires all federal agencies to prepare a detailed statement of environmental impacts. If a proposed action will have a significant effect, the agency must prepare an Environmental Impact Statement (EIS). *Id.* § 4336(b)(1). Where the significance of an agency's action is uncertain, the agency must prepare an Environmental Assessment (EA) to determine whether a Finding of No Significant Impact (FONSI) should be issued. *Id.* § 4336(b)(2).

The CWA prohibits the unpermitted discharge of any pollutant into the navigable waters of the United States. 33 U.S.C. § 1311(a). A CWA section 404 permit from the Corps is required to place dredged or fill material into navigable waters. *Id.* § 1344. The CWA prohibits the Corps from issuing any federal discharge permit without certification from the state where the discharge will occur that it complies with water quality standards (WQS). *Id.* § 1341(a)(1); 40 C.F.R. § 121.2. The discharge also must not violate the WQS of neighboring jurisdictions. 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.13.

If a neighboring jurisdiction determines that the discharge will violate its standards, it may object to the issuance of the permit and seek a hearing before the Corps. 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.14. At the hearing, the neighboring jurisdiction must show that the discharges will cause or contribute to a violation of its water quality requirements. 40 C.F.R. § 121.14; *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66637, 66647 (Sep. 27, 2023). After the hearing, the agency may impose conditions on the permit to ensure compliance with the applicable WQS. 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.15(d). If no conditions will ensure compliance with applicable WQS, the agency shall not issue the permit. 33 U.S.C. § 1341(a)(2); 40 C.F.R. §§ 121.15(e), 230.10(b)(1).

All dredge and fill permits must satisfy the CWA 404(b)(1) Guidelines, which require the Corps to make factual determinations that a proposed project will not have significant adverse effects on disposal sites and the surrounding ecosystems. 33 U.S.C. § 1344(b); 40 C.F.R. part 230; 40 C.F.R. §§ 230.10–11.

The APA mandates that agency actions not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where an agency action violates this standard, the reviewing court "shall…set [it] aside." *Id.* § 706(2).

## FACTUAL BACKGROUND

### I. THE BAD RIVER BAND

The Band is a federally recognized Indian tribe with a reservation in northern Wisconsin. The Band signed treaties with the United States in 1837 and 1842, ceding territory in Wisconsin and parts of Michigan and Minnesota. This area (henceforth, the ceded territory) comprises the lands and waters on which the treaty tribes, including the Bad River Band of Ojibwe, explicitly retained rights to hunt, fish, gather, and engage in other customary practices. Treaty with the Chippewa, 7 Stat. 536 (1837) (1837 Treaty) and Treaty with the Chippewa, 7 Stat. 591 (1842) (1842 Treaty); *see* AR003981–90. The 1842 Treaty specifically reserved "the right of hunting on the ceded territory, with the other usual privileges of occupancy[.]" *See* AR003983; 1842 Treaty, Art. II. *See also Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wis.*, 653 F. Supp. 1420, 1426 (W.D. Wis. 1987) (recognizing the Ojibwe Bands' usufructuary or "use" rights in the ceded territory). At the time the treaties were signed, the Ojibwe used almost all the region's flora and fauna in various ways. *Id.* at 1426–29.

At the time the Band and the United States negotiated the 1837 and 1842 Treaties, United States policy was to remove tribes to land west of the Mississippi. However, the Bad River Band avoided removal and retained its off-reservation rights in a third and final treaty with the United

States in 1854. AR024630; Treaty of LaPointe, Signed Sept. 30, 1854, Ratified Jan. 10, 1855, 10 Stat. 1109 (1854 Treaty). This Treaty established permanent homelands (reservations) for the Ojibwe in Wisconsin, Michigan, and Minnesota.

The Bad River Reservation is part of the Bad River Watershed on the shore of Lake Superior. The watershed is an extraordinary ecological and hydrological area, which includes the Kakagon-Bad River Sloughs. The Sloughs are a wetland complex of international significance and a designated Ramsar Site of International Importance. AR071162. EPA also recognized the Bad River and the Kakagon-Bad River Sloughs as Aquatic Resources of National Importance "because they are economically significant; their unique characteristics have been identified and designated for protection under international, national, state, and tribal law; and these waterbodies are integral to maintaining and enhancing the quality of the Nation's waters." *Id*.

Several rivers from upstream subwatersheds—the Potato, Tyler Forks, Upper Bad, Marengo, and White Rivers—all flow downstream into the Bad River. The Bad, White, Potato, Marengo, Brunsweiler, and Tyler Forks Rivers, Beartrap Creek, Vaughn Creek, and many tributaries flow through the Bad River Reservation. AR024433 (Fig. 6). The entire region, including the Project area, has numerous sites of surface water and groundwater interactions. AR024435–38 (Figs. 7–10). These unique characteristics support ecosystems of cultural significance to the Band. AR009099. The Band works hard to protect the water resources of the Reservation and ceded territory.

Mashkiiziibii Natural Resources Department (MNRD)—the Band's natural resources department—carries out a wide range of work to protect and restore natural resources in the Band's homelands for current and future generations, including water quality evaluations, vegetative surveys, wetland protection and remediation efforts, and conservation programs.

Tillison Decl. ¶ 3; AR090283. The Great Lakes Indian Fish and Wildlife Commission (GLIIFWC)—an intertribal agency that regulates off-reservation treaty-based activity within the ceded territory—carries out similar analyses, regulation and restoration efforts. AR024468.

## II. THE LINE 5 REROUTE PROJECT

The Line 5 pipeline has operated within the Band's Reservation since 1953. In 2013, several of Enbridge's easements on the Reservation expired. The Band did not renew them, largely due to the dangers that Line 5 poses to Reservation resources and the community. AR067646; AR067738. Namely, a "crude oil spill at the Waabishkaa-ziibi (White River) or Mashkiigon-ziibi (Bad River) would be catastrophic to the health and economy" of the Odanah community and "impact coastal; wetlands, wild rice beds, and traditional fishing." AR067738. In 2019, the Band filed a lawsuit to remove Line 5 from the Reservation. AR067645–46; AR024671. A federal district court in Wisconsin held that Enbridge was operating Line 5 on the Reservation in trespass since 2013. *Bad River Band of Lake Superior Chippewa v. Enbridge Energy, Inc*., 626 F.Supp.3d 1030 (W.D. Wis. 2022). In response to this litigation, Enbridge submitted a joint application to the Corps and the Wisconsin Department of Natural Resources (WDNR) to construct the Project in February 2020. Enbridge proposes to construct a 41-mile pipeline through wetlands and waterways completely around and directly upstream of the Bad River Band's Reservation. Approximately 7.5 miles of the proposed route cross public land in Iron County Forest, which abuts the Reservation. In November 2021, the Corps determined that a standard individual permit review was required under CWA section 404, and Enbridge and the Corps agreed to treat all waters as jurisdictional for permitting purposes. AR071428.

Project construction includes trenching, blasting, and drilling through the entire 41-mile route, most of which is under and through streams, rivers, and wetlands. Each of these construction methods will affect the aquatic ecosystem. The Project will require tree clearing and

removal of flora along the pipeline right-of-way (ROW). AR000697. The ROW is 95 feet wide in wetlands and 120 feet wide elsewhere. AR000591. Enbridge will need additional areas outside of the ROW for temporary workspace. Staging areas for horizontal directional drilling (HDD) under wetlands and waterways will require additional temporary workspace. AR000695.

Enbridge proposes to directly trench through hundreds of wetlands and waterways, which make up most of the construction route. AR000497. The trench is approximately 18 feet wide and 7 feet deep, although the actual trench volume will vary by site conditions. AR007177. Where soil is unstable due to high water content, trenching will require sheet metal installation (sheet piling) to stabilize the trench long enough to place the pipe. Where Enbridge cannot trench due to bedrock, it will place explosives directly into the rock to blast it loose. After the pipe is placed, the trench will be backfilled—either with the soil removed during trenching or with the bedrock removed from blasting. AR003241. Enbridge currently plans to blast through approximately 8 miles of bedrock and use HDD to cross 13 wetlands and waterways. AR000996–97; AR001757–58; AR004941, 4850, 63−64, 67, 72, 86 (Fig. 14), 90 (Fig. 18); AR006282−83; AR090891. To reduce friction, HDD uses drilling fluid, or drilling mud, as a lubricant. HDD construction requires larger staging and pre-construction areas than other construction methods. HDD construction activity, including entry and exit points for the pipeline, also disturbs wetlands.

### A. The Bad River Band's Concerns About the Reroute Project

During the review, the Band highlighted specific concerns about construction methods, data gaps, and effects on particular wetlands and waterways. The Band's concerns remain unchanged: there is insufficient data to assess all impacts on the current ecosystem; additional

data types are needed; the Project will cause substantial and irreversible environmental harm to the watershed; and it will destroy cultural resources and restrict the Band's access to these areas.

Enbridge will clear trees, including trees that are culturally important to the Band, to make way for construction equipment. Enbridge will remove vegetation from areas to be trenched or blasted, and from areas in or adjacent to HDD workspaces. AR024644; AR024652–53. Construction impacts will permanently degrade wetland functions like flood mitigation and water filtration. Enbridge proposes restoring wetlands and mitigating impacts by purchasing credits, recognizing that wetland functions will be impaired for decades or permanently. AR000594–95, 625, 642.

Trenching will disturb soil along the route, increasing sedimentation in waterways and wetlands. Using sheet piling in saturated areas raises the risk of an aquifer breach. Although Enbridge states it will sheet-pile only as deep as necessary to keep the trench open, it has not committed to a maximum depth. The Band is especially concerned about sheet piling after Enbridge's Line 3 Pipeline construction in Minnesota caused aquifer breaches. AR008882; AR024644, 47–48; AR067650, 74; AR069231–777.

Explosive blasting poses risks to wetlands, streams, bedrock, and water interactions, including breaching aquifers. AR024635–36; AR025081–82, 86–87, 103–111; AR027108; AR027195; AR027209; AR027678–79. Cumulatively, blasting can cause significant changes underground. Although the Band identified these broad risks to the Corps, the site-specific risks remain unknown. AR067675; AR024635. Enbridge and the Corps never provided an evaluation of the environmental impacts of blasting in the sites Enbridge identified. *Id*. At least three proposed blasting locations are over 1 mile long, and five are over ½ mile long. AR024635; AR025082 (Fig. 9). Blasting locations may also be close together, increasing the possibility of

far-reaching cumulative impacts. Several wetlands would be blasted in more than one location. AR001607–09.

HDD construction can cause frac-outs, or inadvertent releases (IRs), of drilling fluid or drilling mud. During Enbridge's construction of Line 3, 28 IRs occurred over three months. AR024644, 47; AR025079, 89, 97–99; AR026168; AR027042, 50–51, 54–55. IRs release drilling mud into the area surrounding the entry or exit hole of the drill bit, potentially causing serious harm. The Band is especially concerned about IRs because several HDD construction areas are in or directly adjacent to sensitive wetlands. Many HDD locations are in difficult terrain or are in areas that are difficult to access if cleanup is necessary.

The Band has spent considerable time and resources evaluating Project application materials, data, and environmental documents. *See* Tillison Decl.; Arbuckle Decl. The Band has participated in all public comment periods, tribal consultations, and technical meetings with the Corps over the past 6 years. In 2022, the Corps solicited public comment on the proposed Project. The materials provided were insufficient, lacking, or inaccurate in their impact data. The Band's 2022 comment letter highlighted data gaps and outlined harmful impacts on the Band and its resources. *See* AR067640–691; *see also* Tillison Decl. ¶ 13b(i–vii) (listing letter attachments). In 2024, the Corps published a Draft Combined Decision Document (DCDD), which included a Draft Environmental Assessment, CWA Section 404(b)(1) Guidelines evaluations, and a Public Interest Review. *See* AR037800–933. In response to the DCDD, the Band again noted that much of the information remained insufficient due to a lack of basic data, and the Project would have significant impacts. *See* AR024628–98; *see also* Tillison Decl. ¶ 13d(i–xii) (listing letter attachments).

### B. The Band's Water Quality Standards

The Band has had treatment as a state status under the CWA since 2009. 33 U.S.C. § 1377(e); AR003378–79. The Band developed WQS that have been in force since 2011. AR003721–806. The Band designated many of its waterways as Outstanding Tribal Resource Waters, Outstanding Resource Waters, and Exceptional Resource Waters under its antidegradation policy. AR003731. The Band's standards also address their cultural relationship with water, which has no equivalent in Wisconsin. AR003379–81. MNRD also monitors water quality in off-Reservation waterways and wetlands that could affect Reservation waters. As the gateway to Lake Superior, the Band is concerned about sediments and contaminants that bioaccumulate or will impact the ecosystem's wild rice, fish, and wildlife. AR003375, 81.

The Corps initiated the CWA Section 401 state water quality certification process in 2024. Wisconsin issued a state water quality certification (WQC) on November 14, 2024, with 231 conditions. AR003378; AR000020–68. On December 13, 2024, EPA notified the Band, a downstream jurisdiction, that the Project "may affect" its water quality.[1] AR003378. On February 11, 2025, the Band determined that the Project "will affect" its water quality and requested a public hearing. *See* AR009094–175; *see also* Tillison Decl. ¶ 13e(i–vii) (listing letter attachments). The Corps held a public hearing on May 13 and 14, 2025. AR008769. At the hearing, the Band presented evidence that Project evaluations lacked key data yet would still harm water quality, leading to violations of the Band's standards. The Band presented evidence that the Project would increase concentrations of pollutants such as sediment and methylmercury, with cumulative impacts on waters entering the Reservation. *See* AR006429–661, 6413–24, 6235–6353. The Band submitted additional technical data and a determination

[1] The Band simultaneously participated in Wisconsin DNR's permitting process, reviewing two sets of materials and dockets to evaluate impacts and reconcile discrepancies.

letter to the Corps in June 2025. *See* AR003368–451, *see also* Tillison Decl. ¶ 13f(i–xvi) (listing letter attachments).

### C. The Line 5 Reroute Project's Impacts to Ceded Territory

The pipeline will create a 41-mile border around the Reservation and through ceded territory, where members hunt, fish, and gather in treaty-protected areas. In Wisconsin, those who "intentionally enter[] an energy provider property"—like a "property that is part of [a]…natural gas [or] oil…distribution system"—"without lawful authority and without consent of the energy provider" are "guilty of a Class H felony." Wis. Stat. Ann. § 943.143(2) (West 2019) (felony trespass law); AR024470–71 (citing 2019 Wis. Act 33 which amended the felony trespass law); AR024694. That felony is punishable by up to 6 years in prison and up to $10,000 in fines. Wis. Stat. Ann. § 939.50(h) (West); AR024470–71. Tribal members will not wish to risk a $10,000 fine or imprisonment to access areas previously open for treaty activities. Stone Decl. ¶ 33 ("I do not trust that I will be safe from prosecution if I were to harvest from [the public lands near the Reroute] now, because of Wisconsin's trespass law."). Some treaty areas will also be harder to reach. GLIFWC found the Project would directly remove 43.4 acres from access to treaty areas and would otherwise affect access to 3,855 acres of ceded territory by increasing travel time to treaty areas. AR024471.

The Band's concerns regarding the pipeline criminal trespass law are not hypothetical. For much of the Band's recent history, Wisconsin has wrongfully prosecuted Ojibwe peoples—including Band members—for their exercise of treaty-protected activities in ceded territory. *See generally*, AR027771–80. This pattern includes prosecution for gill fishing in Lake Superior in the early 1900s, gathering manoomin during the Great Depression, spear fishing in off-Reservation lakes in the 1970s, netting trout in Lake Superior in the 1980s, and hunting deer in ceded territory in the 1990s. AR027773, 78; *Wis. v. Newago*, 134 Wis. 2d 420, 422 N.W. 2d 107

(Wis. App. 1986); *Wis. v. Bearhart*, 212 Wis.2d 642 (Wis. App. 1997). This pattern is ongoing, with current Band members having personal experiences being "harassed by wardens about appropriate areas to hunt and fish." AR002455. Overall, state prosecution has "made it increasingly difficult for tribal members to rely on hunting, fishing, and gathering for their survival," leading to "deteriorating living conditions, poor diets, and both a decline in the quality of…health as well as inadequate health care." AR027772–73.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) provides that a reviewing court "shall hold unlawful and set aside agency actions" that it determines are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision can be upheld only where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).

## ARGUMENT

The Corps failed to fully identify, evaluate, and disclose environmental impacts from the Project prior to issuing Enbridge a permit, contrary to NEPA and the CWA. Construction harms to the environment are immediate, such as the blasting of regulated wetlands. But the Project also poses long-term risks to the Band's homelands with the threat of oil spills and limiting access to treaty resources. The Corps also failed to fully evaluate the Project's impacts to waters and to fully consider how those impacts will travel downstream to waters on the Band's

Reservation. The Corps' failures render its decision arbitrary, capricious, and contrary to law. Accordingly, the permit must be vacated.

## I. THE CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT BY FAILING TO EVALUATE ALL ENVIRONMENTAL IMPACTS OF THE PROJECT

NEPA requires agencies to assess the impacts of a proposed action by preparing an EIS or an EA with a FONSI. 42 U.S.C. § 4336. Where an agency prepares an EA, reviewing courts must ensure that the agency took a "hard look at every significant aspect of the environmental impact of a major federal project." *Indian River Cnty., Fla. v. U.S. Dep't of Transportation*, 945 F.3d 515, 533 (D.C. Cir. 2019) (citation modified). This "hard look" requirement mandates that a reviewing agency consider "all foreseeable direct and indirect impacts [and discuss] adverse impacts [in a way] that does not improperly minimize negative side effects," *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 143 (D.D.C. 2012). By serving as a "procedural cross-check," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 173 (2025), NEPA and its hard look requirement ensures that agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts [and] guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (citation modified).

When a project occurs in "a place of extraordinary importance to the Tribes, a landscape of profound cultural importance, and the water supply for the Tribes," NEPA requires agencies to take a hard look at all foreseeable impacts to a Tribe's treaty-protected rights. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021). As applied here, NEPA requires the Corps to evaluate foreseeable impacts of Project construction and operation on the Band's Reservation and ceded territory resources. *Id.* at 1054 (affirming vacatur

of EA where Corps inadequately assessed impacts of oil spill on treaty rights); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 134 (D.D.C. 2017) (holding the Corps' inadequate assessment of "the impact of an oil spill on the Tribe's fishing and hunting rights" violated NEPA). The Corps must take a hard look not just at impacts to the quality of the resources, but also to the Band's ability to access those resources. *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 606 n.14 (9th Cir. 2010) (holding an agency violated NEPA when it failed to assess a project's impacts to a tribe's "physical and visual access" of cultural resources); *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1522 (W.D. Wash. 1996) (finding that to affirm the permit denial, "the record need only support the Corps' conclusion that the project would affect the [tribe's] right to access").

The Corps failed to meet this "hard look" requirement. They did not consider impacts from the potential criminalization of Band members accessing ceded territory; potential oil spills on treaty-protected resources; construction blasting on sensitive ecosystems and hydrologic connections; or the environmental justice impacts upon the Band and its members. The CDD and the FONSI do not meet NEPA's requirements and must be vacated.

### A. The Corps Failed to Take a Hard Look at Impacts to the Band's Access to Ceded Territory

The Corps violated NEPA by ignoring the impacts of its permitting decision, along with Wisconsin's felony trespass law, on Band members' ability to participate in treaty-protected practices in the ceded territory. Since the Project cuts through "a landscape of profound cultural importance, and the water supply" for the Band, the Corps' duty to address the Band's access concerns is paramount. *Standing Rock Sioux*, 985 F.3d at 1050. By failing to consider the felony trespass law and pattern of state prosecution, the Corps violated NEPA's "hard look" standard.

The Band prepared and shared with the Corps concerns about the felony trespass law and the history of Wisconsin prosecutions in the ceded territory. The Band demonstrated the consistent use of ceded territory and that Band members "mov[e] between the Reservation and ceded territory, as…gathering, hunting, fishing, and harvesting [are] dictated by where the resources are, not where the Reservation boundary is." Stone Decl. ¶ 10; AR024467–68 ("GLIFWC permit and registration data indicates that tribal members exercise usufructuary rights on [ceded territory within] Iron County Forest lands"). Wisconsin's history of prosecuting lawful treaty activity, coupled with the pipeline's presence, is likely to deter Band members from accessing or engaging in those activities. AR027722 (Wisconsin state prosecution made it so harvesting "off-reservation became sites of conflict between Ojibwe who attempted to exercise their rights and state officials who attempted to prevent them"); AR024693–94 (discussing permanent loss of access to the Corps-recognized Potato River cultural property); AR024470–77. Given these concerns, even the EPA asked the Corps to assess "legally enforceable mechanisms to ensure perpetual access to reserved rights in or around project rights-of-way." AR032087–88. EPA concluded that without this analysis, "it is impossible to effectively evaluate the direct, indirect, and cumulative impacts of the project on access to Treaty resources." *Id.*

The Corps did not engage with the materials the Band submitted. The Corps recognized Wisconsin's felony trespass law. AR000656. Still, it concluded it has no duty "to address applicability or enforcement of state law" on the Band's lawful treaty activity, AR002064, where it had no authority "to control [or] intervene in state or local permitting." AR000656. The Corps also tried to rationalize its decision to ignore these impacts by referencing Enbridge's promise not to prosecute Band members practicing treaty rights. *Id.*

The Corps' failure to engage with the Band's comments on the felony trespass law and state patterns of prosecution does not satisfy NEPA. Where the Band submitted ample evidence, the Corps was required to evaluate the Project's foreseeable impacts on the Band's ability to access areas where its members exercise treaty rights. *Te-Moak Tribe*, 608 F.3d at 606 n.14 (overturning NEPA analysis that did not consider "physical and visual access" to tribe's cultural resources). When agencies have properly taken a hard look at tribal access concerns, they have created mitigation conditions to relieve "access restrictions on [tribal] resources." *Ctr. for Biological Diversity v. FAA*, 804 F. Supp. 3d 86, 105 (D.D.C. 2025). Agencies taking a hard look at tribal access concerns have even denied permits outright. *Nw. Sea Farms*, 931 F. Supp. at 1522 (affirming denial of permits that would impact tribal access to traditional fishing grounds). Had the Corps evaluated the Band's concerns, it may have reached a different decision that addressed them. Without an evaluation of the impacts to access, "neither the courts nor the public can be assured that the agency provided the hard look that it is required to provide." *Te-Moak Tribe*, 608 F.3d at 603.

The Corps' excuses do not remedy its failure to review foreseeable impacts of its permitting decision. Simply because Wisconsin has jurisdiction to enforce its own criminal laws does not mean the Corps can ignore the impact of diminished access to the ceded territory and deterrence of treaty activity. *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 314–315 (D.D.C. 2016), aff'd sub nom. *Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177 (D.C. Cir. 2018) (holding the agency took a hard look at potential increase in state criminalization where it gathered information from local agencies). Further, Enbridge's promises not to prosecute are unenforceable, and the Corps cannot rely on them to

dismiss the Band's legitimate concerns. The Corps violated NEPA when it failed to evaluate the foreseeable impacts of its decision on the Band's treaty rights and access to cultural sites.

### B. The Corps Failed to Take a Hard Look at Impacts from Oil Spills on Treaty-Protected Resources

The Corps violated NEPA by disclaiming responsibility for reviewing the Project's oil spill impacts. The Band alerted the Corps of multiple flaws in Enbridge's only oil spill analysis in 2023. *See* AR026306–7036; *see also* AR063001–505 (2023 Spill Report). Far from taking a hard look, the Corps' final decision simply reincorporates the Report without addressing the deficiencies the Band raised.

An oil spill in the Bad River watershed would cause serious harm to resources vital for the Band and its members' livelihoods and traditions. *See, e.g.*, Jennings Decl. ¶¶ 15, 18; Arbuckle Decl. ¶¶ 8, 16. This risk is the main reason the Band did not renew Enbridge's easement and continues to oppose Line 5's continued presence in the Bad River watershed. AR067646; AR067738–67739. The Band requested the Corps prepare a "a site-specific and quantitative analysis of potential environmental impacts" from an oil spill from the Project. AR067674. The Band previously evaluated oil spill risks from the portion of Line 5 within the Reservation. An independent study showed that "damage to the Line 5 pipeline resulting in oil release would have severe environmental impacts to the Bad River and downstream aquatic resources under a variety of scenarios." AR069781.

The Corps did not address the materials the Band submitted on the DCDD. Instead, the Corps concluded that oil spills are a matter of "pipeline operation, which is outside the Corps' purview to consider." AR037830. The Corps then referenced the 2023 Spill Report, which modeled the probability of pipeline failure, the downstream impacts of a spill in the Bad River

and White River, and overland impacts on selected areas of interest and high-consequence areas. *Id.*; AR000659; AR063005–09 (executive summary of analysis).

This 2023 Spill Report had glaring flaws. First, its impact modeling assumed the Project will only transport light crude, not NGLs. AR063038. But the Project will transport nearly 100,000 barrels of NGLs each day. AR000595. Unlike light crude oil, NGLs are airborne and significantly more volatile when released, making leaks more likely to cause explosions. AR026311–12; AR027040–41 (stating that impacts from NGL leaks are "markedly different … than an oil spill"). NGL leaks and explosions not only pose a direct threat to life and resources in leak area, but also materially alter response and recovery times for oil spills, as recovery crews will have to account differently for NGL leaks when conducting recovery activities. AR026311–12. But the 2023 Spill Report only evaluated impacts from the transport of crude oil. AR063038.

Second, Enbridge's 2023 Spill Report lacks elevation profile data. Elevation profiles are the "soul of liquid oil transmission pipelines" and are required to independently assess whether Enbridge's models and subsequent oil spill response planning will be effective. AR026311. For a project that will transport NGLs, the elevation profile is even more vital for agency and public review as the "NGL liquid stream will flow uphill pushing crude oil and NGL to release out a pipeline rupture breach." AR026312. Without the elevation profile, EPA was unable to determine the "adequacy of spill-related modeling and analysis." AR032108. Accordingly, EPA requested the Corps "disclose spill modeling methodologies and assumptions," "include a thorough discussion of the impacts of a spill on Tribal reserved rights" and "clearly state whether [the Corps] finds Enbridge's spill models and analysis to be acceptable." *Id.* The Corps precluded public engagement and assessment of Enbridge's modeling by failing to provide this model to the public in the publication of the DCDD. *Ctr. for Biological Diversity v. USFS*, No.

CV 22-91-M-DLC, 2025 WL 3268655, at *11 (D. Mont. Nov. 24, 2025) (overturning NEPA analysis because the agency did not "provide accurate data to the public to substantiate its analysis and conclusions" (citation modified)); *State of Idaho By & Through Idaho Pub. Utilities Comm'n v. ICC*, 35 F.3d 585, 596 (D.C. Cir. 1994).

Third, the 2023 Spill Report assumed that response times to a full-bore rupture would be 13 minutes to a valve closure but provides no basis for that assumption. AR063066–70. Despite Enbridge calling this estimate "conservative," analysis of Enbridge's catastrophic 2010 Line 6B oil spill shows it took over 17 hours before remote-operated isolation mainline valves were finally closed. AR063038–39; AR026310, 6878–80, 6994–7001 (summary of National Transport Safety Board's evaluation of Enbridge's Line 6B rupture). Enbridge's estimate does not square with its own history of oil spills and does not account for how NGL leaks will potentially make identification and shutdown even more difficult and dangerous.

The Corps did not respond to these flaws. Instead, it reiterated that "oil spills are operational issues outside [the Corps'] scope," and referenced the 2023 Spill Report. AR000603. Failing to address these comments without an explanation or reasoning violates NEPA.

### C. The Corps Failed to Take a Hard Look at Impacts of Blasting on the Band's Treaty-Protected Resources

The Corps did not take a hard look at the impacts of blasting as a construction method. Instead, the Corps relies on Enbridge's General Blasting Plan to analyze blasting impacts. The Plan will inform Enbridge's environmental review of blasting impacts only five days before blasting activities occur. Delegating review to a later date fails NEPA's hard look requirement. *State of Idaho*, 35 F.3d at 596.

The Blasting Plan does not disclose or evaluate the environmental impacts of blasting. AR000993–1006; AR038190–203. In fact, it only lists the streams to be blasted and does not

include the wetlands at all. The Plan did not "quantify, minimize, or mitigate the short- and long-term impacts of blasting." AR067669. It also did not disclose what blasting agents will be used, how the blasting will physically take place, the depth to which blasting will occur, or how the blasting materials will be cleaned up. AR024635–36. The Band highlighted these points as crucial because blasting could harm water quality by releasing contaminants, such as nitrates, fuel oil, perchlorate, mercury, RDX, HMX, PETN, uranium, iron, lead, and copper, from bedrock and residual blasting materials. *Id* Physical explosions may threaten seeps and water flow, sensitive soils, or endangered plants along the Project. AR067669; AR069196, 208, 216–17, 220, 223, 228. Accordingly, the Band requested that the Corps consider and expand upon the materials on the record related to site-specific impacts of blasting. AR024637.

The Corps recognized the potential impacts of blasting and that those impacts vary by blast site. AR000621, 624–25 (stating that impacts "vary by species, with small motile organisms and those near the blast or sediment surface experiencing higher mortality" and that blasting can "alter wetland hydrology"); AR000996 ("The extent of bedrock present on either side […] will depend on on-site geotechnical investigation."). It also recognized that site-specific blasting plans would need to be prepared to understand impacts of blasting at different areas along the Project. AR000624–25. The Corps also included a special condition in the Final Permit, allowing Enbridge to submit site-specific blast plans only five days before blasting. AR000015. Based on an evaluation to be conducted at a later date, the Corps concluded that construction-related effects from blasting would be "minor in intensity, with mitigation to compensate for anticipated temporary and permanent wetland functional loss." AR000625.

Neither the General Blasting Plan nor the Corps' condition for post-permit environmental evaluation supports this conclusion. It also violates NEPA. First, the Plan does not evaluate any

environmental impacts. *Id.*; AR000998 ("site-specific blasting plan will include details and calculations regarding environmental variables that will be recorded closer to the time of the blast."). It instead describes "general blasting procedures" that are meant to be "supplemental to Enbridge's blasting contractor(s) blasting plans." AR000997. The General Blasting Plan outlines conditions that contractors, to be selected at a later date, must meet when blasting at a later time. AR000998. It does not assess the general impacts of blasting upon hardrock, waterways, and wetlands that the pipeline will run through, let alone assess site-specific impacts at potential blast sites Enbridge has already identified. *Id.*

Second, the Corps' permit conditions are "no substitute for an overarching examination of environmental problems at the time the licensing decision is made." *State of Idaho*, 35 F.3d at 596. "Where significant environmental damage may occur to a treasured natural resource, the studies must be conducted first, not afterwards." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001). The Corps' CDD and Permit conditions do not evaluate environmental impacts of blasting *before* a permit decision is made. Instead, the Corps requires only that, five days prior to blasting, Enbridge provide plans describing the length of the blasting area and hydrological site conditions, and blast reports on seismic monitoring after each blast. AR000015. This order of operations violates NEPA, *State of Idaho*, 35 F.3d at 596 ("NEPA prohibits" issuing a permit where "[o]nly [the permit applicant] will be in a position to assess the total environmental impact of salvage activities and perform an individualized balancing analysis" (citation modified)), and shields blasting impacts from both Corps and public review.

Accordingly, by failing to assess the impacts of blasting and delegating review of blasting impacts to Enbridge at a later date, the Corps violated NEPA's hard look requirement.

### D. The Corps Violated NEPA by Removing Any Consideration of Environmental Justice Impacts

The Corps violated the APA and NEPA when it completely scrapped any discussion of the Project's environmental justice impacts from the CDD. The Corps considered these impacts in the DCDD and then omitted all analysis from the final CDD without explanation. This "significant departure" from the DCDD prevented public "opportunity to comment upon this substantial modification" and failed to provide the "detailed comparative explanation…required under NEPA." *Nat. Res. Def. Council v. Hughes*, 437 F. Supp. 981, 990 (D.D.C. 1977).

For many decades, industry, state, and federal actors have conducted exploitative activities that threaten the Band's environment and the health and well-being of the Band and its members. AR067658–60; AR024682–83 (discussing "recent incidences of human trafficking and violence against women by employees and contractors on fossil fuel projects" and additional impacts from "greenhouse gas emissions, potential spills, increased flooding, and water quality degradation"). Accordingly, the Band asked the Corps to develop an environmental justice assessment evaluating the "disproportionate exposures for Native American and Indigenous communities to pollutants from the oil and gas industry," "changes to land and water resources," and impacts to "the types and frequencies of religious events or ceremonies and on-site non-consumptive use." AR067658.

The Corps spent several pages and an appendix discussing environmental justice concerns in the DCDD. AR037926–31; AR043781–854. The Band commented that the Corps must supplement its analysis. AR024681–84. Instead, the Corps scrapped the entire section, leaving the final CDD void altogether of any discussion of environmental justice impacts. That "significant departure" from the DCDD without explanation violates NEPA and requires vacatur. *Hughes*, 437 F. Supp. at 990.

## II. THE CORPS VIOLATED THE CLEAN WATER ACT BY FAILING TO COMPLY WITH THE SECTION 404(B)(1) GUIDELINES

The Corps erroneously concluded that the Project complies with the Section 404(b)(1) Guidelines. The Guidelines clearly state that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). The regulations assess whether effects, individually or collectively, significantly degrade or harm human health, welfare, fish, wildlife, aquatic sites, ecosystems, or wetland functions. *Id*.

To decide that dredged or fill material does not cause or contribute to significant degradation of regulated waters, the Corps must evaluate project impacts and make several factual determinations regarding those impacts. *Env't Def. v. U.S. Army Corps of Engineers*, 515 F. Supp.2d 69, 77 (D.D.C. 2007). An agency's compliance with the CWA is subject to the APA. *Id.* at 76. The Corps' failure here is simple: it completely neglected to evaluate the Project's impacts in accordance with the Guidelines. In the CDD, the Corps evaluated only a select number of Project impacts under the Guidelines, manipulating a conclusion that the Project will not have a significant adverse effect on aquatic resources. The Band commented on the shortcomings of this analysis in the DCDD. The Corps largely ignored these comments and failed to reasonably explain why it excluded evaluation of Project-related impacts on the aquatic environment. Without a full evaluation of Project construction impacts, or a reasoned explanation of why the Corps is exempt from making those evaluations, its conclusion that the Project will not have significant adverse impacts under the Guidelines is not supported by the CDD or the record. *State Farm*, 463 U.S. at 43.

The Corps refused to assess blasting impacts on wetlands and HDD effects on adjacent wetlands, *infra* § II.A–C. Although the Corps insists it is not required to consider blasting or

HDD impacts, the Permit explicitly permits blasting in wetlands and temporary wetland fill for HDD construction. The Corps thus must evaluate dredge-and-fill impacts associated with those construction methods under the Guidelines. *Env't Def.*, 515 F. Supp.2d at 77. Without this evaluation, the Corps' impact assessment on wetlands is invalid. It also ignored, without review, the Band's concerns about substrate, aquifers, and aquatic species. These failures make the Decision and Permit non-compliant with Section 404(b)(1) Guidelines.

### A. The Corps Did Not Evaluate the Impacts of Construction Blasting in Wetlands Under the Guidelines

The Corps failed to assess the impacts of blasting on wetlands and aquatic resources. In comments, the Band requested a final list of blasting locations, a disclosed blasting plan with methodology and contaminant details, and site-specific impact details. AR024635–37. The Band demonstrated that blasting is likely to pose significant impacts and adversely affect the aquatic ecosystem. AR025086–87. Rather than contend with the Band's comments, the Corps ignored the Band's concerns and actively avoided its duties under the 404(b)(1) Guidelines.

First, the Corps' attempts to escape regulatory responsibility by claiming that blasting "does not result in regulated discharges of dredged or fill material[.]" AR000624. Yet in the same paragraph, the Corps states, "Enbridge anticipates blasting in approximately 2.6 acres of wetlands," and tries to differentiate that the purpose of blasting in a wetland "is conducted to fracture rock to allow the trench to be excavated." *Id.* However, the *purpose* of the destructive activity in a wetland does not automatically exclude the activity from the Corps' authority. Corps regulations for section 404 permitting define dredged material as "material that is excavated or dredged from waters of the United States," 33 C.F.R. § 323.2(c), and discharge of dredged material as "any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States," including "[a]ny addition,

including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation," *id.* § 323.2(d)(1); (d)(1)(iii). A plain reading of these regulations demonstrates that blasting within wetland areas is squarely within the Corps' regulatory authority and, as such, the Corps must fully evaluate and disclose blasting impacts pursuant to the 404(b)(1) Guidelines. *Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F4th 297, 307 (D.C. Cir. 2023) ("If the agency's interpretation 'would contravene the plain text of its own regulations,' we reject it.").

The Corps' attempt to exclude wetland blasting as a regulated discharge on the grounds that the purpose is to excavate bedrock ignores logic and circumvents CWA Section 404 Guidelines. While not all discharges need permits, blasting in wetlands is not exempt. *See* 33 C.F.R. § 323.4 (listing exemptions). Nor has the Corps shown that blasting within wetlands is otherwise exempted as a regulatory activity. In *Stewart v. Potts*, a NEPA case, the court found that the Corps could not avoid evaluating the environmental impacts of forest fragmentation before filling the wetlands beneath the trees—no matter the agency's claims about the limits of its jurisdiction. 996 F. Supp. 668 (S.D. Tx. 1998). "To suggest that the Corps has no jurisdiction to consider the environmental impacts of the fragmentation of the forest, even though it has jurisdiction to consider the impacts of the wetlands which co-exist underneath those very trees, is asinine on its face[.]" *Id.* at 682–83. The circumstances here are parallel with respect to the CWA and applying the Guidelines to blasting. The Corps has not cited any other authority or offered a reasonable explanation for its exemption from evaluating those impacts. The Corps' attempt to escape regulatory authority is contrary to law.

Second, the Corps inaccurately described the wetlands subject to blasting. This leads to an underrepresentation of construction impacts without a full analysis, and the Corps cannot reasonably determine that there will be no significant impacts under the Guidelines. The CDD neatly lumps blasting impacts into 2.6 acres. AR000624–25. But this does not reflect how many separate wetlands will be blasted. The General Blasting Plan identifies only certain streams for blasting, not wetlands. The Wetland and Waterbody Crossing Table is the only part of the record that lists the individual wetlands Enbridge anticipates blasting, as well as wetlands "likely" to be blasted. AR001607–09. In total, it estimates approximately 100 wetland blasts. Almost 40 wetlands will experience blasting impacts exceeding 1,000 square feet. And some wetlands will be blasted in more than one location. For example, wetland wirb1007f will be blasted four times, and each blast will impact 1347, 4458, 1796, and 8807 square feet. *Id*. A visualization of those wetland crossings can be demonstrated in the Corps permit mapping. Wetland wirb1007f can be seen on the Corps permit map page 71, squarely within the Corps permitting outline. AR001564.

The Corps' consolidation of the individual wetland impacts into 2.6 acres without any evaluation of impacts to those individual wetlands is contrary to what the CWA and the Guidelines require. The court in *Environmental Defense. v. U.S. Army Corps of Engineers* rejected a similar manipulation by the Corps to minimize the appearance of project impacts. 515 F. Supp.2d 69 (D.D.C. 2007). The Corps concluded that a project would not have significant impacts, in part by relying on its own deliberate mischaracterization of impacts and mitigation. *Id.* at 83 (Agency cannot make reasonable conclusions on impacts to aquatic ecosystem when calculations underestimate habitat impacted). Similarly, the Corps here attempted to sweep the impacts of blasting on wetlands under the rug. The individual, secondary, and cumulative impacts cannot be ignored. Using the Corps' jurisdictional maps as an example, blasting will

occur in almost 100 wetlands identified between map pages 42–80. AR001535–73. Failure to identify and analyze impacts to these wetlands is contrary to the Guidelines' requirement to evaluate cumulative effects. 40 C.F.R. § 230.11(g).

Third, the Corps ignores the Band's concerns that blasting, as a construction method, could affect groundwater in the area. The Corps attempts to discharge any responsibility to look at impacts to groundwater aquifers by claiming that "[it] has no regulatory control over aquifer discharges." AR002044. However, blasting within wetlands is a regulated activity per Corps permitting regulations. *Supra* at 23–24. And blasting in wetlands can directly affect aquifers that feed into them or are otherwise part of the aquatic ecosystem. At the very least, aquifer discharges due to blasting are a secondary effect under the 404(b)(1) Guidelines. 40 C.F.R. § 230.11(h)(1).

The Corps' rationale and responses in the CDD are unreasonable and unsupported. The CDD briefly includes Enbridge's response, which the Corps describes as "voluntary." The response, however, fails to address the Band's concerns regarding blasting and aquifer breaches. Enbridge cites the Aquifer Analysis and HDD Design (App. 18), AR001639–2031, to argue that the Band ignored maximum construction depth. Appendix 18, however, is limited to geotechnical analysis for HDD boring, not aquifer breaches. HDD and blasting locations are not co-located. AR025078, 107 (Fig. 15), 111 (Fig. 19). Enbridge does not point to any analysis of the potential impacts of blasting on area aquifers.

The Corps does not provide any substantive answer to the Band's comments regarding blasting, either. The Corps claims that "[e]ffects on wetlands and wetland habitat, including from blasting are addressed in Section 6.5.2 of the final CDD," impacts to aquatic organisms are in Section 6.4.2 and 6.5.2, and the potential effects on waters and wetlands are in Section 6.3 and

6.4. AR002047, 64. But there is no mention of blasting in Section 6.3. *See* AR000615–19. Section 6.4 only mentions that there will be instream blasting in 17 streams without any disclosure or analysis of impacts. AR000621. Section 6.5.2 provides a cursory analysis of blasting on wetlands, but as mentioned above, it does not identify individual wetlands to be blasted, nor does it include any analysis of impacts. AR000623−25. The Corps also cannot rely on Enbridge's "voluntary" response as the Corps offers no analysis of Enbridge's answer. The court in *Atchafalaya Basinkeeper, Inc. v. Spellmon, et al.* recently rejected a Corps permit for a similar failure. No. 24-00381, 2026 WL 917509 (M.D. La. March 31, 2026). There, the court held that under the APA, the Corps had to respond to comments. *Id*. at *9. Further, the court reasoned that the Corps cannot just rubber-stamp applicant responses; it must conduct its own analysis. *Id*. The Corps' responses lack evidence showing it considered blasting impacts in its decision or in the record. It also cannot rely on its own 401(a)(2) analysis for 404(b)(1) Guidelines compliance, as the 401(a)(2) evaluation is limited to impacts on Reservation water quality. AR002102. The agency wholly failed to analyze the impacts of blasting on wetlands under the Guidelines.

The Corps attempts to bandage its omission by adding a permit condition requiring that Enbridge "provide site-specific blasting plans prior to any blasting activities within [Corps] permit areas…[to] consider the environmental/site-specific conditions that exist, as well as the methods, materials, and locations of all explosives to be used for blasting." AR000625. The permit condition, however, does not cure the Corps' failure to comply with the 404(b)(1) Guidelines. The Corps must evaluate impacts of blasting prior to making a permitting decision. 33 C.F.R. § 320.4 (generally outlining Corps permit application procedures where the Corps must determine whether permits will comply with Section 404(b)(1) Guidelines). In this

instance, the Corps avoids disclosing or analyzing the impacts of blasting in the CDD and instead pays lip service to the requirement by adding a permit condition. The Corps' decision to issue a permit without evaluating blasting impacts in wetlands is arbitrary and capricious, and its failure to evaluate blasting in wetlands under the Section 404(b)(1) Guidelines is contrary to law.

### B. The Corps Arbitrarily Limited the Review of HDD Impacts

The Corps erroneously fails to analyze the impacts of HDD construction on wetlands under the Section 404(b)(1) Guidelines. The Corps disclaims responsibility for assessing the impacts of HDD IRs on wetlands within the Project route. The Corps argues that its regulatory authority over HDD crossings is limited to the White River because it is a section 10 river under the Rivers and Harbors Act, 33 U.S.C. § 403, and that IRs are not a foreseeable action that the Corps is required to evaluate. The Corps misses the mark on both accounts.

First, the Corps is directly authorizing the temporary fill of 28.11 acres of emergent wetlands, 32.76 acres of forested wetlands, and 6.31 acres of scrub-shrub to facilitate pipeline construction, including HDD construction. AR000624. The Corps reports that 18.77 acres will have temporary discharges for access roads and HDD entry/exit locations. AR000645. Even though the Corps classifies this fill as temporary, these impacts must still be evaluated under the 404(b)(1) Guidelines, which do not distinguish between temporary or permanent fill. This evaluation must include secondary and cumulative effects. 40 C.F.R. § 230.11(g)–(h). Secondary effects are "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials." *Id*. § 230.11(h)(1). Even if the Corps claims it need not consider impacts of HDD construction, it must still evaluate secondary impacts of the temporary wetland fill required to facilitate HDD construction. *Atchafalaya Basinkeeper*, at *8 ("a permitting decision requires a determination of cumulative effects on the aquatic ecosystem"); see also *Fox Bay Partners v.*

*U.S. Corps of Engineers*, 831 F.Supp. 605, 609–610 (N.D. Ill. 1993) (upholding the Corps' permit denial based in part on the Corps' evaluation of secondary and cumulative effects).

Second, the Corps cannot selectively ignore the impacts that IRs will have on wetlands near or adjacent to HDD construction. Without explanation, the Corps simply states IRs are not foreseeable. AR002045–46. The Corps also states that it would regulate IRs if they meet the criteria as a discharge of fill material. AR002045; AR000617. However, the Corps does not need to regulate IRs to examine the impacts that the IRs will have as a secondary effect under the 404(b)(1) Guidelines. As noted above, regulatory responsibility is associated with the temporary fill of wetlands to facilitate HDD construction.

The Band commented that IRs from HDD construction are very common. AR004958, 83 (Fig. 11); AR024647−48; AR025097−99. During construction of Enbridge's Line 3 pipeline, there were 28 IRs over the course of construction. AR026308. Even WDNR included the likelihood of IRs in the state WQC: "It is likely that the Project will experience an [IR] during one or more of the proposed trenchless installations." AR002444. The Corps' evaluation of IRs on wetlands surrounding or adjacent to HDD construction sites is especially important, given that at least 6.24 acres of temporary fill are directly associated with HDD entry/exit locations. AR000645. This means that if an IR were to occur at these locations, it would severely impact those 6.24 acres.

The Corps' response to the Band's comments is not reasonable. The Corps simply responds that Enbridge modified HDD designs to reduce the risk of an IR. AR002034–35. However, the Corps does not disclose whether it reviewed or approved Enbridge's HDD designs, nor does it analyze HDD impacts to wetlands under the Guidelines. Its only HDD review is in

the 401(a)(2) evaluation, which only assesses impact on the Band's WQS, not wetlands under the 404(b)(1) Guidelines.

### C. The Corps Failed to Consider All Project Impacts in Making Factual Determinations Under the Guidelines

The Corps failed to make reasonable or accurate factual determinations under several sections of the 404(b)(1) Guidelines. The factual determinations are essential reviews that the Corps must conduct to comply with the 404(b)(1) Guidelines. Accurate determinations can lead to the conclusion that a project will significantly harm human health, aquatic life, ecosystems, or recreational and economic values, precluding the issuance of a permit. 40 C.F.R. § 230.10(c). If there are significant impacts to any of those categories, the Corps cannot issue a permit. *Id.*

In the CDD, the Corps lists the factual determination topics in Sections 6.3 through 6.6. However, the Corps only evaluates certain subcategories of those explicitly required in the 404(b)(1) Guidelines. Although the Guidelines allow some flexibility of factual evaluations, the Corps does not explain why it limited its analysis under the Guidelines. 40 C.F.R. § 230.12(b). Even if the Corps limited its analysis, there would still need to be sufficient information to support its decision. *Id.* § 230.6. The Band submitted robust comments to the Corps on several factual determination topics. *See generally* AR024637–64; *see generally* Tillison Decl. ¶ 13. In addition to the large failure to evaluate basting and HDD impacts, the Corps did not evaluate impacts to wetland substrate, area hydrology, or wildlife. The Corps offers no reasonable explanation for why it declined to evaluate impacts required under the regulatory Guidelines and its determination is arbitrary and capricious.

#### *1. The Project will have significant effects on wetland substrate.*

The Corps failed to fully account for or evaluate "the nature and degree of effect that the proposed discharge will have, individually and cumulatively, on the characteristics of the

substrate at the proposed disposal site." 40 C.F.R. § 230.11(a). Per the Guidelines, impacts to substrate may result in changes to "the complex physical, chemical, and biological characteristics of the substrate," and "[e]rosion, slumping, or lateral displacement of surrounding bottom of such deposits can adversely affect areas of the substrate outside the perimeters of the disposal site by changing or destroying habitat." *Id.* §230.20(b). The location, method, and timing of discharges influence the degree and impact on the substrate. *Id.*

The Band submitted comments and evidence that construction matting has significant, long-lasting impacts on wetland substrate. The Band alerted to the severe impacts that Enbridge's construction matting has had on Reservation wetlands in the last two years. AR024646; AR026165; AR027043–44. Enbridge has been constructing a "check valve" as a mitigative measure for the current operation of Line 5 through the Reservation. AR005530–31; 5540–47, 5552–68, 5583–5610; Tillison Decl. ¶ 5. Enbridge used "temporary" construction matting to facilitate the use of heavy construction equipment. The use of "temporary" construction matting, even in a small area, had significant impacts on wetlands extending beyond the physical footprint of the mat. AR005529–30, 84. Matting was left in place longer than initially proposed, and it compacted wet soils to the point where another layer of matting was necessary. AR005555. The Band presented evidence that the compacted soils facilitated water and silt runoff, degraded water quality in nearby wetlands, and violated the Band's WQS. AR003399–3403. The Band noted the Project proposes to use the same matting as part of construction in and around wetlands, which are ecologically similar to those in and around the check valve project. AR003399.

The Corps sidestepped the Band's concerns and provided no reason for failure to evaluate the Project's effects on wetland substrate. In response, the Corps simply acknowledged the

proposed temporary discharges include construction access/workspace matting and that "[e]xtended heavy equipment travel on matting can cause soil compaction within the mat footprint, changing the soil substrate properties." AR000615. This modest acknowledgment does not meet the Guidelines' requirements. The Corps does not evaluate the adverse effects of matting within the same region, using the same construction method, on a project owned and operated by the same company. The Corps' failure to evaluate the impacts of matting over time is alarming because timber mats may remain in place for "several months." AR000623. The Corps also fails to evaluate the impact prolonged matting use would have on wetland substrate and on areas outside of the matting, as directed in the Guidelines. 40 C.F.R. §230.20(b).

Similarly, the Corps fails to evaluate the impacts that blasting as a construction method will have on wetland substrate. Blasting within wetlands will directly affect "the surface of wetlands." *Id*. §230.20(a). Because the Corps erroneously neglected to identify or evaluate any impacts that blasting will have on wetlands, it cannot make a determination of what effects blasting will have on wetland substrate.

Despite the significant evidence the Band submitted of how construction matting affects wetland substrate and failure to evaluate blasting impacts, the Corps still concluded that "construction related effects on substrate would be minor in the short term and long term." AR000616. This determination lacks any support in the Corps' CDD or the record.

*2. The Corps failed to evaluate changes to water circulation.*

The Corps' analysis of Project impacts on aquifers is incomplete and does not address the Band's concerns that blasting may alter bedrock, breach aquifers, or affect groundwater. The Guidelines require factual determinations about water circulation to consider "the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime." 40 C.F.R. § 230.11(b). This framework reflects the Band's concerns

about Project impacts on aquifers. While the Corps mentions potential impacts from HDD construction, its evaluation is limited "to the intake of a municipal or private water supply system." *Id.* § 230.50(a); AR000626–27. Based on this limited scope of review, the Corps determines in the CDD that the "proposed construction activities are not anticipated to affect private and municipal water supplies." AR000627. By limiting the analysis of potential aquifers to private and municipal water supplies, the Corps fails to evaluate whether, and how, aquifer breaches may impact the water circulation and fluctuation of the aquatic ecosystem through changes in "current patterns, circulation including downstream flows, and normal water fluctuation." 40 C.F.R. § 230.11(b).

The Corps determined that effects on current water patterns and circulation "would be minor, short-term, and fully restored upon completion of the crossings." AR000618. The Corps also determined that effects on normal water-level fluctuations would be minor and short-term. AR000619. Neither of those determinations considers aquifer breaching at all. To the extent the Corps does consider aquifer breaching as an impact affecting private and municipal water supplies, it limits its consideration to impacts from boring as part of HDD construction and sheet piling as part of trenching. AR000627. The Corps does not contend with the Band's concerns that blasting may cause aquifer breaching in the CDD or in the record.

The Corps stated that it "requested information on geotechnical and hydrotechnical evaluations along the proposed WI L5R project route to identify potential risks to aquifers due to construction activities." AR000626. The Corps neither identified extra information from Enbridge nor provided an evaluation of it. It also did not explain why additional info beyond Appendix 18 was unnecessary. The final CDD Appendix 18 is identical to that in the DCDD.

3. *The Corps did not evaluate any impacts to state threatened and endangered species.*

The Corps also abandoned the requirement under the 404(b)(1) Guidelines to consider impacts to threatened and endangered species. 40 C.F.R. § 230.30. The Corps' explanation in the CDD is limited to its consultation with federal agencies under the federal Endangered Species Act. AR000619–20. The Guidelines, however, explicitly include listings of threatened and endangered species and critical habitats maintained by states. 40 C.F.R. § 230.30(a). The Band submitted extensive comments documenting the presence of state-listed threatened and endangered species within the proposed pipeline corridor. AR024653; AR027196–98. This includes the very rare Braun's Holly Fern, a threatened wetland plant species that is very sensitive to changes in hydrology and which was documented directly within the pipeline corridor. AR068894; AR069196; AR069208. The Band flagged this species for the Corps because it can be affected by changes in hydrology, and to demonstrate that Enbridge's initial reviews failed to identify individual species within the corridor. MNRD staff and contractors identified the individual Braun's Holly Fern that was missed within a spatially- and time-limited site visit. *Id*. At the heart of the Band's concern is that more threatened and endangered species could be within the pipeline corridor that were not previously identified. Rather than contend with this concern, the Corps completely ignored any state-listed species.

The Corps failed to comply with the 404(b)(1) Guidelines because it fully failed to evaluate the impacts from blasting and HDD on wetlands. It also did not evaluate Project impacts under each required factual determination. The Band committed substantial resources to alert the Corps to these deficiencies. *See* Tillison Decl. ¶ 13. The Corps failed to grapple with the information submitted or offer a reasonable explanation for why it did not need to consider it. These shortfalls amounts to a manipulation of the factual determinations in the CDD, which state

that the Project will have only minor effects on the aquatic ecosystem. However, the 404(b)(1) Guidelines are clear about the impacts the Corps must consider. Falling far short of a full evaluation, the Corps' failure to respond to the Band's significant comments, the conclusion that the Project will only have minor impacts and the determination that the Corps complied with the Section 404(b)(1) Guidelines are arbitrary, capricious, and contrary to law.

## III. THE CORPS VIOLATED THE CLEAN WATER ACT BY FAILING TO ENSURE THE PROJECT COMPLIED WITH THE BAND'S ON-RESERVATION WATER QUALITY STANDARDS

The Corps failed to identify all of the Project's effects on the Band's waters and arbitrarily ignored evidence demonstrating likely violations. The Band determined that Enbridge's planned discharges to more than 500 wetlands and 57 waterways located upstream of the Band's Reservation will cause or contribute to violations of its WQS. AR006741–43. At a two-day hearing, the Band, Enbridge, EPA, and the public offered testimony and evidence regarding the Project's impact on waters, wetlands, and water quality. AR000651–52. Hearing transcripts and written evidence raise dozens of factual and technical issues over thousands of pages. In its cursory nine-page Decision Memo, the Corps found that the Band did not demonstrate the Project's discharges would violate WQS, and no extra permit conditions are needed for compliance. AR002107.

The Decision Memo ignores the Band's unrebutted evidence that Enbridge grossly underestimated wetlands, waterways, and hydrologic connectivity between the Project area and the Reservation and dismisses the Band's on-the-ground experience with prior Enbridge projects. The Corps relies entirely upon Wisconsin's WQC, even though Wisconsin did not consider impacts to the Band's waters and some of the Band's requirements are more stringent. The Corps' decision that the Project will not violate the Band's standards is arbitrary and capricious and must be overturned.

### A. The Corps Failed to Consider Relevant Evidence and Failed to Provide a Reasoned Explanation for Its Decision

The Corps ignored the Band's evidence that undercuts the agency's judgment, without adequate explanation, focusing instead on evidence in its favor. *See Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003) (holding the agency could not rely on a "clipped view of the record" to support its conclusion). This Court must ensure that the Corps examined the relevant data and adequately considered the issues raised by the parties, including "evidence contradicting its position." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (quoting *Butte Cty., Cal. v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010)); *see also State Farm*, 463 U.S. at 43. Where the Corps offers conclusory explanations for a factual dispute with conflicting evidence and fails to "articulate a satisfactory explanation" for its decision, its action is arbitrary and capricious. *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).

The Corps, in its nine-page memo, purports to address all the issues related to the Project's impacts to the Band's waters. AR002099–107. The Corps defers to EPA's Evaluation and Recommendation (EPA report), conducting little independent analysis. AR006739–6774. The EPA report was submitted prior to the hearing, and EPA did not supplement that report with any evidence or testimony presented at or after the hearing. AR006746. Recognizing this, EPA recommended that the Corps seek an updated technical review and evaluation incorporating the additional information before making a final decision. *Id.* The Corps did not, nor did it explain its reasons for ignoring EPA's recommendation. AR006743; AR006746. AR000639–40.

The Corps may not rely on portions of the record that support its position while ignoring those that do not. *Butte Cnty.*, 613 F.3d at 194–95; *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1140 (D.C. Cir. 2000) ("[E]vidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account."). Because the Corps failed to

analyze and resolve evidence contradicting its determination of no effect on the Band's WQS, its final action is arbitrary and capricious. *See Int'l Union, United Mine Workers of Am. v. MSHA*, 626 F.3d 84, 94 (D.C. Cir. 2010) (agency's failure to "resolve…objections…is fatal to its [decision]"); *Comcast Corp. v. FCC*, 579 F.3d 1, 7–8 (D.C. Cir. 2009).

*1. The Corps failed to identify all affected waterways and Project impacts.*

The Corps' decision memo and EPA's report do nothing to address the Band's unrebutted evidence that Enbridge does not identify all waterways and wetlands affected by the Project. Nor do they address the Band's assertions, based on its own regional knowledge, experience, and data, showing that Enbridge underestimated and misidentified wetlands, waterways, and hydrologic connectivity in its permit application. *See, e.g.,* AR080595–80617; AR071245–47; AR067664–81; AR067313–18; AR027203–30; AR027673–84. The Corps and EPA also ignore the Band's position that, because Enbridge and the agencies do not describe construction methods and impact locations with the requisite detail, "determining the full extent of Project impacts is impossible." AR024628–30; AR009167.

Due to the Corps' ongoing failure to fully identify affected wetlands and waterways, the Band submitted a report (GLIFWC report) that more accurately identifies them in areas south and east of the Reservation. *See* AR003991–4076. The GLIFWC report showed Enbridge greatly underestimated wetlands, streams, and the hydrologic connectivity of the Project area and the Reservation. AR003997–4000. The Band's experts testified that underestimation of the connectivity resulted in underestimation of the contaminants that would flow to the Reservation, AR006247–53; AR006528–6654.

Enbridge did not attempt to rebut the GLIFWC report; instead, it asked the Corps not to consider it. AR002870. In its Decision Memo, CDD App. 21, the Corps does not analyze the impact of GLIFWC's report, mentioning it only once in the context of mercury pollution to claim

that "it does not demonstrate discharges would result in violation of the Band's water quality requirements." AR002101. This conclusory statement does not explain why the Corps ignored the Band's repeated assertions that Enbridge underestimated the waters and wetlands in the Project area, information essential to determining the violations of the Band's standards. AR009098, 167; AR003372. The Corps cannot decline to provide information requested by the Band, ignore the Band's evidence supporting its assertions, then dismiss the Band's evidence of the Project's water-quality impacts as not specific enough. At minimum, the Corps did not meet its obligation to explain why it did not consider the Band's underestimation concern. *See Genuine Parts Co.*, 890 F.3d at 312, *Butte County*, 613 F.3d at 194.

The Band also submitted evidence of artesian conditions—areas with pressurized groundwaters. *See* AR004945, 51–52, 60, 63, 84, 90. If artesian wells or aquifers are punctured during construction, as occurred on Enbridge's Line 3 project, it can cause increased or uncontrolled flow of groundwater, increased stream flow rates and increases in erosion, all of which can affect the Band's downstream waters. AR006208, 6211, 6274. Enbridge stated the Project is unlikely to encounter artesian conditions, but the Band showed artesian conditions are likely, particularly in areas where Enbridge anticipates blasting. AR003024–26, 32, 34; AR006208, 11–13; AR003113; AR004952, 68; AR006279, 81. The Corps' decision does not mention artesian conditions and provides neither analysis nor resolution. AR002594, 599, 602.

The Corps failed to articulate a reasoned analysis of whether IRs from HDD will violate the Band's WQS. AR002104–05. Enbridge claimed that IRs are unlikely to occur and will not affect the Band's waters. But Enbridge's conclusions were based on inaccurate calculations, and the Band submitted its own evidence that IRs are both foreseeable and likely to violate water quality requirements in certain conditions. AR006261–66, 325; AR005396–419. The Corps was

aware of the importance and centrality of this issue, AR002592, 600, 602, 605, 607, but concludes, without analyzing the evidence, that IRs are not foreseeable and the Band did not demonstrate that discharges would violate its water quality requirements. AR002105.

The Band presented evidence that subsurface impacts, including from trenching and blasting, would affect groundwater quality and change flows in ways that would violate the Band's WQS. AR004940–41, 48–52, 67–68. Enbridge stated there would be no impacts to groundwater or bedrock from trenching or blasting. AR006209, 13. Again, the Corps did not substantively resolve the issue, stating only that the Band failed to support its assertion that the Project would affect its waters. AR002102. When an agency offers conclusory explanations where there is evidence in conflict, it fails to "articulate a satisfactory explanation" for its decision, and its action is arbitrary and capricious. *Tourus Records*, 259 F.3d at 737.

*2. The Corps improperly relied on Wisconsin's WQC to protect the Band's waters.*

The Corps determined Wisconsin's WQC is sufficient to protect the Band's on-Reservation waters and that no additional permit requirements were necessary. AR000665; AR002107. But the Corps did not consider the Band's more stringent water-quality requirements and dismissed the Band's case studies showing how best management practices (BMPs) regularly fail to protect water quality. AR002101, 2103, 2105–06.

The Band has created stringent WQS to reverse decades of degradation of the Band's waterways, largely caused by off-reservation activities. AR006239–40; AR006247–51; Arbuckle Decl. ¶¶ 2, 12, 13, 26. The Band's standards aim to maintain and restore water quality to support designated uses for future generations and to address problems such as high levels of mercury in fish. AR003725; AR006033–178. The Band cannot, and need not, rely on Wisconsin to protect its waters. *See City of Albuquerque v. Browner*, 97 F.3d 415 (10th Cir. 1996) (tribes may

establish WQS more stringent than federal standards, including ceremonial use standard); *see also Wisconsin v. EPA*, 266 F.3d 741, 745 (7th Cir. 2001) (Tribe's authority to develop WQS upheld despite state's concern that the tribal water standards might limit upstream mining.).

Some of the Band's designated uses, such as cultural uses, do not have an equivalent in Wisconsin's WQS. *See* AR003728. The Band's antidegradation policy does not permit any lowering of water quality in Outstanding Tribal Resource Waters, even temporarily, because of their importance to unique tribal traditional uses. *See* AR003731–36. And the Band's mercury standard is more stringent than Wisconsin's, due to high rates of fish consumption. AR006298; AR006309–13; AR006059–61, 65–66. The Corps did not address any of the Band's individual standards in its decision despite the substantial evidence the Band provided. AR009176–87. EPA's Report at least listed the Band's WQS, but instead of engaging with the substance of the standards or considering specific waterbodies, it merely lists conditions. This is neither an evaluation nor an explanation. AR006739−74.

Sedimentation is the most widespread nonpoint source pollution challenge in the Lake Superior Basin. AR005044. The waterways flowing into the Reservation and moving into Lake Superior are heavily sedimented. *Id*. Enbridge's experts characterize this sedimentation as "natural," but the Band's experts argue the region's high rates of sedimentation results from deforestation, agriculture, hydrologic changes, and other man-made conditions, similar to this Project. AR003100; AR006228, 31; AR006315−17, AR006319. The experts did not agree on whether BMPs would reduce erosion, sedimentation, and runoff enough to avoid causing or contributing to the lowering of the Band's water quality.

The Band provided evidence showing persistent failures of BMPs. It highlighted increased sediment, erosion, and runoff from deforestation; soil compaction from machinery and

timber mats; and impacts such as plant displacement and spread of invasive species after project completion, even when BMPs worked as intended. AR006282–301; AR006461–91; AR006506–26; AR005446. With no analysis, the Corps concluded there would be no impacts to the Band's waters, again failing to articulate its reasoning. AR002099–127; AR006739–774.

*3. The Corps failed to address the Band's concerns about specific waterways.*

The Corps' decision also completely ignores, without explanation, the Band's analysis of impacts to specific waterways and sub-basins. Each waterway or crossing's unique conditions must be identified and considered to properly evaluate the Project's impacts to the Band's waters. AR006262; AR006324; AR005500–610. For example, Tyler Forks River, on the east side of the Reservation, has less-disturbed wetlands and is currently protected by tribal land practices and upstream forest (Iron County Forest land). AR005465–72. And the Marengo River in the southwest corner of the Reservation is heavily impacted by human land practices. AR005465, AR005476. Both watersheds support culturally and ecologically important cold-water fisheries. These environments are key to the life cycles of both resident (walleye, lake sturgeon) and migratory (trout, salmon) fish. AR005502, AR006453, AR006242–45.

Tyler Forks is one of four main tributaries to the Bad River, sustaining a 62.4-square-mile watershed upstream of the southeast edge of the Reservation. AR006434, AR006626. The Tyler Forks area is frequently used by Band members for cultural and subsistence practices, including fishing, off- and on-Reservation. Stone Decl. ¶¶ 7–8, 11–13; Roundwind Decl. ¶ 5; Connors Decl. ¶ 3, AR006086; AR006243. The Band designated the on-Reservation portions as an Outstanding Resource Water supporting a robust fishery. AR003631. Wetlands cover 37.1% of the watershed between the Project ROW and the Reservation boundary, more than any other Bad River tributary watershed. AR006564, AR003994, 998, 4005, 06, 09; AR004048–53, AR004060–61. All experts agree that the Bad River watershed is impaired by mercury.

AR006492, 551, 609. Tyler Forks has the highest methylmercury concentration in the Bad River watershed due to naturally occurring anaerobic conditions in wetland soils, creating ideal conditions for methylation. AR004283; AR006555; AR006310.

Because wetland soils concentrate mercury and methylmercury, disturbances in the wetland-rich Tyler Forks sub-basin pose a major concern for mobilizing these toxic substances. AR006609; AR006309–6313. Blasting, trenching, and other Project activities are likely to cause sedimentation that exceeds the EPA-approved 5 NTU WQS and increase mercury and methylmercury in tribal waters. AR006645; AR006492; AR005517–19. Ten blasting areas are planned within Tyler Forks, cumulatively impacting over 19,000 square feet of the watershed. AR000504; AR036295. Blasting also risks unintended wetland dewatering, compounding the threat that the degree of dewatering needed for the Project is already impossible to achieve without causing dewatering outside the Project area. AR006610; AR006283–84; AR006465. Access roads will create additional disturbance. AR006464.

The Marengo River enters the Reservation on the southwest side and hugs the southern boundary. AR005513. Before entering the Reservation, the Marengo travels through an area heavily impacted by agriculture and deforestation, impairing water quality and affecting designated uses. AR006257. Multiple high-risk stream segments exist in that area, with slopes greater than 50%, resulting in excessive peak flows that cause erosion and sedimentation, degrading aquatic habitat and water quality. AR005512–13; AR006657–58. The Marengo is the largest contributor of sediment to the Bad River, which, in turn, is the largest contributor of sediment to Lake Superior. AR006315

The Project will travel under the Marengo River via direct bore, and several of its tributaries, including Brunsweiler River, Billy Creek, Trout Brook, and Silver Creek, will be

crossed via HDD. AR005390, 97, 400–03. The HDD proposed across Silver Creek is described as "significant" and "challenging." AR001924. The Project is highly likely to breach the Band's WQS in the southwest corner of the Reservation, as all Marengo River tributaries are expected to experience sediment increases due to the proposed activities. AR006317; AR005520–21. This area is also where the Project is nearest to the Reservation boundary. AR006262.

These are just two of the dozens of waterbodies the Project will cross upstream of the Reservation and affect the Band's downstream waters. As a whole, and on a waterbody-specific basis, the Project simply cannot comply with the Band's WQS. The Band's analysis was thorough, considering uncertainties and data gaps related to baseline conditions and Project effects. The Corps' decision to the contrary was arbitrary and capricious, selectively ignoring evidence and failing to explain its conclusions.

## IV. THE PERMIT DECISIONS SHOULD BE VACATED

Vacatur is the "normal remedy" for unlawful agency action. *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 382 (D.C. Cir. 2026) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); 5 U.S.C. § 706(2) (reviewing court "shall . . . set aside" unlawful agency action). *See also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460–66 (2024) (Kavanaugh, J., concurring) (detailing the validity and benefits of the vacatur remedy). Where an agency has entirely failed to consider an important aspect of the problem or offered an explanation that runs counter to the evidence, "the court must vacate [its] decision." *SecurityPoint Holdings v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017) (citing *State Farm*, 463 U.S. at 43). Remand without vacatur is considered an "exceptional remedy" and is appropriate only under narrow circumstances not applicable here. *Zeldin*, 171 F.4th at 382 (quoting *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518–19 (D.C. Cir. 2020)).

The D.C. Circuit Court has stated that whether remand without vacatur is warranted depends upon "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). The second factor weighs heavily only where "the agency may be able to rehabilitate its rationale." *Zeldin*, 171 F.4th at 382 (quoting *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021)). Both factors counsel towards vacatur in this case.

Here, the Corps' permitting decision contains deficiencies that cast serious doubt as to whether the agency acted correctly. *See supra* § I–III. The Corps failed to comply with the CWA's substantive requirements that it evaluate Project impacts on the aquatic ecosystem, and it failed to reasonably explain its determination that the Project would not impact the Band's Reservation waters. The Corps also failed to respond to comments or offer a reasonable explanation for its failure to do so as part of its NEPA analysis. These failures render the Corps' permitting decision arbitrary and capricious. *See Comcast Corp.*, 579 F.3d at *8; *Zeldin*, 171 F.4th at 383 (D.C. Cir. 2026) (vacating where agency "cannot sufficiently explain its actions on remand" as it was based on a "flawed…analysis and inaccurate assumptions").

Likewise, vacatur is unlikely to cause undue disruptive consequences. Project construction has not begun in earnest. And because the Corps is unlikely to rehabilitate its rationale, this factor does not weigh heavily. *Zeldin*, 171 F.4th at 382. The Corps failed wholesale to evaluate the Project's environmental impacts and must conduct those evaluations before it can determine whether it can issue a permit. The D.C. Circuit has found vacatur appropriate where the court was "far from certain" that the agency had acted correctly, and remanding without it "would give the…incentive to allow 'build[ing] first and conduct[ing] comprehensive reviews

later.' [The court] certainly do[es] not wish to encourage such an approach." *Env't Def. Fund,* 2 F.4th at 976 (quoting *Standing Rock Sioux,* 985 F.3d at 1052). Further, this Court has vacated agency action, even when vacatur would cause some disruption, where the agency acted unlawfully. *See id.*; *Ctr. for Biological Diversity v. Regan*, 734 F.Supp.3d 1 (D.D.C. 2024) ("[S]etting aside unlawful agency action almost always results in some disruption."). Even if vacatur would cause some disruption in this case, the Court should nevertheless vacate here given the agency's failure to follow the law.

Because the Corps here violated the Clean Water Act and the APA, this court need not decide whether vacatur is required under NEPA in isolation. *See, e.g.*, *Washington Area Bicyclist Ass'n v. Burgum*, 2026 WL 1078218, at *2, *31 (D.D.C. Apr. 21, 2026) (vacating agency action because APA "is clear" that vacatur is proper remedy where agency acted arbitrarily and capriciously, including in its application of NEPA). Here, that analysis requires vacatur. *See supra* § II–III.

## V. CONCLUSION

For the foregoing reasons, the Band respectfully requests that the Court grant its motion for summary judgment and vacate and remand the Corps' Section 401 and 404 decisions. The Band also requests any and all other relief as appropriate.

Respectfully submitted this 11th day of June 2026.

*/s/Stefanie Tsosie*
Stefanie Tsosie*
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, WA 98104
Phone: (206) 343-7340
Fax: (720) 550-5757 or
7205505757@egoldfax.com

E-mail: stsosie@earthjustice.org

Gussie Lord (DC Bar No. 1009826)
Joseph V. Langkilde III (DC Bar No. 90006198)
EARTHJUSTICE
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
Phone: (202) 667-4500
Fax: (720) 550-5757 or
7205505757@egoldfax.com
E-mail: glord@earthjustice.org
jlangkilde@earthjustice.org

Christopher Meyer (NY State Bar No. 6015028)
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
Phone: (212) 845-7376
Fax: (720) 550-5757 or
7205505757@egoldfax.com
E-mail: cmeyer@earthjustice.org

**Admitted Pro Hac Vice*