**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BAD RIVER BAND OF LAKE SUPERIOR CHIPPEWA INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>Defendant,<br><br>and<br><br>ENBRIDGE ENERGY, LIMITED PARTNERSHIP,<br><br>Defendant-Intervenor. | ) | Case No. 1:26-cv-01171-TNM |

**DEFENDANT-INTERVENOR ENBRIDGE ENERGY, LIMITED PARTNERSHIP'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 3

I. Enbridge's Line 5 Wisconsin Segment Relocation Project ........................................ 3

II. The Project's Permitting & Environmental Reviews ............................................... 4

  A. WDNR's Permitting & Approvals Process ........................................................... 5

  B. The Corps' Permitting Process ............................................................................. 7

STANDARD OF REVIEW ........................................................................................ 10

ARGUMENT ........................................................................................................... 10

I. The Corps complied with NEPA and adequately considered the environmental impacts of the discharges authorized by the Permit ............................................................ 10

  A. The Corps took a hard look at the impact from the authorized discharges on tribal access to ceded territory. ......................................................................... 12

  B. NEPA does not require the Corps to consider operational spill impacts. ............. 15

  C. The Corps' analysis of the Project's blasting impacts complied with NEPA ....... 19

  D. The Corps was not required to consider environmental justice concerns. ............ 21

II. The Corps met its obligations under CWA Section 404 when issuing the permit. .......... 22

  A. The Corps fully analyzed potential impacts from the authorized discharges within its jurisdiction. ......................................................................................... 25

    1. The Project's blasting activities do not result in regulated discharges subject to the Corps' CWA jurisdiction. ................................................................. 25

    2. The Corps appropriately evaluated impacts from HDD in Section 10 waters. .......................................................................................................... 28

  B. The Corps made all relevant determinations required by the Guidelines. ............ 30

III. The Corps complied with CWA Section 401(a)(2) in concluding that the Band failed to demonstrate that the authorized discharges will violate the Band's water quality standards. ............................................................................................................ 32

  A. The Corps identified and discussed all affected resources and relevant impacts from the discharges authorized by the Permit ....................................................... 36

  B. The Corps appropriately incorporated Wisconsin's WQC conditions into its Permit. ........................................................................................................... 40

  C. The Corps had no obligation to assess specific waterways. ................................ 42

IV. If the Court finds in the Band's favor, any remedy must be narrowly tailored. ............... 44

CONCLUSION ......................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaacon Auto Transp., Inc. v. ICC*,
792 F.2d 1156 (D.C. Cir. 1986) ........................................................................22

*Adya LLC v. DEA*,
2026 WL 797339 (D.D.C. Mar. 23, 2026)..........................................................42

*Atchafalaya Basinkeeper, Inc. v. Spellmon*,
2026 WL 917509 (M.D. La. Mar. 31, 2026) .......................................................27

*Bad River Band of Lake Super. Chippewa Indians v. Wis. Dep't of Nat. Res.*,
Case Nos. 2026CV000008, Dkt. No. 192
(Wis. Cir. Ct. Iron Cnty. May 15, 2026)..............................................................15

*Bad River Band of Lake Super. Chippewa Indians v. Wis. Dep't of Nat. Res.*,
Case Nos. 2026CV000008, 10 (Wis. Cir. Ct. Iron Cnty.) ...................................6, 7

*Bad River Band of Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.*,
2023 WL 4043961 (W.D. Wis. June 16, 2023) ..................................................1, 45

*Bad River Band of the Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.*,
2026 WL 560028 (W.D. Wis. Feb. 27, 2026)..........................................................1

*Bad River Band of Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co.*,
Nos. 23-2309 & 23-2467 (7th Cir. July 30, 2026)...............................................1, 45

*City of Shoreacres v. Waterworth*,
420 F.3d 440 (5th Cir. 2005) ..............................................................................25

*Colo. River Cutthroat Trout v. Salazar*,
898 F. Supp. 2d 191 (D.D.C. 2012).....................................................................18

*County of San Diego v. Babbitt*,
847 F. Supp. 768 (S.D. Cal. 1994).......................................................................18

*Covad Commc'ns Co. v. FCC*,
450 F.3d 528 (D.C. Cir. 2006).............................................................................27

*Ctr. for Biological Diversity v. FAA*,
804 F. Supp. 3d 86 (D.D.C. 2025).......................................................................21

*Ctr. for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023)....................21

*Ctr. for Biological Diversity v. USFS*,
2025 WL 3268655 (D. Mont. Nov. 24, 2025)....................18

*Del. Riverkeeper Net. v. FERC*,
748 F. App'x 346 (D.C. Cir. 2018)....................20, 21

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004)....................12, 13, 15

*Enbridge Energy Co., Inc. v. Bad River Band of the Lake Sup. Tribe of Chippewa Indians*,
No. 23-2309 (7th Cir. Oct. 11, 2023)....................2, 3, 4

* *Enbridge Energy, LP v. Whitmer*,
813 F. Supp. 3d 777 (W.D. Mich. 2025)....................16, 45

*Environmental Defense v. U.S. Army Corps of Eng'rs*,
515 F. Supp. 2d. 69 (D.D.C. 2007)....................26, 27

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................10, 33

* *Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)....................44

*Ga. River Net. v. U.S. Army Corps of Eng'rs*,
2012 WL 930325 (S.D. Ga. Mar. 19, 2012)....................36, 37

*State of Idaho ex. rel. Idaho Pub. Utils. Comm'n v. ICC*,
35 F.3d 585 (D.C. Cir. 1994)....................18, 21

*Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*,
2023 WL 6226387 (S.D. Tex. July 27, 2023)....................16

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)....................33

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010)....................10, 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................44

*Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs*,
2014 WL 5307850 (S.D. Ala. Oct. 16, 2014)....................29, 44

*Nat. Res. Def. Council v. Hughes*,
437 F. Supp. 981 (D.D.C. 1977) ........................................................................22

*Nat'l Comm. for the New River v. FERC*,
373 F.3d 1323 (D.C. Cir. 2004) ........................................................................28

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001) ........................................................................21

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
753 F. Supp. 2d 103 (D.D.C. 2010) ........................................................................40

*Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*,
931 F. Supp. 1515 (W.D. Wash. 1996) ........................................................................13, 15

*Oceana, Inc. v. Ross*,
920 F.3d 855 (D.C. Cir. 2019) ........................................................................10

* *Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ........................................................................11, 19, 25

* *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
636 F. Supp. 3d 33 (D.D.C. 2022) ........................................................................14, 16

*River Road Alliance, Inc. v. U.S. Army Corps of Engineers*,
764 F.2d 445 (7th Cir. 1985) ........................................................................27, 28

*Sagarwala v. Cissna*,
387 F. Supp.3d 56 (D.D.C. 2019) ........................................................................44

* *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ........................................................................ *passim*

*Sierra Club v. FERC*,
97 F.4th 16 (D.C. Cir. 2024) ........................................................................41

*Solenex, LLC v. Haaland*,
626 F. Supp. 3d 110 (D.D.C. 2022) ........................................................................14

*Sovereign Iñupiat for a Living Arctic v. BLM*,
555 F. Supp. 3d 739 (D. Alaska 2021) ........................................................................36

*Stand Up for California! v. U.S. Dep't of the Interior*,
204 F. Supp. 3d 212 (D.D.C. 2016) ........................................................................14

* *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ........................................................................13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d. 1032 (D.C. Cir. 2021) .......... 13

*Stewart v. Potts*,
996 F. Supp. 668 (S.D. Tex. 1998) .......... 25, 26

*Stone v. U.S. Dep't of State*,
2026 WL 861064 (D.D.C. Mar. 30, 2026) .......... 10

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) .......... 13

*Tourus Records, Inc. v. DEA*,
259 F.3d 731 (D.C. Cir. 2001) .......... 36

*Town of Norfolk v. U.S. Army Corps of Eng'rs*,
968 F.2d 1438 (1st Cir. 1992) .......... 30, 32

*Van Hollen, Jr. v. Fed. Election Comm'n*,
811 F.3d 486 (D.C. Cir. 2016) .......... 36, 39

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 12

* *Wendling Quarries, Inc. v. U.S. Army Corps of Eng'rs*,
2017 WL 8678693 (S.D. Iowa Nov. 30, 2017) .......... 19, 29, 38, 39

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
222 F.3d 1105 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) .......... 11

**Statutes**

5 U.S.C. § 706(2)(A) .......... 10

33 U.S.C. § 1341(a)(2) .......... 32, 33, 41

33 U.S.C. § 1344(d) .......... 17, 41

42 U.S.C. § 4321, *et seq.* .......... 21

Wis. Stat. § 943.143 .......... 15

Wis. Stat. § 943.143(2) .......... 5, 15

**Other Authorities**

33 C.F.R. Part 325, App. B .......... 11, 21

33 C.F.R. § 323.2(e).....29

33 C.F.R. § 325.2(b)(1)(i).....33

33 C.F.R. § 325.2(d)(5).....27

40 C.F.R. § 121.3(a).....17

40 C.F.R. § 121.15(d).....33

40 C.F.R. § 230.3(l).....23

40 C.F.R. § 230.6(a).....30

40 C.F.R. § 230.10(a).....23

40 C.F.R. § 230.10(b).....32

40 C.F.R. § 230.10(c).....23, 32

40 C.F.R. § 230.10(c)(1)–(4).....23

40 C.F.R. § 230.10(d).....23

40 C.F.R. § 230.11.....23

40 C.F.R. § 230.20-230.32.....23

40 C.F.R. § 230.30(a).....32

40 C.F.R. § 1500.1, *et seq.* (2022).....21

Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025).....21

Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).....21

## INTRODUCTION

This case is just one of a decade-long series of efforts by the Bad River Band of Lake Superior Chippewa Indians ("Band") to shut down Enbridge Energy, Limited Partnership's ("Enbridge") 645-mile-long international Line 5 pipeline that currently crosses the Band's Reservation. Line 5 has been operating since 1953 as critical energy infrastructure between Superior, Wisconsin and Sarnia, Canada, serving ten refineries in the United States and Canada and providing the main source of propane in Michigan and Ontario.

In Wisconsin, Line 5 crosses Douglas, Bayfield, Ashland, and Iron Counties, as well as the Band's Reservation. The Band filed a lawsuit against Enbridge in 2019, alleging that Line 5 is operating in trespass on certain parcels on the Reservation without valid easements. Enbridge was ordered to discontinue use of the pipeline on the Reservation by June 16, 2026, although the order was later stayed pending appeal.[1] To resolve the dispute, Enbridge proposed to replace the 12 miles of the pipeline within the Reservation with approximately 41 miles of new pipeline that bypasses the Reservation (the "Project").

For the past six years, Federal, State, Tribal and local authorities, including the U.S. Army Corps of Engineers ("Corps" or "USACE"), the Environmental Protection Agency ("EPA"), the U.S. Fish and Wildlife Service, and the Wisconsin Department of Natural Resources ("WDNR"), have studied and issued permits for the Project. ECF No. 10-2 ¶¶ 25-27. In pursuit of its goal to

[1] *See Bad River Band of Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.*, 2023 WL 4043961 (W.D. Wis. June 16, 2023); *Bad River Band of the Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.*, 2026 WL 560028, at *2-3 (W.D. Wis. Feb. 27, 2026). On July 30, 2026, the Seventh Circuit affirmed the District Court's order in part but remanded to the District Court to decide the precise timing of the injunction. *Bad River Band of Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co*., Nos. 23-2309 & 23-2467 (7th Cir. July 30, 2026), at 43 (holding that any timing of any injunction must be crafted to "permit Enbridge a reasonable opportunity to complete its proposed reroute of Line 5 around the Reservation").

"shut down and remove the pipeline" from the Reservation, Bad River Br., *Enbridge Energy Co., Inc. v. Bad River Band of the Lake Sup. Tribe of Chippewa Indians*, No. 23-2309 (7th Cir. Oct. 11, 2023), at 1, the Band has challenged these authorizations at every turn. This case involves the Band's challenge to a Corps permit required for the Project, under Section 404 of the Clean Water Act ("CWA") and Section 10 of the Rivers and Harbors Act ("RHA") (the "Permit"), because the Project unavoidably crosses some wetlands and waterbodies subject to the Corps' regulatory jurisdiction.

While the Corps only has authority over 18% of the Project's 41 miles, the agency's six-year-long review was nothing short of comprehensive. The Corps amassed a 10,000-page record, prepared a 100-page Combined Decision Document ("CDD") with 1,700 pages of appendices, reviewed hundreds of thousands of public comments, examined an expansive analysis from WDNR, and consulted extensively with other Federal, State, and Tribal agencies.

The Band's claims that the Corps' review violated the National Environmental Policy Act ("NEPA"), CWA, and Administrative Procedure Act ("APA") fail. *First*, the Corps' review of the Permit complied with NEPA because the Corps took a "hard look" at all impacts within its regulatory authority and exceeded its minimal obligations by reviewing impacts outside its jurisdiction in response to Tribal and public concerns. *Second*, the Corps reasonably determined that the CWA Section 404 Permit should be issued because it fully evaluated the potential impacts of authorized discharges, took steps to minimize impacts, and made the necessary factual determinations, pursuant to its regulations and the CWA. *Third*, the Corps' CWA Section 401(a)(2) decision was reasonable because it reflects that the Corps considered all relevant evidence and concluded that the Band failed to carry its statutory burden to demonstrate that

discharges authorized by the Permit would violate its water quality standards ("WQS") in Reservation waters.

For these reasons, as explained in more detail below, summary judgment should be granted in favor of the Corps and Enbridge, and the Band's request for summary judgment should be denied.

## FACTUAL BACKGROUND

### I. Enbridge's Line 5 Wisconsin Segment Relocation Project

In operation since 1953, Line 5 is a critical energy resource for the U.S. and Canada that transports approximately 540,000 barrels per day ("bpd") of crude oil and natural gas liquids ("NGLs"). AR090876. The pipeline "is subject to a treaty intended to 'ensure the uninterrupted transmission' of hydrocarbons" between the two countries, and its continued operation is vital to the U.S.'s energy security. Statement of Interest of the United States, *Enbridge Energy, LP v. Whitmer*, No. 1:20-cv-01141, Dkt. No. 140, at 23-25; Canada Amicus Br., *Enbridge Energy Co., Inc. v. Bad River Band*, No. 23-2309 (7th Cir. Sept. 18, 2023) (any shutdown of Line 5 would violate the Treaty and "cause grave harm to Canada and the broader public interest").

In response to the Band's 2019 lawsuit seeking to remove Line 5 from the Reservation and out of respect for the Band's sovereignty, Enbridge proposed to replace approximately 20 miles of the existing pipeline, including the 12-mile segment within the Reservation, with approximately 41 miles of new pipeline located entirely outside of the Reservation. AR090876-77. The Project was designed to resolve the Band's concerns while also ensuring the uninterrupted delivery of Line 5's essential products to refineries and other end-users in both the U.S. and Canada. *Id.*

The Project's design and construction will comply with applicable pipeline safety standards established by the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") and will employ industry-standard pipeline construction methods. AR078684. The Project was

designed and routed to minimize and avoid impacts to sensitive resources, such as wetlands and waterbodies, to the maximum extent possible. AR002847, 2851, 3223-52. Because of this considered design, construction of the Project will only result in modest discharges into wetlands and waterbodies, the impacts of which are mostly temporary in nature. AR000592, 3242. In addition, at all points, the Project will be between 2.1 and 23.9 km upstream of the Reservation. AR002926.

The Project utilizes several construction methods to clear land along the right-of-way ("ROW") and temporary workspaces, construct access roads, excavate trenches, install and bury the pipeline, and restore the site. AR003208-90, 7199-8620. Trenching, which involves digging a trench and then lowering the pipe into it, will be used at approximately 70 water crossings and in wetlands. AR002852-54, 3226-32, 3243-44. The remaining 30 waterbody crossings will use trenchless methods that avoid direct impacts to surface features, including horizontal directional drill ("HDD"). AR003226, 3233-40.

Following installation and as required by Corps and WDNR permit conditions, the area will be restored to minimize environmental impacts. AR007199-8620. For trenched crossings, backfilling will be used to place material removed from the trench over the pipe to fill the trench to the desired contours. AR003228. Enbridge will restore the area according to several comprehensive restoration plans using grading, seeding, and stabilization. AR003253-77. During construction and restoration, Enbridge will employ industry-standard best management practices ("BMPs") to minimize and avoid environmental impacts. *Id.*; AR002860, 3228.

## II. The Project's Permitting & Environmental Reviews

The Project's construction activities require authorization from both Federal and State agencies. The Project has thus been subject to an extensive regulatory review in which the Band has been actively involved.

### A. WDNR's Permitting & Approvals Process

On February 11, 2020, Enbridge submitted applications to WDNR for wetland and waterway permits, coverage under a stormwater general permit, and a CWA Section 401 water quality certification ("WQC"). AR090858-68.

After holding a public hearing on the completeness of Enbridge's applications and the appropriate scope of its review, WDNR prepared a draft Environmental Impact Statement ("EIS"), AR079396-764. WDNR received over 32,000 public comments on the draft and held a 10-hour public hearing at which over 160 individuals commented. AR022273.

WDNR's final EIS, published on September 6, 2024, is nearly 900 pages and contains over 7,000 pages of appendices.[2] AR000079, 21605-22502. The EIS contains a lengthy discussion of the Project's construction activities and addresses a multitude of issues, including Tribal treaty rights; Wisconsin's trespass law[3]; environmental justice; erosion and sedimentation; HDD inadvertent returns[4] ("IRs"); wetland, waterway, wildlife, and public land impacts; and oil spills. AR0021648-49, 21659-734, 21806, 21852-69, 21922-22158, 22230-45. The final document incorporates and responds to numerous public comments, including issues raised by the Band and the Great Lakes Indian Fish & Wildlife Commission ("GLIFWC"). AR000079.

On November 14, 2024, WDNR issued a WQC and a combined Wetland and Waterway Permit and granted coverage for the construction activities under Wisconsin's General Permit to Discharge under the Wisconsin Pollutant Discharge Elimination System. AR015044-156. The

---

[2] The EIS appendices are available at: https://dnr.wisconsin.gov/topic/EIA/Enbridge.html#Draft%20Environmental%20Impact%20Statement.

[3] Wisconsin's energy provider property trespass law provides that "[w]hoever intentionally enters an energy provider property without lawful authority and without the consent of the energy provider that owns, leases, or operates the property is guilty of a Class H felony." Wis. Stat. § 943.143(2).

[4] An HDD inadvertent return (or inadvertent release) is the accidental release of drilling fluids to the surface during HDD installation. AR003113.

WQC confirms WDNR's "reasonable assurance" that the authorized discharges will comply with Wisconsin's WQS and contains 231 conditions for construction, including one requiring Enbridge to ensure compliance with the Band's WQS. AR015075-96.

The Band and several environmental groups challenged WDNR's approvals. They first pursued an administrative contested case hearing, which was held in August and September 2025. AR000071, 2655-2837. The hearing addressed nearly every facet of the Project, including wetland and water quality impacts, blasting, hydrology, and oil spills. *See* AR000069-120, 2655-2837.

An Administrative Law Judge ("ALJ") upheld WDNR's authorizations and affirmed the adequacy of the EIS on February 13, 2026. AR000069-120. In a 52-page, single-spaced decision, the ALJ examined each issue raised by the Band and environmental groups, repeatedly finding that they failed to meet their evidentiary burden. *Id.* As to the WQC, after considering substantial information exchanges between Enbridge and WDNR, as well as Enbridge's Water Quality Monitoring Plan, the ALJ concluded that the Band and environmental groups "failed to establish that the information [WDNR] reviewed was so incomplete or inaccurate that reasonable assurance [of compliance with Wisconsin's WQS] could not be reached." AR000106. As to the EIS, the ALJ explained that the "arguments f[e]ll short and lack[ed] evidentiary support" and concluded that the EIS contained a complete environmental analysis as required by Wisconsin law. AR000108-09.

The Band and environmental groups sought judicial review of the ALJ order in state court, which remains pending. *Bad River Band of Lake Super. Chippewa Indians v. Wis. Dep't of Nat. Res.*, Case Nos. 2026CV000008, 10 (Wis. Cir. Ct. Iron Cnty.). Although the Band requested an immediate ex parte stay of construction and a stay pending review of WDNR's authorizations, the court substantially denied the Band's motions, granting a stay only as to four waterbody crossings

comprising just 0.02% of the total Project length. *Id.*, Dkt. No. 192. On July 17, 2026, Enbridge filed a motion to lift that stay following WDNR's issuance of a permit and exemptions for those four waterbody crossings. Construction outside the four crossings is underway.

**B. The Corps' Permitting Process**

Because construction of the Project unavoidably crosses some wetlands and waterbodies, a Corps permit to authorize the discharge of dredged or fill material into "waters of the United States" ("WOTUS") under CWA Section 404 and the crossing of the White River under Section 10 of the RHA is required. AR000591-92. In February 2020, Enbridge submitted a permit application to the Corps. AR000595, 090858-68. Initially, the Corps indicated that the discharges associated with the Project were eligible for authorization under a Regional General Permit. AR000595. But, in 2021, the Corps determined that the Project would require a Standard Individual Permit and an environmental assessment ("EA") "[b]ased on the concerns expressed by tribes and their representatives" that the proposed activities subject to the Corps' jurisdiction "may have more than minimal adverse effects on tribal resources." AR080278-79.

Despite only 18% of the Project's 41 miles falling within its regulatory jurisdiction, AR000597, the Corps conducted an extensive review of the proposed discharge activity and its impacts. The Corps repeatedly emphasized its limited authority under the CWA yet provided additional public comment opportunities akin to those used during preparation of an EIS. AR000595-98, 37820-21, 37831-32 62978-79. These public comment opportunities resulted in hundreds of thousands of comments, including thousands of pages of documentation from the Band and GLIFWC. AR000600-02; *see, e.g.*, AR024417-24617, 24628-28379.

The Corps also conducted "more tribal engagement than ever before" and consulted extensively with the Band, GLIFWC, and other Tribes. AR063530; AR000658-60, 1610-35. At all points in the Corps permitting process, Tribal representatives raised issues touching on every

aspect of the Project, including the Project's impact on cultural and historic resources and treaty rights, Wisconsin's trespass law, the accuracy of wetland delineations, oil spills, the adequacy of baseline monitoring and site-specific crossing plans, downstream impacts, environmental justice concerns, and an array of alleged wetland and water quality impacts, despite the fact that the Corps lacks jurisdiction over many of these issues. AR001610-35. Five years into the permitting process, the Band raised, for the first time, concerns about mercury impacts from Project activities. AR004279-938, 6548-71, 8664-703.

On May 20, 2024, the Corps published a draft CDD containing its draft EA, Section 404(b)(1) Guidelines Evaluation, and Public Interest Review. AR037800-37933. The Corps held a public hearing in June 2024 and received over 150,000 written comments, including a 70-page letter from the Band with over 3,750 pages of exhibits. AR000601, 24626-28379.

After receiving WDNR's Section 401 WQC in November 2024, the Corps initiated the CWA Section 401(a)(2) process by notifying EPA of Enbridge's completed Permit application and the WQC. AR014992-15042. EPA reviewed the Permit application and WQC, determined that a discharge of dredged or fill material "may affect" the Band's waters downstream, and notified the Band of its determination on December 13, 2024. AR009370-71. The Band determined that the Corps-authorized activities "will affect" its water quality in violation of its WQS, and, on February 11, 2025, it notified the Corps of its objection to the Permit and requested a hearing under Section 401(a)(2). AR009094-175. On May 6, 2025, the Band submitted additional reports to EPA on issues such as hydrologic connectivity and mercury. AR008660-760.

The Corps held its Section 401(a)(2) hearing on May 13 and 14, 2025. AR006192-394. Prior to the hearing, EPA submitted its Evaluation and Recommendations to the Corps, concluding that the Band did not demonstrate that discharges authorized by the Permit would violate the

Band's WQS or that any additional permit conditions were necessary. AR006739-74. The Band, EPA, and Enbridge all provided testimony at the hearing, and afterwards, the Band and Enbridge each submitted rebuttal statements. Enbridge's submission was accompanied by expert reports explaining that the Band did not demonstrate that discharges authorized by the Permit will violate its WQS. AR002842-3367. In total, the hearing transcripts, presentations, and submissions amounted to more than 6,000 pages. AR002842-6178, 6192-6394, 6413-6665, 6670-8647, 8660-8760, 9092-9259.

On October 29, 2025, the Corps finalized its CDD containing the final EA, Section 404(b)(1) Guidelines Evaluation, and Public Interest Review. AR000584-687. The CDD's 23 appendices also included the Corps' Section 401(a)(2) Decision Memo ("401(a)(2) Decision Memo"). AR002099-127. The CDD and its appendices document the Corps' extensive analysis of the discharges authorized by the Permit, including issues raised by the Band, such as the Tribal treaty rights, blasting activities, and downstream impacts. AR000584-2450. The CDD reflects that the Corps (at the Band's urging) considered issues beyond the scope of its CWA authority, such as oil spills, HDD IRs, and aquifer breaches. *Id.* The Corps concluded, as relevant here: (1) "that this permit action will not have a significant impact on the quality of the human environment," (2) "that the proposed discharges comply with the Section 404(b)(1) Guidelines, with the inclusion of the appropriate and practicable special conditions," and (3) "that the discharges proposed will not affect the quality of the Bad River Band's waters so as to violate their water quality requirements" and "that no additional permit conditions are necessary." AR000665.

The Corps issued the Permit on February 24, 2026, after the ALJ affirmed WDNR's WQC on February 13. AR000003, 69-119. The Permit authorizes an HDD crossing of the White River under RHA Section 10 and temporary discharges into 101.1 acres of wetlands and 0.20 acres of

non-wetland waters and permanent discharges into 0.02 acres of wetlands under CWA Section 404. AR000004. The Permit includes six general conditions and 16 special conditions, one of which incorporates all 231 conditions in WDNR's WQC. AR000005-7. The conditions require Enbridge to comply with monitoring, mitigation, and restoration plans developed to minimize environmental impacts. *Id.* Condition 8 also requires Enbridge to provide the Corps with site-specific blasting plans five days prior to engaging in blasting activities in Corps permit areas. *Id.*

## STANDARD OF REVIEW

The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "highly deferential" standard under which the reviewing court must "presume[] that the agency action is valid." *Oceana, Inc. v. Ross*, 920 F.3d 855, 863 (D.C. Cir. 2019). This Court "may not substitute its own policy judgment for that of the agency" and may *only* set aside agency action where the agency has not "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The question is not "whether the record might support the plaintiff's preferred interpretation of the evidence, but rather whether the record supports the agency's ultimate decision." *Stone v. U.S. Dep't of State*, 2026 WL 861064, at *8 (D.D.C. Mar. 30, 2026). A harmless or immaterial error is not sufficient to overturn agency action. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). The burden of proof is on the party challenging the agency action. *Id.*

## ARGUMENT

### I. The Corps complied with NEPA and adequately considered the environmental impacts of the discharges authorized by the Permit.

The Corps fully met its NEPA obligations. It prepared a comprehensive CDD, including a final EA, that took a hard look at the potential environmental impacts of the discharges authorized by the Permit. AR000584-687. As the Supreme Court recently reinforced, NEPA is a "purely procedural" statute that "'simply prescribes the necessary process' for an agency's environmental review of a project." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

NEPA "imposes no substantive environmental obligations or restrictions" and "does not require the agency to weigh environmental consequences in any particular way." *Id.* at 173. Moreover, "NEPA 'does not mandate particular results,'" and "an agency's only obligation is to prepare an adequate report." *Id.* at 177, 180 (quoting *Robertson*, 490 U.S. at 350). The CDD is more than "adequate": it marked the culmination of a nearly six-year permitting process that included review of hundreds of thousands of public comments, frequent tribal consultations, and examination of an over 10,000-page administrative record. AR000600-02, 1610-35.

Under the Corps' NEPA regulations, the focus of the NEPA review for a Section 404 permit is the activity subject to the Corps' regulatory authority – i.e., the discharge of fill material for which federal authorization is sought. 33 C.F.R. Part 325, App. B. So even though a Corps permit may be necessary for the construction of a larger project (as is the case here), the scope of the Corps' action for NEPA purposes is defined by the discharges of dredged or fill material over which it has authority and does not include effects of the project from activities outside the Corps' control.[5]

[5] *See, e.g.*, *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009) ("[T]he fact that the Corps' § 404 permit is central to the … valley-filling process [as part of a coal mine] does not itself give the Corps 'control and responsibility' over the entire fill"); *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116-17 (9th Cir. 2000), *abrogated on*

NEPA likewise does not require federal agencies to evaluate environmental effects they lack jurisdiction to prevent. There must be "a 'reasonably close causal relationship' between the environmental effect and the alleged cause," analogous to the concept of proximate cause in the tort context. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)). In other words, an "agency need not consider" effects that it "has no ability to prevent." *Id.* at 770.

When reviewing an agency's compliance with NEPA, "[t]he bedrock principle of judicial review" is "[d]eference." *Seven Cnty.*, 605 U.S. at 185. A reviewing court "should not micromanage … agency choices so long as they fall within a broad zone of reasonableness," and "may not 'substitute its judgment for that of the agency as to the environmental consequences of its actions.'" *Id.* at 183 (quoting *Kleppe v. Sierra Club*, 427 U.S. 410 n.21 (1976)). The CDD sets forth the Corps' review of the environmental effects of the discharges subject to its jurisdiction. The Corps made a "fully informed and well-considered decision," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978), that should be upheld. "NEPA requires no more." *Seven Cnty.*, 605 U.S. at 180 (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 228 (1980)).

**A. The Corps took a hard look at the impact from the authorized discharges on tribal access to ceded territory.**

While the Band asserts that the Corps violated NEPA by failing to assess impacts relating to the State of Wisconsin's enforcement of its trespass law, Bad River Band Br. ("BRB") at 13-15, that state trespass law is outside the Corps' regulatory authority and therefore not required to be assessed under NEPA. NEPA's "hard look" requirement only extends to impacts over which

---

*other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (Corps' NEPA review of CWA permit need not include effects of larger project).

the Corps has regulatory authority. *See Pub. Citizen*, 541 U.S. at 770. It is indisputable that "USACE has no control over enforcement of state trespass law"; enforcement is controlled directly by the State itself. AR000658. Because the Corps' issuance of a CWA Section 404 permit "cannot be considered a legally relevant 'cause' of the effect" from the Wisconsin's enforcement of the trespass law, the state trespass law is not required to be assessed under NEPA. *Seven Cnty.*, 605 U.S. at 188.

Nevertheless, the Corps did take a "hard look" at tribal access to ceded territory, and, although not required, the impacts of the state trespass statute. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 131-32 (D.D.C. 2017) (NEPA requires the agency to show that it took a "hard look" at a project's impact on Tribal rights). Contrary to the Band's assertion, BRB at 12-13, 15, there is no special or heightened NEPA standard that applies to consideration of projects involving areas of significance to Tribes.[6] *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d. 1032 (D.C. Cir. 2021) (applying traditional NEPA standards to project affecting lands of Tribal significance). Rather, courts will uphold an EA for projects, including CWA permits for pipelines, in areas of Tribal significance as long as the agency "clearly addresse[s]" the project's impact to Tribal rights. *See, e.g.*, *Standing Rock*, 255 F. Supp. 3d at 131-32 (Corps complied with NEPA because it "clearly addressed" pipeline construction impacts on the exercise of tribal rights).

[6] Neither *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592 (9th Cir. 2010), nor *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515 (W.D. Wash. 1996), establishes a standard for NEPA review of impacts to Tribal access. The *Te-Moak* court applied the regular "hard look" standard. 608 F.3d at 606. The *Nw. Sea Farms* court did not consider whether the Corps had taken NEPA's requisite "hard look," and instead reviewed the basis for the denial of a permit. *Nw. Sea Farms*, 931 F. Supp. at 1519-22.

After reviewing information from GLIFWC, the Corps recognized the potential for impacts to treaty rights and ceded territory access and chose to elevate the proposed permit to a Standard Individual Permit with an EA to ensure these issues were thoroughly considered. AR000595, 79765, 79800-01, 80278-79. The Corps consulted frequently with Tribes about the Wisconsin law and access to the ceded territory, listening to their concerns at consultation meetings and reviewing their submissions discussing Tribal members' exercise of treaty rights, concerns about the Wisconsin trespass law, and historic issues with law enforcement. *See, e.g.*, AR002454-55, 24550-65, 37344, 45305, 81318, 81354-55, 81418-32.[7] The agency also consulted with EPA,[8] AR062043, 32087-88, and sought information from Enbridge on possible mitigation measures, AR063659, 64330. The Corps' Office of Counsel took "a very hard look" at the Wisconsin law, but "didn't see how [the Wisconsin trespass law] is an effect of the permit action." AR002455; *see also* AR037344, AR045305; AR037828, 37881, 37887, 37907-08, 37924, 37930; *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 60 (D.D.C. 2022) (Corps complied with NEPA in reviewing replacement pipeline project where it "describe[d] efforts undertaken to consult with Tribes and address potential impacts resulting from" the project).

[7] The Band cites *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212 (D.D.C. 2016), to suggest that the Corps should have gathered information about the Wisconsin law from the State or even potentially local law enforcement, BRB at 15, but such further action is not required under NEPA. *Solenex, LLC v. Haaland*, 626 F. Supp. 3d 110, 115 (D.D.C. 2022) ("NEPA … neither prohibits, nor requires, particular courses of action an agency may consider[.]").

[8] The Band selectively quotes from EPA's comments on the Corps' Draft CDD, AR037800-933, which do not dispute the Corps' conclusion that its Permit neither conveys property rights nor gives it control over enforcement of state law. AR037881, AR032087-88. EPA's comments suggested that the Corps clarify which parts of the ROW will be open to the public, discuss whether Enbridge can make changes to access, and clarify mitigation measures. AR032087-88.

The Corps also acknowledged in the CDD that the Wisconsin law and ceded territory access were issues of importance to Tribes. AR000655-58. But the Corps explained that its regulatory authority extends only to authorizing discharges of dredged or fill material and the HDD crossing of the White River. *E.g.*, AR037820-21, 37881, 37908, 44399, 62953, 71419. It appropriately found that these limited jurisdictional activities (occurring temporarily on only 27.89 acres) do not result in significant impacts to Tribal access to the 170,000-acre Iron County Forest where Band members assert that they exercise their treaty rights. AR000657. The record also makes clear that Enbridge "will not impede the lawful exercising of the right to hunt, fish, or gather on property open to the public." AR021649; *see also* AR043787.[9] Having considered the extensive record, the Corps reasonably concluded that the regulated activities would only "have a minor, temporary effect on the tribe's exercise of usufructuary rights." AR000658. This determination is entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 192.[10]

### B. NEPA does not require the Corps to consider operational spill impacts.

Contrary to the Band's assertions, BRB at 16-18, the Corps had no obligation under NEPA to evaluate operational spill impacts because its jurisdiction is limited to authorizing discharges of dredged or fill material in wetlands and waterbodies and not operation of a pipeline. *Pub. Citizen*,

[9] Further, the Project is not likely to trigger enforcement of the Wisconsin trespass law. The statute only applies "without consent of the energy provider," Wis. Stat. Ann. § 943.143(2), and Enbridge has consented to tribal access. A Wisconsin court also recently considered the Band's trespass argument and was "unpersuaded" that the law applies to energy utility ROWs crossing public lands or "that any member of the public exercising their right to access public land, including Tribal members exercising their respective treaty rights to hunt, gather or recreate, would be subject to prosecution under Wis. Stat. § 943.143 if they are exercising on otherwise public land." *Bad River Band of Lake Super. Chippewa Indians v. Wis. Dep't of Nat. Res.*, Case Nos. 2026CV000008, 10, Dkt. No. 192, at 8-9 (Wis. Cir. Ct. Iron Cnty. May 15, 2026).

[10] This case presents an entirely different situation than the one presented in *Nw. Sea Farms*. There, the project would have *eliminated* the Tribe's ability to fish at a treaty-protected location. 931 F. Supp. at 1519-22. Here, however, the Project does not eliminate any Tribal rights or access. The Corps' Permit will not prevent the Band from exercising its treaty rights and will only temporarily limit access to 0.01% of Iron County Forest land as a safety precaution during construction.

541 U.S. at 770; *Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*, 2023 WL 6226387, at *25-26 (S.D. Tex. July 27, 2023) (Corps' exclusion of operational effects, including oil spills, was not arbitrary because NEPA review is limited to the "specific activity" a permit authorizes); *Red Lake*, 636 F. Supp. 3d at 54-55 (Corps' exclusion of pipeline operational effects was consistent with NEPA).

Here, the Corps has no authority over pipeline operation, as Congress "explicitly delegated" that role to the U.S. Department of Transportation and PHMSA. *Enbridge Energy, LP v. Whitmer*, 813 F. Supp. 3d 777, 799 (W.D. Mich. 2025) ("Congress explicitly delegated regulatory authority over the 'operation' of an interstate pipeline to the Secretary of Transportation, 49 U.S.C. 60102(a)(2)[.]"). Because the Corps lacks sufficient "control or responsibility" over pipeline operations or releases regulated exclusively by PHMSA, AR000598, 603, the Corps reasonably excluded operational spill effects from its NEPA analysis. *Indigenous Peoples*, 2023 WL 6226387, at *26 ("[T]he Corps need not have considered ongoing operational effects," such as oil spills, in its EA.).

While the Corps explained that spill impacts are outside its regulatory authority, AR000603, it nonetheless recognized that the public "may struggle to understand [its] scope of analysis, and how that frames the NEPA analysis," AR062978. For that reason, the agency exceeded its NEPA obligations by responding to concerns about spills with an "enhanced content and [] engagement process" that included providing additional opportunities for public comment comparable to those available for an EIS and recommending that Enbridge conduct spill modeling. AR062978-79; AR000603, 635.

In response to the Corps' request, Enbridge's consultant RPS prepared the 2023 Oil Spill Report ("Report") using RPS's proprietary modeling tools that are "used extensively in the United

States and internationally to assess the potential impacts of oil spills." AR063005-06. The Report describes "potential [] worst case resulting effects," which "are highly conservative estimates that tended to err on the side of predicting greater magnitudes and extents of potential effects," and it evaluates predicted trajectories for 10,088 hypothetical releases. AR063074, 63020. The modeling assessed the potential for effects of spills in three release volume categories: full-bore ruptures ("FBR"), historical accidental release volumes, and recent average release volumes. AR063038. The Report assesses potential impacts to environmental resources resulting from a release, including downstream waters within and beyond the Reservation, accounting for Enbridge's emergency response procedures. AR063031-34.

Based on the Report, the Corps concluded that the probability of a spill is "extremely remote." AR000635. This finding was also supported by WDNR's 100-page analysis of spill effects in its EIS, AR022275-2396, which concluded that the probability of an oil spill is "low, just 0.00317 spills of any size over 20 years."[11] AR022283. The Corps also explained that Enbridge's "[e]mergency response measures further reduce downstream impacts, and the proposed route minimizes risks to sensitive areas like the Bad River Band Reservation, wild rice beds, and Lake Superior." AR000635; *see also* AR023254-56 (describing Enbridge's PHMSA-regulated emergency response measures).

The Band's disagreements with the Report, BRB at 17-18, do not demonstrate any NEPA violation. *First*, as explained above, the Corps had no obligation under NEPA to assess operational spill impacts, which are outside of its jurisdiction. Also, while the Band contends that the Report

[11] In contrast to the Corps' limited authority, WDNR considered the "water quality-related impacts from the activity subject to the [Corps] permit, including the activity's construction and operation" under EPA's CWA Section 401 regulations. 40 C.F.R. § 121.3(a). WDNR's Section 401 WQC conditions are incorporated into the Corps' final Permit. 33 U.S.C. § 1344(d).

improperly excludes NGLs, BRB at 17, there was no need to address a spill of those products because NGLs "would very quickly convert from liquid to gas[], and [do] not have the same potential for traveling downstream" and threatening aquatic resources. AR080330.

*Second*, the Band faults the Report for not disclosing the elevation profile data used in calculating FBRs. BRB at 17-18. But the Report does include elevation information (*see* AR063156-157, Figs. 3-1 and 3-2), and three-dimensional site-specific elevation was used to calculate the FBR and resulting trajectory of released product over land surface following a release. AR063038-39, 70, 363-64, 372; *see also Seven Cnty.*, 605 U.S. at 182-83; *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 209 (D.D.C. 2012) ("the agency's choice of methodology need only be 'reasonable'" and is entitled to deference). The Band further complains of a lack of public disclosure. But NEPA only requires public disclosure of data "relevant to the environmental impacts" of the permitted activities, *County of San Diego v. Babbitt*, 847 F. Supp. 768, 776-77 (S.D. Cal. 1994), and, as explained above, spills are not an environmental impact of the Corps-permitted activities. Therefore, the Corps had no obligation to disclose the Report or its methodologies.[12]

*Third*, the Band claims that the 13-minute spill response time used in the Report is unrealistic, pointing to a spill that occurred over 16 years ago. BRB at 18. But as documented in the Corps' record, the Band ignores the fact that, since then, Enbridge has implemented substantially enhanced safety measures enabling rapid incident response. AR023254-56. Because

[12] The Band cites *Ctr. for Biological Diversity v. USFS*, 2025 WL 3268655 (D. Mont. Nov. 24, 2025) and *State of Idaho ex. rel. Idaho Pub. Utils. Comm'n v. ICC*, 35 F.3d 585 (D.C. Cir. 1994) in support of its assertion that the Corps was required to disclose the Report in the publication of the draft CDD. But neither of those cases is applicable where, as here, the data at issue is irrelevant to the permitted activities. And the Band ignores that the Report was made public by WDNR in 2023. *See* https://dnr.wisconsin.gov/topic/EIA/Enbridge.html#Draft%20Environmental%20Impact%20Statement.

of those measures, "Enbridge's leak detection systems and control center monitoring process are capable of detecting a[n FBR] almost instantaneously," making the 13-minute response time highly conservative. AR080331-32; *see also* AR023254, 63039.

Accordingly, the Corps far exceeded its obligations under NEPA to consider spill impacts, and its analysis merits substantial deference. *Seven Cnty.*, 605 U.S. at 182-83.

**C. The Corps' analysis of the Project's blasting impacts complied with NEPA.**

The Band's contention that the Corps failed to adequately assess blasting impacts fails because the Corps had no obligation to do so as part of its NEPA analysis for the simple reason that the Project's blasting does not result in discharges within the Corps' regulatory authority. As the Corps explained, because the Project's blasting activities will occur at a depth "typically approximately 1 foot below the bottom of the pipe" and "the area proposed to be trenched would not change if blasting occurs," the Project's blasting activities "do[] not result in regulated discharges of dredged or fill material" for purposes of this Permit. AR000624-25. The Corps thus had no obligation to review blasting impacts in connection with this Permit. *Ohio Valley Env't Coal.*, 556 F.3d at 195; *Wendling Quarries, Inc. v. U.S. Army Corps of Eng'rs*, 2017 WL 8678693, at *2 (S.D. Iowa Nov. 30, 2017) (Corps is "entitled to 'considerable deference'" on determinations of what constitutes a CWA discharge).

Nevertheless, the Corps comprehensively reviewed blasting impacts and reasonably concluded that, with mitigation, any blasting impacts would be "minor in intensity." AR000624-625. Enbridge's Wetland and Waterbody Crossing Table (appended to the CDD) identified each possible wetland and waterbody where blasting might take place. AR000621, 624-625, 1607-09. The Corps then examined submissions from Enbridge and findings from WDNR that thoroughly explained the Project's blasting impacts to the identified wetlands and waterbodies. *See, e.g.*, AR003315, 317 (Enbridge's General Blasting Plan "provides the information that is normally

indicated in a blast plan at the onset of a project"); AR000098-99, 484, 492, 3014-75 (expert analysis of potential blasting impacts), 3291-3360 (expert analysis of blasting activities), 8866-69 (describing the Project's use of blasting and impacts), 21697-98 (same), 21906-07 (same), 22129-2130 (same), 58393-398 (same), 59616-618 (same), 63626-627 (same). Enbridge further demonstrated that blasting impacts are comparable to those of other trenching methods and are expected to be "negligible" through use of mitigation measures, such as trench breakers, controlled drilling practices, erosion control devices, and restoration of the area to preconstruction conditions. AR000484, 8868-69, 58394, 59617, 63627. The Corps considered possible impacts from the Project's blasting activities, such as varied harms to aquatic species and "the potential to alter wetland hydrology," and found that Enbridge's proposed mitigation measures would minimize these impacts. AR000621, 625.

Contrary to the Band's assertion, BRB at 19-20, the Corps was not required to review site-specific blasting plans prior to permitting. As a "rule of reason," *Seven Cnty.*, 605 U.S. at 183, NEPA "does not demand forecasting that is 'not meaningfully possible.'" *Del. Riverkeeper*, 753 F.3d at 1310 (quoting *Scientists' Inst.*, 481 F.2d at 1092). Requiring site-specific blasting plans prior to permitting is neither reasonable nor meaningfully possible. There can only be "certainty as to what rock will require blasting" after site conditions are confirmed, and it "is impossible" to assess site conditions until excavation commences pursuant to a permit. AR003317. Any pre-permitting, pre-excavation site-specific plan "would be worthless" and "ineffective at limiting impacts," as it would not be able to account for actual site conditions. AR003317, 323-324. Given the inability to develop site-specific blasting plans before permitting, the Corps included Permit condition 8 that requires site-specific plans to be approved by the Corps and hydrological monitoring in wetlands "to ensure hydrology is restored to baseline conditions after construction."

AR000624-625; *see also* AR000492. As a result, NEPA's "hard look" standard was more than satisfied. AR000006, 625, 664; *Ctr. for Biological Diversity v. FAA*, 804 F. Supp. 3d 86, 105 (D.D.C. 2025) (agency's adoption of mitigation measures helped demonstrate that "hard look" requirement was satisfied).[13]

**D. The Corps was not required to consider environmental justice concerns.**

While the Band asserts that the Corps was required to address environmental justice concerns in the final CDD, BRB at 21, NEPA did not require the Corps to do so or to explain its reason for excluding them in its final CDD after addressing them in the draft CDD. *Del. Riverkeeper Net. v. FERC*, 748 F. App'x 346, 347 (D.C. Cir. 2018) (FERC not required to explain differences between a draft EA and final EA).

NEPA does not impose any environmental justice requirement. *See* 42 U.S.C. § 4321, *et seq.* Nor did the Corps' NEPA-implementing regulations or CEQ's 2020 regulations (as amended in 2022), which governed the Corps' NEPA process for this Permit. *See* 33 C.F.R. Part 325, App. B (1990); 40 C.F.R. § 1500.1, *et seq.* (2022); AR000585. While Executive Orders previously required agencies to consider environmental justice impacts, those Executive Orders created no legal rights, and in any event, those orders were rescinded in January 2025, ten months prior to the issuance of the CDD. Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) (rescinding Exec. Order 14096); Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (rescinding Exec. Order

[13] The Band's protestations, BRB at 18-20, do not dictate another outcome. The Band relies only on cases where the agency was required by NEPA to do more. *See State of Idaho*, 35 F.3d at 595-96 (agency was required to prepare an EIS and failed to do so); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732-36 (9th Cir. 2001) (same). While the Band suggests that NEPA can require an agency to deny a permit, BRB at 20, *State of Idaho* does not support that assertion. NEPA "will never force an agency to change the course of action it proposes," and, following a NEPA analysis, agencies may issue permits *despite their potential environmental impacts*. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181, 1186 (D.C. Cir. 2023) (quoting *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008)).

12898). The CDD is consistent with the 2025 Executive Orders.[14] *See Aaacon Auto Transp., Inc. v. ICC*, 792 F.2d 1156, 1161 (D.C. Cir. 1986) ("[A]gencies must apply the law in effect at the time a decision is made, even when that law has changed during the course of a proceeding.").

While the Band asserts that the omission of environmental justice considerations from the CDD represents a "significant departure" without public comment or explanation, BRB at 21, that position is simply incorrect. The Corps did meaningfully evaluate environmental justice issues throughout the permitting process. For example, the draft CDD found that "the proposed regulated activities would not have disproportionately high adverse impacts to disadvantaged communities" and that "the Corps action complies with Executive Order 12898."[15] AR037931. And the CDD responds to comments requesting that the Corps consider environmental justice, explaining that public involvement and tribal coordination and consultation "have been an integral part of the USACE analysis … to ensure that concerns of all people are considered." AR002039. The agency stated that it shared concerns related to environmental justice and impacts to minority and low-income populations with Enbridge and retains Enbridge's Environmental Justice Commitment Plan, which "identifies specific commitments that would be taken to communities and individuals in the vicinity of the project." *Id.*; AR043781-854. The Corps fully met its obligations.

## II. The Corps met its obligations under CWA Section 404 when issuing the permit.

Construction of the Project will unavoidably cross jurisdictional wetlands and waterbodies. As a result, in February 2020, Enbridge applied for a Corps permit to authorize the discharge of

---

[14] The Band relies on *Nat. Res. Def. Council v. Hughes*, but that case, which evaluated the EIS for a new national coal leasing policy, concerned a significant substantive change the agency made to the process at the "heart" of the new policy, as opposed to a change in governing law, as is the case here. 437 F. Supp. 981, 989-90 (D.D.C. 1977).

[15] The fact that the Corps did not repeat that conclusion in the CDD – a conclusion that is consistent with the Corps' ultimate determination – would not have changed the outcome of the proceeding. *Jicarilla Apache Nation*, 613 F.3d at 1121 (agency error is harmless where it does not affect the outcome of the proceeding).

dredged or fill material into WOTUS under CWA Section 404 and the crossing of the White River under Section 10 of the RHA. AR000591-92, AR000595, 090858-68. The Corps fully met its obligation to evaluate proposed discharges of dredged or fill material associated with construction of the Project pursuant to the 404(b)(1) Guidelines and the CWA.

The Guidelines direct the Corps to evaluate whether the proposed discharge would "cause or contribute to significant degradation of the waters of the United States," 40 C.F.R. § 230.10(c), by considering effects on human health or welfare, aquatic life and ecosystem diversity, productivity, and stability, as well as recreational, aesthetic, and economic values, *id.* § 230.10(c)(1)–(4), and evaluating the physical, chemical, and biological effects associated with the discharge, *see id.* §§ 230.11, 230.20–230.32.

The Corps began its evaluation by considering the purpose and need of the Project and the proposed activities that would require Corps authorization. AR000591, AR000599-600. The Corps also conducted a robust alternatives analysis to determine whether there was a practicable alternative to the proposed discharges with less adverse impact on the aquatic ecosystem. 40 C.F.R. §§ 230.3(l), 230.10(a).[16]

In its alternatives analysis, the Corps fully evaluated the potential impacts from construction-related discharges authorized by the Permit and took actions to minimize adverse effects. The Corps asked Enbridge to provide information on crossing method alternatives and alternative crossing locations for high-quality wetlands, including alternative crossing methods and locations specifically for the White River. AR000611-14. Enbridge, in turn, (1) provided a

[16] The Corps may only authorize the "least environmentally damaging practicable alternative." 40 C.F.R. § 230.10(a). And even where no less damaging practicable alternative exists, a permit may not issue unless "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* § 230.10(d).

comparative assessment of the suitability and impacts of trench and trenchless stream crossing methods, which included consideration of where HDD may be practicable; (2) analyzed opportunities to reduce disturbance in 20 wetlands; and (3) provided information on crossing methodology and location options for the White River. *See id.* The Corps evaluated this information and determined that Enbridge's proposed minimization measures were sufficient. *See id.*; *see also id.* at AR000630 (concluding that the use of construction matting, water quality monitoring, and post-construction restoration and monitoring would sufficiently minimize impacts when combined with the crossing methodology and location minimization plans). The Corps also considered and required compensatory mitigation to offset adverse impacts, and, accordingly, Enbridge purchased 48.85 wetland mitigation credits from Corps-approved mitigation banks in the Lake Superior bank service area. AR000643.[17]

The Corps made the necessary factual determinations pursuant to the 404(b)(1) Guidelines and the CWA to support issuance of the Permit. Based on its detailed and thorough evaluation, the Corps concluded that: "this permit action will not have a significant impact on the quality of the human environment," and "the proposed discharges comply with the Section 404(b)(1) Guidelines, with the inclusion of the appropriate and practicable special conditions." AR000665. The Corps fulfilled its statutory and regulatory duties, and the Band has failed to show that the Corps' findings were arbitrary or capricious. The Permit should be upheld.

[17] The Corps determined that stream mitigation was not required based on the limited duration (24-48 hours) of any impacts and Enbridge's commitment to restore the streambeds and banks that had been disturbed by construction to pre-construction contours and elevations immediately upon installation of the pipeline crossing. AR000644.

### A. The Corps fully analyzed potential impacts from the authorized discharges within its jurisdiction.

The Band contends that the Corps evaluated "only a select number of Project impacts …, manipulating a conclusion that the Project will not have a significant effect on aquatic resources." BRB at 22. That assertion is belied by the Corps' extensive discussion of impacts in the CDD.

The CDD shows that the Corps considered potential impacts to the physical and chemical characteristics of the non-living environment, AR000615-619 (discussing substrate; suspended particulates and turbidity; water quality, circulation, and fluctuations; and salinity); potential impacts to threatened and endangered species other aquatic and terrestrial wildlife, AR000619-662; potential impacts to special aquatic sites, AR000622-626; and potential effects on human use characteristics, AR000626-630 (discussing water supplies, fisheries, recreation, aesthetics, and parks and historical use issues). Upon completing its comprehensive review, the Corps concluded that "no significant adverse effects from pollutants would occur on the resources described evaluated above and the regulated activities associated with the [Project] would be compliant with the Section 404(b)(1) Guidelines." AR000632; *see City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005) (Corps' Section 404 decisions entitled to deference).

#### 1. The Project's blasting activities do not result in regulated discharges subject to the Corps' CWA jurisdiction.

As explained above, *supra* at § I.C, because the Project's blasting activities do not result in regulated discharges, the Corps was not required to evaluate blasting impacts in its 404(b)(1) Guidelines analysis. AR000624-25; *Ohio Valley Env't Coal.*, 556 F.3d at 195. The Band takes issue with this decision, pointing to *Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1998), to support its argument that the Corps should evaluate impacts beyond the limits of its CWA jurisdiction. BRB at 23-24. But the Band's reliance on *Stewart* is misplaced. *Stewart* is a NEPA case applying specific language from the Corps' NEPA regulations to determine when the Corps has "sufficient

control and responsibility" over portions of the project beyond the limits of its CWA jurisdiction such that the Corps should evaluate the broader action as part of its NEPA review. *See Stewart*, 996 F. Supp. at 681-83 (citing NEPA cases). Importantly, there is no analogous concept under the CWA that would expand the scope of the Corps' CWA review. Thus, *Stewart* has no bearing on the scope of the Corps' analysis under the Guidelines.[18] Regardless, the Corps extensively considered impacts from the Project's blasting activities as part of its 404(b)(1) Guidelines analysis as explained *supra* at 20. AR000624-25.

The Band also takes issue with the Corps' description of wetlands where blasting would occur. BRB at 25. Enbridge anticipates that, at most, blasting would occur in approximately 2.6 acres of wetlands (0.5 acres emergency, 0.2 acres shrub, 1.9 acres forest wetland types). AR000624. In response to comments requesting site-specific identification and analysis of whether blasting is proposed in wetlands and non-wetland waters, the Corps requested, and Enbridge provided, a wetland and waterbody crossing table that shows the individual wetlands and waterbodies that are anticipated to require blasting. AR001607-09, 2064.

Notwithstanding this information, the Band argues that the Corps' "consolidation of the individual wetland impacts into 2.6 acres without any evaluation of impacts to those individual wetlands is contrary to what the CWA and the Guidelines require," citing *Environmental Defense v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d. 69 (D.D.C. 2007). BRB at 25. But nothing in *Environmental Defense* addresses the underlying issue here – which is that the Project's blasting activities do not result in regulated discharges. The issue in *Environmental Defense* was whether the Corps improperly manipulated habitat models to make it seem that a project's environmental

[18] The Corps did evaluate whether it had "sufficient control and responsibility" to expand its analysis beyond the proposed regulated activities in WOTUS for purposes of NEPA. AR000598.

impacts would be fully mitigated. 515 F. Supp. 2d. at 74. By contrast, the Corps met its obligations here to analyze the effects of the discharges of dredged and fill material authorized by the Permit.[19]

The Band challenges the sufficiency of the Corps' response to its comments concerning blasting. BRB at 26. However, "[an agency] 'need not address every comment, but it must respond in a reasoned manner to those that raise significant problems.'" *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (quoting *Reyblatt v. NRC*, 105 F.3d 715, 722 (D.C. Cir. 1997). And so it did. The level of detail and analysis provided in the CDD and the Corps' response to comments is more than sufficient in light of the Corps' limited CWA jurisdiction. *See supra* at § I.C; AR000624-25, 2064.

Moreover, the Band's contention that the Corps cannot rely on Enbridge's responses on blasting to inform its decision-making, BRB at 26-27, runs afoul of both the Corps' regulations, which specifically allow an applicant to review and provide input on comments received in response to the public notice, and the case law.[20] 33 C.F.R. § 325.2(d)(5). In *River Road Alliance, Inc. v. U.S. Army Corps of Engineers*, the Seventh Circuit explained that the Corps "has to depend on the parties for … information" because it "is not a business consulting firm" and is therefore

[19] The Band's argument that the Corps ignored blasting in its evaluation of secondary and cumulative effects similarly has no merit. BRB at 25-26. The Corps properly analyzed the cumulative and secondary effects of the proposed discharges. AR000644-46. As the Corps noted, "[a] cumulative effects assessment evaluates how the direct and indirect environmental impacts of *the proposed activity requiring Department of the Army authorization* contribute to cumulative effects and determines whether this contribution is significant. This analysis specifically focuses on *regulated activities to wetlands and waterbodies within USACE's scope of authority*." *Id.* (emphases added).

[20] The Band relies on *Atchafalaya Basinkeeper, Inc. v. Spellmon*, 2026 WL 917509 (M.D. La. Mar. 31, 2026), in claiming that the Corps "rubber-stamp[ed]" Enbridge's responses in analyzing blasting and responding to comments. BRB at 26-27. But the record is clear that the Corps undertook an independent evaluation of those impacts, despite explaining that the Project's blasting does not result in regulated discharges. AR000624-25, 2052, 2064.

"in no position" to conduct studies to inform its consideration of an applicant's project. 764 F.2d 445, 452-53 (7th Cir. 1985).

In sum, the Corps' conclusion that "[b]lasting does not result in regulated discharges of dredged or fill material, and the area proposed to be trenched would not change if blasting occurs" (AR000624-25) is consistent with the CWA and the Corps' regulations, was supported by the record, and is entitled to deference. *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (Corps' evaluation of "scientific data" entitled to an "extreme degree of deference.").

**2. The Corps appropriately evaluated impacts from HDD in Section 10 waters.**

The Band advances two arguments in support of its theory that the Corps erred in its review of impacts from HDD: (1) the Corps improperly disclaimed jurisdiction over HDD crossings outside of Section 10 waters; and (2) the Corps failed to consider IRs as a foreseeable consequence of the HDD crossings. BRB at 28. The Band is wrong on both counts.

HDD is used to *avoid and minimize* adverse effects to jurisdictional waters during pipeline construction, obviating the need for a Section 404 authorization. HDD is a technique used to lay pipe *below* a given surface object without having to disturb the object or the surface around it. AR003234. There is no ground disturbance, except at the entry or exist points, or the drilling location. *Id.* Because HDD lays the pipeline *under*, not in, WOTUS, it avoids the discharge of fill material into WOTUS at the drill site and does not implicate CWA Section 404.

The Corps reasonably concluded that its jurisdiction over HDD crossings is limited to Section 10 waters because construction of HDD crossings does not result in a discharge of dredged or fill material to WOTUS. *See* AR000593; *see also id.* at AR000669 ("Perennial waterbodies do not include the HDD crossing of the White River, a federally navigable WOTUS, because this

crossing method does not result in a discharge of dredged or fill material, or both."). If there is no jurisdictional discharge from an HDD crossing, the Corps lacks regulatory authority over the crossing. In *Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs*, 2014 WL 5307850 (S.D. Ala. Oct. 16, 2014), the court dismissed challenges to Corps permits for crossings of streams accomplished by HDD, noting that "[t]he Corps is not empowered to regulate those HDD activities … because those crossings were actually completed in a manner that involved no trenches, no discharge of dredged or fill material into United States waters and, hence, no activities for which Corps approval was needed." *Id.* at *8.[21]

With respect to IRs of drilling fluid, the Corps explained they may only be regulated under Section 404 *if* they meet criteria for discharges of fill material. AR000617. For an IR to be a regulated discharge, "drilling mud must change the bottom elevation of a WOTUS or replace a WOTUS with dry land." 33 C.F.R. § 323.2(e). In its response to comments, the Corps explained that "inadvertent releases are not foreseeable activities" within the Corps' authority to consider, but that, nonetheless, "appropriate measures were considered to reduce the risk of potential IRs associated with HDD." AR002034; *Wendling Quarries*, 2017 WL 8678693, at *2 (Corps' interpretation of what constitutes a regulated discharge entitled to deference). For example, Enbridge will implement IR response plans, including site-specific information and tailored containment and recovery measures. *Id.*; *see also* AR000617, AR00727-30 (Environmental

---

[21] The Band claims that the Corps ignored the impacts of temporary discharges into wetlands necessary to facilitate HDD crossings, BRB at 28, but that is not the case. The Corps recognized that HDD activities would result in temporary discharges into 6.24 acres of wetlands, described the impact that clearing and use of timber matting would have on wetlands, and acknowledged secondary impacts associated with soil compaction from construction activities and ROW clearing. AR000623-24, 645. Though the Band asserts that the Corps also should have evaluated secondary and cumulative impacts associated with HDD construction, it fails to point to any specific impacts that the Corps failed to consider and does not explain how the existing discussion is inadequate.

Protection Plan, describing measures to be implemented if an IR occurs despite prevention efforts). And Enbridge made design modifications to two HDD crossings to further reduce risk of an IR. AR000627, AR002034-35.[22]

**B. The Corps made all relevant determinations required by the Guidelines.**

The Band alleges that the Corps failed to make certain factual determinations required under the Guidelines. BRB at 30-35. But the Corps reasonably explained its analysis and determination for each of the categories the Band raises, commensurate with the discharge authorized by the Permit and the applicability of the provision and potential impact. *See* 40 C.F.R. § 230.6(a) ("It is unlikely that the Guidelines will apply in their entirety to any one activity, no matter how complex."); *id.* at § 230.6(b) ("The level of documentation should reflect the significance and complexity of the discharge activity."). *See also Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1447 (1st Cir. 1992) ("Clearly, the guidelines contemplate an analysis which varies in magnitude depending on the impact of the proposed discharge.").

The Band asserts that the Corps failed to properly account for the use of construction matting and blasting on wetland substrate. BRB at 30-32. Not so. For the reasons already discussed, the Project's blasting activities do not result in the discharge of dredged or fill material to WOTUS and therefore fall outside the scope of the Corps' jurisdiction. In its impacts analysis, the Corps calculated the total acreage of wetland substrate that the Permit's authorized discharges

---

[22] The Band erroneously claims that "IRs from HDD construction are very common" and asserts that "[d]uring construction of Enbridge's Line 3 pipeline, there were 28 IRs." BRB at 29. But "public comments regarding the number and extent of inadvertent returns encountered during HDD installation of the Line 3 Replacement Project were not based on facts. … [T]he HDD inadvertent release volumes were low and, in all cases but one, did not occur in a waterbody. The inadvertent releases were identified, contained, and cleaned up in accordance with the Line 3 Replacement Inadvertent Release Contingency Plans as well as coordination with the respective agencies." AR0016410. Enbridge evaluated the designs and events of the Line 3 project with its HDD design engineering firm to "assess modifications to the Project's HDD designs to further reduce the likelihood of an IR." AR002855.

would impact. AR000615 (proposed discharges would permanently cover 0.02 acres of wetland substrate and temporarily cover 101.1 acres of wetlands and 0.20 acres of non-wetland waters). The Corps recognized that the majority of the impacts would be temporary, explaining that use of matting "minimizes rutting and disperses compaction pressure from heavy equipment on unfrozen ground," *id.*, and "will minimize adverse effects that may otherwise occur within wetlands." AR000630. Moreover, "Wisconsin's WQC conditions are expected to minimize impacts on substrate resulting from discharges of dredge and fill material in [WOTUS] for the construction of the project." AR000616. Based on these factors, the Corps reasonably concluded that any construction-related effects on substrate would be minor in the short and long term. *Id.*

The Band next argues that the Corps failed to address concerns that blasting may alter bedrock, breach aquifers, or affect groundwater, which in the Band's view undermines the Corps' determination regarding water circulation. BRB at 32-33. Notwithstanding blasting's lack of jurisdictional impacts, the Corps expressly recognized that blasting in "shallow bedrock has potential to alter wetland hydrology" and conditioned the Permit on the development and implementation of site-specific blasting plans, prior to blasting in any permitted areas. AR000625. In addition, as the Band recognizes, the Corps requested and obtained geotechnical and hydrotechnical evaluations along the project route to identify potential risks to aquifers from construction activities. AR000626.[23]

The Band contends that the Corps only considered the risk of aquifer breach in the context of private and municipal water supplies, but the Corps' "water circulation, fluctuation, and

[23] The Corps also differentiated between "unconfined aquifers" and "confined aquifers" and separately analyzed the risks and appropriate minimization measures. AR000626-27. For sheet piling and HDD, the Corps requested additional geotechnical and HDD design information to ensure that appropriate measures were considered to reduce the risk of potential IRs. AR000627.

salinity" determinations expressly incorporated its consideration of information evaluated in Sections 6.3.3 (Water), 6.3.4 (Current Patterns and Water Circulation), 6.3.5 (Normal Water Fluctuations), and 6.3.6 (Salinity Gradients) and "incorporation of the actions to minimize effects." AR000630-01. Based on this analysis, the Corps determined that the "proposed regulated … activities would have a minor short-term effect on water circulation." AR000631.

Finally, the Band asserts that the Corps erred by failing to consider the Project's effects on State-listed endangered and threatened species. BRB at 34. But consideration of State-listed species is relevant only to the extent that the discharge would result in significant degradation of WOTUS. *See* 40 C.F.R. §§ 230.10(b), 230.10(c), 230.30(a); *see also Town of Norfolk*, 968 F.2d at 1452-53 (discussing interplay of these provisions). Here, the CDD reviewed effects on "other wildlife," AR000621, and quantified the number of State-listed species along the route, *see* AR000674-75, AR000677, which demonstrates that the Corps considered the impacts to such species when determining that issuance of the Permit would not result in significant degradation to WOTUS, *see id.* at AR000632 ("Based on available data, USACE has determined no significant adverse effects from pollutants would occur on the resources described evaluated [sic] above and the regulated activities associated with the [Project] would be compliant with the Section 404(b)(1) Guidelines."). The Corps' analysis fully complies with the 404(b)(1) Guidelines. The Band has failed to show otherwise, or establish that the Corps' review was arbitrary or capricious.

**III. The Corps complied with CWA Section 401(a)(2) in concluding that the Band failed to demonstrate that the authorized discharges will violate the Band's water quality standards.**

The Band failed to produce any evidence to prove that discharges authorized by the Corps' Section 404 Permit will result in a violation of its WQS in waters within the Reservation. 33 U.S.C. § 1341(a)(2) (neighboring jurisdiction must provide that permitted activity "will affect the quality of its waters so as to violate any water quality requirements in such state"); *Int'l Paper*

*Co. v. Ouellette*, 479 U.S. 481, 490 (1987) (absent proving a violation, a neighboring jurisdiction "does not have the authority to block the issuance of the permit if it is dissatisfied with the proposed standards."). Because the Band failed to meet its burden to show a violation of its WQS resulting from the Permit's *discharges*, no further action by the Corps was required (*see* 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.15(d); 33 C.F.R. § 325.2(b)(1)(i)), and its final decision is entitled to deference. *Prometheus Radio Project*, 592 U.S. at 423.

"Having fully considered" the statutorily-relevant materials – the Band's objection and evidence, EPA's evaluation, and the evidence presented at and after the hearing (AR002099-2100) – the Corps determined that the Band "did not demonstrate that discharges from the Project … would reach the Band's waters in amounts that would result in violation of the Band's water quality requirements" and that the Band failed to "substantiate[] a need for further conditions." AR002107. This decision was reached following a full hearing under Section 401(a)(2), during which EPA, Enbridge, and the Band all submitted voluminous information – over 6,000 pages – concerning whether discharges authorized by the Permit would violate downstream water quality. AR002842-6178, 6192-6394, 6413-6665, 6670-8647, 8660-8760, 9092-9259.

All discharges regulated by the Corps occur outside of and between 2.1 and 23.9 km upstream of the Band's Reservation. AR002926. The regulated discharges are typical of construction of linear projects; they do not generate any new pollutants and are magnitudes less impactful than naturally occurring storm events that lead to flooding. AR002947-48, 3182. The primary pollutant at issue from discharges authorized by the Permit is increased sediment (dirt) generated during trenching activities, which are completed for each water crossing within a matter of hours. AR003082, 3100, 3226. Stream water quality returns to pre-construction conditions

within approximately four to ten hours, "avoiding the potential for long-term or downstream impacts to water quality." AR002852, 6736, 63002, 63476, 63482.

Both Enbridge and EPA presented substantial evidence showing that the Band did not prove that any discharge will violate its WQS. Enbridge's post-hearing rebuttal submission "demonstrate[d] that no measurable or detectable impact will occur to waters within the Reservation as a result of the Project." AR002871. Enbridge's experts in dispersion modeling and effects assessment, hydrology, environmental impacts, and blasting each evaluated the Project's impacts through industry-standard modeling and data analysis. AR2920-3207, 3291-3360; *see also* AR002871-2908. Sediment modeling for the Project was highly conservative and evaluated the potential for impacts based on the Band's standard for turbidity, demonstrating that any increases in total suspended solids ("TSS") would fall below the most conservative 1.0 mg/L threshold (well below the Band's 19.3 mg/L threshold) by approximately 1.0 km (for trenching) and 2.0 km (for IRs) downstream of the discharge point.[24] AR002936, 2947-48, 63472-83. Each expert also reviewed the Band's evidence, finding that none of it proved that any downstream impacts to the Band's waters will occur. AR002871-2908. The experts concluded that, while some Project activities may result in water quality impacts at or in the immediate vicinity of the Project site (*see, e.g.*, AR002873, 2882-85, 2889-90, 2901), due to the "considerable distance" of at least 2.1 km between the Project and the Band's waters, "by the time the water reaches the

[24] The Band's WQS only refer to turbidity, "which is a measure of the cloudiness of a liquid" and is based on NTUs. AR002872. However, the concerns the Band identified during the Section 401(a)(2) process relate to the amount of increased sediment in the water column due to construction activities, which is best measured using TSS. *Id.* Enbridge's expert developed a relationship between TSS and NTU using all available TSS and turbidity data in the Bad River, calculating a TSS threshold of 19.3 mg/L from the Band's 5 NTU turbidity standard. AR002936.

Reservation, there will be no measurable impacts to water quality," let alone any violation of the Band's WQS. AR002907.

EPA similarly concluded that the Band had not "demonstrate[d] that discharges [authorized by the Permit] will affect the quality of the Band's waters so as to violate the Band's water quality requirements." AR006773. Although EPA did not review the supplemental submission the Band made one week before the Section 401(a)(2) hearing, it analyzed all relevant prior submissions. AR006744-45. After considering each of the Band's objections and its WQS (AR006753-73), EPA did "not recommend[] conditions for the Corps to include in its permit." AR006773.

The Band's submissions were based on speculation and issues outside the scope of the Corps' jurisdiction. The Band failed to provide any data, studies, modeling, or analysis that *proved* that any downstream impacts would occur, entirely failing to refute Enbridge's sediment modeling for trenched crossings. *See, e.g.*, AR002874, 2886, 2888, 2893, 2895, 2899, 2901, 2906. The Band presented flawed and indefensible modeling and case studies that were limited to reviewing localized, as opposed to downstream, impacts claimed by the Band. *See, e.g.*, AR002874, 2890, 2906; *infra* at § III.B. The Band also raised issues entirely unrelated to Corps-regulated discharges, such as oil spills, tribal treaty rights and sovereignty, environmental justice, environmental remediation, and Enbridge's state-issued stormwater permit. AR002868-69, 71.

The Corps' record makes abundantly clear that, despite the Band's claims, BRB at 36, it considered all evidence, including EPA's recommendations, AR002099-2107, and all of the Band's submissions, in concluding that the Band's evidence was insufficient to carry its Section 401(a)(2) burden. For each issue, the Corps' 401(a)(2) Decision Memo summarized the Band's objections and evidence, identified competing evidence and analysis from EPA and/or Enbridge, and explained that the Band did not substantiate its assertions with evidence demonstrating that

any violation of its WQS will occur. AR002100-06. Though the Band raised other issues, they "were not considered further" because they "were not responsive to the purpose of or were outside the scope of CWA Section 401(a)(2)." AR002107. The 401(a)(2) Decision Memo easily clears the "low hurdle" under the APA to prepare a reasoned explanation supported by the record. *See Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 497 (D.C. Cir. 2016); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) ("satisfactory explanation" need be "nothing more than a 'brief statement'").

### A. The Corps identified and discussed all affected resources and relevant impacts from the discharges authorized by the Permit.

Contrary to the Band's assertions, BRB at 37-39, the Corps fully complied with the CWA and APA because its Section 401(a)(2) decision identified affected aquatic resources, was not required to address artesian conditions outside its regulatory jurisdiction, and analyzed HDD IRs and groundwater impacts. *Van Hollen, Jr.*, 811 F.3d at 496-97 (APA satisfied where agency's "analytical path" can be "reasonably discern[ed]").

*Identification of Affected Wetlands & Waterways.* The robust record evidences that the Corps identified affected aquatic resources and considered hydrologic connectivity, and its "determination that it had sufficient information" on aquatic resources "is entitled to deference." *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 785 (D. Alaska 2021). The Corps is also "entitled to significant deference regarding its [aquatic resource] delineation[s]," and it "is not required to accept [the Band's] opinions" on the adequacy of those delineations. *Ga. River Net. v. U.S. Army Corps of Eng'rs*, 2012 WL 930325, at *26 (S.D. Ga. Mar. 19, 2012) (quoting *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1018 (S.D. Tex. 2004)).

Enbridge identified wetlands and waterways in the Project area through a desktop review of the Wisconsin Wetland Inventory and then conducted field delineations in 2019 and 2020 using

the industry-standard *Corps of Engineers 1987 Wetland Delineation Manual*. AR000480-81, 2856, 3085, 3218, 22088-89. The Corps subsequently completed field visits between 2020 and 2023, often with other federal, state, and Tribal agencies, to assess the accuracy of Enbridge's delineations, including wetlands that were not present in the Wisconsin Wetland Inventory. AR000085, 623, 22089. Based on these field visits, the Corps determined that Enbridge "accurately identified and delineated aquatic resources in areas proposed for construction activities." *Id.*

The Corps and Enbridge did not ignore the GLIFWC report asserting increased waterbodies, wetlands, and hydrologic connectivity in the Project area, as the Band claims. BRB at 37-38. The Corps explicitly addressed the GLIFWC report but explained that it lacked proof "demonstrat[ing that] discharges would result in violation of the Band's water quality requirements."[25] AR002101. Enbridge's expert analysis of the report[26] likewise determined that the Band's "hydrologic connectivity mapping does not, by itself, prove that the Project will cause violations of the Band's water quality standards." AR002907, 2978-80. This analysis identified several issues with the GLIFWC report, including that it lacked information on its methodologies and did not demonstrate any correlation between increased connectivity and downstream contaminant transport. *Id.* Nearly all newly identified watercourses appear to be small and likely intermittent or ephemeral and wetland areas would likely have slow waterflow, limiting the

[25] While the Band is correct that the Corps addressed the GLIFWC report in the mercury section of the 401(a)(2) Decision Memo, the Corps' discussion of the report is not limited to considering the report's implications for mercury transport and instead generally considered whether it showed downstream transport of "discharges" as a whole. AR002101.

[26] Enbridge's expert was only able to review GLIFWC's "preliminary" report (AR008704-14) in advance of the rebuttal submission. But the "final" version of the report (AR003991-4076) does not correct any of the deficiencies Enbridge's expert identified in the original submission, as it contains no reference, methodology, or explanation as to how increased wetlands, waterbodies, and connectivity would increase downstream contaminant transport. *See* AR002978-80.

potential for downstream transport even considering the alleged increase in watercourses and wetlands. *Id.* A WDNR ALJ likewise rejected the Band's argument that WDNR had inadequate information about the location, acreage, and quality of wetlands. AR000087. Accordingly, because the report failed to prove any actual likelihood of downstream contaminant transport, it was reasonable for the Corps to conclude that no violation of downstream water quality would occur even accounting for previously unidentified wetlands. AR002101.

*Artesian Conditions*. While the Band asserts that the Corps failed to consider the possibility of artesian well or aquifer breaches, that issue is irrelevant to Section 401(a)(2) because it is outside the Corps' regulatory authority and the Corps' "assessment of what constitutes a CWA discharge … is entitled to considerable deference." *Wendling Quarries*, 2017 WL 8678693, at *2.

The Corps explained in the CDD that accidental breaches of artesian wells or aquifers "are not regulated by USACE." AR002034; *see also* AR002044 ("USACE has no regulatory control over aquifer discharges."). Though the Corps did not name artesian conditions in the 401(a)(2) Decision Memo, it stated that it declined to discuss impacts outside the scope of Section 401(a)(2), which includes unregulated impacts. AR002107. Nonetheless, the CDD addresses artesian conditions at length, explaining that there is limited potential for the Project to even encounter artesian conditions based on the extensive studies and surveys conducted for the Project. AR000626-27 (discussing the potential for encountering aquifers), 638 (Enbridge's aquifer analysis helps ensure minimal potential for aquifer breaches), 1639-2031 (concluding that "artesian conditions will not be encountered at the planned construction depths"). The issue was also fully considered by WDNR. AR000098-100 (rejecting arguments regarding encounter of artesian conditions); AR021905 (Project route relocated away from artesian conditions); AR021916-20 (examining the possibility for encountering artesian conditions). Accordingly, the

Corps' conclusion that artesian conditions are outside of its regulatory authority and unlikely to be encountered during Project construction can be "reasonably discern[ed]" from the Corps record. *Van Hollen, Jr.*, 811 F.3d at 497.

*HDD IRs.* Although the possibility of accidental IRs from the HDDs are outside the scope of Section 401(a)(2), the Corps nonetheless considered potential IR impacts because, if one occurs, it *could* be regulated under Section 404. AR000617, 2105; *Wendling Quarries*, 2017 WL 8678693, at *2 (Corps' decision about what constitutes a "discharge" is entitled to deference).

After reviewing the Band's reports and objections to Enbridge's modeling, the Corps explained that the Band did not satisfy its burden to "provide[] data or modeling that an HDD IR will cause measurable changes to [sediment] concentrations to waters within the Reservation that would result in violation of the Band's water quality standards." AR002105. This conclusion is consistent with EPA's and Enbridge's analyses, which explained that the Band failed to "produce[] a defensible quantitative demonstration that [IRs] will cause exceedances within its Reservation." AR002890, 2953-55, 6751, 6767-68.

The Band does not cite any evidence proving that any increased sedimentation from IRs will exceed its WQS within the Reservation boundaries. BRB at 38-39. By contrast, Enbridge's expert used conservative modeling to show that IRs will not result in increased sediment levels within the Band's Reservation 2.1 km downstream from the Project area and that any TSS exceedances will fall below the conservative 1 mg/L threshold within 2.0 km of the discharge point. AR002889-91, 2948-52. And, as EPA noted, existing Permit conditions requiring heightened monitoring for IRs during HDD operations and implementation of site-specific Inadvertent Release Response Plans approved by the Corps will minimize any impacts from any such occurrence. AR000015, 617, 6768, 7221-24, 7451-7633; *supra* at § II.A.2. The Band's

"mere disagreement cannot discharge its burden of establishing that the [Corps'] determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 133 (D.D.C. 2010).

*Groundwater Impacts.* The Band complains that the Corps failed to resolve the Band's concerns about groundwater impacts, BRB at 39, but the burden was on the Band to establish that discharges would result in violations of its WQS, and the Corps found the Band's "evidence" lacking. AR002102.

The Corps reviewed the Band's materials and identified "general assertions" about groundwater impacts, but the Corps did not find "any specific data, studies, modeling, or analyses to substantiate" the Band's assertions. AR002102. EPA explained that "[g]roundwater-surface water interactions are complex and are best analyzed through field measurements, laboratory analyses and modeling techniques," AR006751, but the Corps concluded that the Band's materials were devoid of "any specific data, studies, modeling or analyses to substantiate the Band's assertions," AR002102. Conversely, Enbridge's experts showed that the activities authorized by the Permit would either have no effect or would only have short-term localized effects on groundwater quality and flow that could not impact the Band's waters located 2.1 km or more from the Project site. AR002895-97 (explaining that neither trenching nor blasting activities will impact groundwater quality or flow), 3022-29 (same), 3124-30 (all "risks have been proactively addressed through comprehensive inventories and targeted mitigation strategies to try to eliminate any groundwater impacts"), 3163-64, 3179-80.

**B. The Corps appropriately incorporated Wisconsin's WQC conditions into its Permit.**

Despite the Band's contention otherwise, Wisconsin's WQC is relevant to the Corps' Section 401(a)(2) inquiry because the Corps must incorporate the Wisconsin WQC conditions into

its final Permit. 33 U.S.C. § 1344(d); AR000006. Wisconsin's conditions are particularly relevant to the Corps' analysis for this Permit because WDNR expressly considered the Band's WQS in its WQC. Specifically, Wisconsin Condition 135 states that, "[a]t no time shall the dewatering discharge cause a violation of Bad River Band of Lake Superior Chippewa water quality standards at the point that it enters the Reservation."[27] AR000038. This condition, which is part of the Corps Permit, thus explicitly requires Enbridge to comply with the Band's WQS.

Under Section 401(a)(2), the Corps' role is to determine whether any *additional* conditions are necessary to protect the Band's waters; but if the existing conditions sufficiently protect the Band's waters, no further action is necessary. 33 U.S.C. § 1341(a)(2). The Corps explained that the Band did not substantiate its assertions regarding a downstream WQS violation and that the Band failed to prove that any additional conditions were necessary to protect its waters. AR002107. Given that the Corps' finding that the Band failed to carry its burden is well-supported (*supra* § II.A), and its permit (via Wisconsin's incorporated conditions) already requires compliance with the Band's WQS, the Corps' reliance on Wisconsin's WQC was reasonable and thus not arbitrary and capricious. *Sierra Club v. FERC*, 97 F.4th 16, 29 (D.C. Cir. 2024) (agency decisions that are reasonable and supported by the record are not arbitrary and capricious).

The Band complains that the Corps did not individually address any of its WQS in the 401(a)(2) Decision Memo, but the Corps *did* in fact consider the Band's WQS. As noted, Enbridge's downstream submission included extensive modeling analysis based on the Band's

[27] Dewatering is used during dry trenched crossings to "pump[] water out of the trenches … at the rate and duration necessary to install the pipeline." AR003022-23. Enbridge plans to "conduct location-specific dewatering to remove accumulated water and discharge that water adjacent to the construction workspace using BMPs to filter the water and dissipate energy." *Id.* Trench dewatering discharges are a likely source of sedimentation, which is the only water quality parameter likely to be impacted in the immediate Project vicinity. AR002927, 3109.

WQS for turbidity. AR002942-52 (assessing the potential for violations of the Band's turbidity standard using a standard for total suspended solids based on the Band's standard). Indeed, the 401(a)(2) Decision Memo reflects that the Corps considered the Band's WQS throughout its analysis but ultimately found that the Band had not produced the requisite evidence to show any actual violations of its WQS from discharges that would be authorized by the Permit. AR002099-2107; *see also Adya LLC v. DEA*, 2026 WL 797339, at *6 (D.D.C. Mar. 23, 2026) (an agency need not write "an essay" where the "why and wherefore" of its decision can be discerned (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999)).

The Corps also reasonably rejected the Band's BMP case studies because they did not prove that discharges authorized by the Permit would violate the Band's WQS. Despite substantial evidence showing the effectiveness of BMPs, AR002860, 2886-88, 2892-93, 2899, 3100-01, 3030-32, 3035-36, the Band asserts that its case studies of other projects show they are ineffective. BRB at 40-41. But, as the Corps explained, none of the case studies prove violations of the Band's WQS from discharges that would be authorized by the Permit because they "only evaluated the local impacts of each project and did not assess whether there were measurable sedimentation o[r] turbidity impacts downstream." AR002103, 2106, 2874 ("both case studies only evaluated the local impacts of each project and did not assess whether there were downstream sedimentation impacts"), 2973-78, 6753-54, 6758-59. In fact, Enbridge provided modeling showing the opposite – that no downstream impacts would result from the Project's sediment discharges. AR002873-82, 2889-90, 2947-55. The Corps reasonably concluded that the case studies did not satisfy the Band's burden.

**C. The Corps had no obligation to assess specific waterways.**

While the Band argues that the Corps should have individually addressed impacts to specific waterways, BRB at 41-43, the Corps' 401(a)(2) Decision Memo reflects that the Corps

concluded that the Band did not produce any data, studies, modeling, or analyses showing violations of its WQS would occur. AR002107 ("[N]o violation of the Band's water quality standards, including its antidegradation rule, will occur as a result of the project."). Even now, the Band does not cite any evidence proving such violations. *See* BRB at 41-43. By contrast, Enbridge assessed the potential for sediment impacts on a sub-watershed level and concluded that "the Project's sub-watershed cumulative impacts would be non-existent or negligible and unidentifiable within the Reservation." AR002877, 3361-67. For example, for both the Tyler Forks and Marengo River sub-watersheds, Enbridge's analysis showed that the potential for measurable impacts within the Reservation is negligible and would not exceed the Band's regulatory thresholds. AR002879-81. Enbridge's modeling also demonstrated that there is no scenario that will result in measurable sediment impacts to the Band's waters, AR002873-74, 2889-90, 2947-55, and the Band did not provide any contrary, non-speculative evidence.

The Corps also fully considered the mercury and methylmercury issue, which the Band introduced for the first time during the Section 401(a)(2) process, after the permitting process had been ongoing for more than five years. AR002870. Expert analysis of the fate processes that impact methylmercury concentrations, watershed conditions, and historic mercury sampling showed that the Project was not expected to "alter the baseline mercury system to a degree that would be measurable or impactful downstream in Reservation waters." AR002893-94, 2987-88. WDNR's analysis of the issue reached the same conclusion – that the Band's evidence was "insufficient to find that the Project *will* result in the significant adverse impact of increased methylmercury." AR000091. The Band's mercury analysis did not provide any demonstration of downstream mercury transport to its waters, let alone proof regarding specific waterways. AR002982 (the Band "d[id] not provide evidence or quantification of the potential for measurable

effects to downstream receptors from [Project] construction and operations"). Thus, while Enbridge showed that the impacts the Band asserts are unlikely or not possible, the Band "d[id] not provide information that demonstrates discharges from the project would increase mercury or mercury methylation from the point of discharge downstream to waters that reach the Reservation as to violate the Band's water quality criteria." AR002101. The Corps' finding was neither arbitrary nor capricious. *Sagarwala v. Cissna*, 387 F. Supp.3d 56, 69 (D.D.C. 2019).

## IV. If the Court finds in the Band's favor, any remedy must be narrowly tailored.

The Court should grant Enbridge's and the Corps' motions for summary judgment.[28] If the Court finds in the Band's favor on any count, however, it should provide an opportunity for further briefing on an appropriate remedy consistent with its determinations.

To the extent the Court reaches remedy, vacatur of the Permit is not warranted or appropriate. The general course of action when an agency action is found unlawful is remand to the agency. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Were a remand ordered here, it should be without vacatur.

The consequences of any vacatur of the Permit would be extremely disruptive. An order vacating and setting aside the Permit would prevent Enbridge from constructing this important Project. ECF No. 10-2 ¶ 58. In granting Enbridge's intervention in this case, this Court found that

[28] The Band's motion for summary judgment fails on the merits. In addition, the Band also lacks standing for at least Claims 1 and 2 of their Complaint. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Band submitted five declarations as attachments to its opening brief. ECF Nos. 22-2 to 22-6. These declarations are extra-record material, not properly before the Court, and should be struck. To the extent these declarations are intended to support the Band's standing for Claims 1 and 2, the Band has failed to establish any injury that could be redressed by this Court, because as explained above, the Band's NEPA and CWA Section 404(b)(1) Guidelines arguments pertain to issues outside the scope of the Corps' jurisdiction. *See Mobile Baykeeper*, 2014 WL 5307850, at *8 (finding that where the Corps declines to regulate HDD crossings over which it lacks statutory authority due to the absence of jurisdictional discharge, there is no relief the court can provide).

"invalidating the permit would at least delay Enbridge's proposed relocation and could prevent Enbridge from using the pipeline at all." *Bad River Band*, No. 1:25-cv-04359-TNM, at Dkt. 18, at 2. Any further delay impairs Enbridge's ability to "complete[ its] reroute as soon as possible," as the Seventh Circuit recently urged. *Bad River Band of Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co.*, Nos. 23-2309 & 23-2467 (7th Cir. July 30, 2026), at 44.

Further, any shutdown of Line 5 would violate the Treaty with Canada and the United States' "clear" foreign policy position that the pipeline remain in operation. *Enbridge Energy*, 813 F. Supp. 3d at 806-07 (the Treaty establishes the foreign policy of the U.S. concerning uninterrupted flow of oil through international pipelines, and as a result, Michigan's action to shutdown Line 5 is preempted by the foreign affairs doctrine). Indeed, as the Seventh Circuit recently noted, a disruption to Line 5's ongoing operation and throughput "risk[s] placing the United States in breach of its agreement with Canada." *Bad River Band of Lake Super. Tribe of Chippewa Indians v. Enbridge Energy Co.*, Nos. 23-2309 & 23-2467 (7th Cir. July 30, 2026), at 40-42. Delaying the Project would also result in significant additional construction costs and lost revenue for Enbridge, push out the expected regional economic benefits, and cause extensive harm to the public interest, including the refineries and fractionators currently served by Line 5. ECF No. 10-2 ¶¶ 59-69.

## CONCLUSION

For the foregoing reasons, the Band has failed to prove that the Corps acted arbitrarily and capriciously, or contrary to law, in issuing the Permit. The Court should grant Enbridge's cross-motion for summary judgment and deny the Band's motion for summary judgment.

Dated: July 31, 2026

Respectfully submitted,

/s/ Joshua H. Runyan
Joshua H. Runyan (D.C. Bar No. 977664)
Caitlin E. Ames (D.C. Bar No. 90002918)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
jrunyan@steptoe.com
cames@steptoe.com

Deidre Duncan (D.C. Bar No. 461548)
Karma B. Brown (D.C. Bar No. 479774)
HUNTON ANDREWS KURTH LLP
220 Pennsylvania Avenue, N.W.
Washington, DC 20037-1701
(202) 955-1500
dduncan@hunton.com
kbbrown@hunton.com

*Counsel for Defendant-Intervenor*
*Enbridge Energy, Limited Partnership*