UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| BAD RIVER BAND OF LAKE SUPERIOR CHIPPEWA,<br><br>*Plaintiff*<br><br>-v.-<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>*Defendant*<br><br>and<br><br>ENBRIDGE ENERGY, LIMITED PARTNERSHIP,<br><br>*Intervenor-Defendant* | Civil Case No: 26-cv-01171-TNM<br><br>**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS


TABLE OF CONTENTS ... i

TABLE OF AUTHORITIES ... iii

GLOSSARY ... ix

INTRODUCTION ... 1

ARGUMENT ... 2

I. THE CORPS FAILED TO MEET THE CLEAN WATER ACT SECTION 404 STANDARDS AND REGULATORY GUIDELINES ... 2

A. The Corps Failed to Evaluate the Impacts of Blasting Under the CWA and the 404(b)(1) Guidelines ... 3

1. The Corps has jurisdiction over and is required to evaluate the impacts of blasting in jurisdictional wetlands and waterways. ... 4

2. The Band raised significant concerns that blasting will have a negative impact on wetlands within the Project. ... 8

3. The Corps failed to consider the negative impacts of blasting on wetlands. ... 11

4. The Corps failed to respond to the Band's significant concerns that blasting will adversely impact wetlands. ... 14

B. The Corps Failed to Evaluate the Impacts of HDD Inadvertent Releases under the CWA and the 404(b)(1) Guidelines. ... 17

1. The Corps has jurisdiction to evaluate the impacts of inadvertent releases on wetlands adjacent to HDD construction. ... 18

2. Impacts from HDD IRs are foreseeable and must be disclosed and evaluated. ... 20

3. HDD IRs will adversely affect wetlands adjacent to HDD construction. ... 22

4. The Corps failed to consider the negative impacts of HDD IRs on wetlands. ... 25

C. The Corps cannot reasonably conclude that there will be no significant impacts under the 404(b)(1) Guidelines without evaluating the impacts of blasting and HDD construction on jurisdictional wetlands. ... 26

D. The Corps failed to support its factual determinations under the Guidelines. ... 27

II. THE CORPS' CLEAN WATER ACT 401(A)(2) DETERMINATION WAS ARBITRARY AND CAPRICIOUS ... 28

A. The Corps Failed to Consider All Evidence and Failed to Reasonably Explain Its Decision ... 30

1. The Corps' decision did not address the Band's evidence of under-identification of water resources or provide a reasonable explanation for its failure to do so. ... 31

2. The Corps' decision failed to address impacts to specific waters. ... 33

3. The Corps failed to address evidence of the ineffectiveness of Wisconsin's Water Quality Certification conditions and failed to explain its reasoning .......... 35

4. The Corps must consider all discharges from the Project .......... 36

III. THE CORPS VIOLATED NEPA .......... 37

A. The Corps Did Not Take a Hard Look at Impacts of Blasting Activities Required to Construct the Project .......... 38

B. The Corps Did Not Take a Hard Look at the Project's Oil Spill Risks and Effects .......... 41

C. The Corps Failed to Take a Hard Look at Impacts to the Band's Access to Ceded Territory .......... 47

D. The Corps Failed to Assess Environmental Justice Impacts .......... 51

IV. THE BAND HAS STANDING TO BRING ITS CLAIMS .......... 52

V. VACATUR IS THE APPROPRIATE REMEDY .......... 53

CONCLUSION .......... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

**All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*,
606 F. Supp. 2d 121 (D.D.C. 2009) ........................................................3, 16

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........................................................53

*Apache Stronghold v. United States*,
782 F. Supp. 3d 756 (D. Ariz. 2025) ........................................................49

*Appalachian Voices v. U.S. Army Corps of Eng'rs*,
134 F.4th 410 (6th Cir. 2025) ........................................................12

*Arkansas v. Oklahoma*,
503 U.S. 91 (1992) ........................................................37

**Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
No. CV 18-23-SDD-EWD, 2020 WL 1450750 (M.D. La. Mar. 25, 2020) ..........................44

*Audubon Society of Greater Denver v. U.S. Army Corps of Eng'rs*,
908 F.3d 593 (10th Cir. 2018) ........................................................19

*Bad River Band of Lake Super. Chippewa Indians v. Wis. Dep't of Nat. Res.*,
Case Nos. 2026-CV-08, 2026-CV-10 (Wis. Cir. Ct. Iron Cnty.) ..........................21, 49

*Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy*,
184 F.4th 874 (7th Cir. 2026) ........................................................1, 54

*Blue Mountains Biodiversity Project v. Trulock*,
No. 2:21-CV-01033-HL, 2023 WL 3645966 (D. Or. Apr. 27, 2023) ..........................40

**Borden Ranch Partnership v. U.S. Army Corps of Engineers*,
261 F.3d 810 (9th Cir. 2001) ........................................................6, 7

*Border Power Plant Working Grp. v. Dep't of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ........................................................52

*Butte Cty. v. Hogan*,
613 F.3d 190 (D.C. Cir. 2010) ........................................................33

*City of Albuquerque v. Browner*,
97 F.3d 415 (10th Cir. 1996) ........................................................34

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
144 S. Ct. 2440 (2024) (Kavanaugh, J., concurring) ....................53

*Covad Communications Company v. FCC*,
450 F.3d 528, 550 (D.C. Cir. 2006) ....................16

*Ctr. for Biological Diversity v. FAA*,
804 F. Supp. 3d 86 (D.D.C. 2025) ....................41, 48

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
No. CV 22-91-M-DLC, 2025 WL 3268655 (D. Mont. Nov. 24, 2025) ....................46

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) ....................53

*Defs. of Wildlife v. Ballard*,
73 F. Supp. 2d 1094 (D. Ariz. 1999) ....................41

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) ....................54

**Env't Def. Fund v. U.S. Army Corps of Eng'rs*,
515 F. Supp. 2d 69 (D.D.C. 2007) ....................13

**FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................28

*Fond du Lac Band of Lake Superior Chippewa v. Wheeler*,
519 F. Supp. 3d 549 (D. Minn. 2021) ....................30, 37

*Friends of the Bitterroot v. Burgum*,
No. CV 24-169-M-DLC, 2026 WL 1660439 (D. Mont. June 9, 2026) ....................50

*Fuel Safe Washington v. FERC*,
389 F.3d 1313 (10th Cir. 2004) ....................51

**Genuine Parts Co. v. Env't Prot. Agency*,
890 F.3d 304 (D.C. Cir. 2018) ....................28, 29, 32, 35

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
857 F.2d 505 (9th Cir. 1988) ....................40

*Indian River Cnty., Fla. v. U.S. Dep't of Transp.*,
945 F.3d 515 (D.C. Cir. 2019) ....................37

*Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*,
No. 2:21-CV-00161, 2023 WL 6226387 (S.D. Tex. July 27, 2023) ....................43

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)....................................................................................................37

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010)...................................................................................28, 33

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
99 F. Supp. 3d 1033 (N.D. Cal. 2015) ......................................................................49, 51

*Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs*,
No. CIV.A. 14-0032-WS-M, 2014 WL 5307850 (S.D. Ala. Oct. 16, 2014)...........................52

**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................................3, 21, 25, 26, 28, 34

*Nat. Res. Def. Council v. Hughes*,
437 F. Supp. 981 (D.D.C. 1977)..................................................................................51

*Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*,
931 F. Supp. 1515 (W.D. Wash. 1996)........................................................................48

*Ohio v. EPA*,
603 U.S. 279 (2024)....................................................................................................28

*Oregon Wild v. U.S. Forest Serv.*,
819 F. Supp. 3d 1185 (D. Or. 2026) .............................................................................37

*Orutsararmiut Native Council v. U.S. Army Corps of Eng'r*s,
751 F. Supp. 3d 971 (D. Alaska 2024) ..........................................................................20

**Pawnee Nation of Okla. v. U.S. Bureau of Indian Affairs*,
No. 4:16-cv-00697 (N.D. Okla. Aug. 6, 2026) .........................................................45, 48, 53

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
636 F. Supp. 3d 33 (D.D.C. 2022)..............................................................16, 27, 43, 51

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) ...........................................................................37, 44, 46

*River Road Alliance, Inc. v. U.S. Army Corps of Engineers*,
764 F.2d 445 (7th Cir. 1985) .......................................................................................15

*San Carlos Apache Tribe v. U.S. Forest Serv.*,
803 F. Supp. 3d 879 (D. Ariz. 2025) ...........................................................................52

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025)...........................................................................16, 37, 39, 42, 53

*Sierra Club, Inc. v. Bostick*,
787 F.3d 1043 (10th Cir. 2015) ....................................................................................43

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002)........................................................................................52

*Sierra Club v. FERC*,
153 F.4th 1295 (D.C. Cir. 2025).....................................................................................43

*Sierra Club v. U.S. Army Corps of Eng'rs*,
2020 WL 7389744 (D. Me. Dec. 16, 2020)....................................................................39

*Sierra Club v. U.S. Army Corps of Eng'rs*,
64 F. Supp. 3d 128 (D.D.C. 2014)..................................................................................43

*Sierra Club v. Watkins*,
808 F. Supp. 852 (D.D.C. 1991).....................................................................................46

*Stand Up for California! v. U.S. Dep't of the Interior*,
204 F. Supp. 3d 212 (D.D.C. 2016)................................................................................48

**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) (*Standing Rock I*)...............................................42, 45, 51

**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) (*Standing Rock II*) ...........................................38, 39, 42, 48

**Stewart v. Potts*,
996 F. Supp. 668 (S.D. Tex. 1998) ...............................................................................7, 39

**Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ..........................................................................................48

*W. Watersheds Project v. Bureau of Land Mgmt.*,
971 F. Supp. 2d 957 (E.D. Cal. 2013)............................................................................52

*Washington Area Bicyclist Ass'n v. Burgum*,
2026 WL 1078218 (D.D.C. Apr. 21, 2026) ....................................................................53

*Wendling Quarries, Inc. v. U.S. Army Corps of Eng'rs*,
No. 3-16-CV-83-CRW-CFB, 2017 WL 8678693 (S.D. Iowa Nov. 30, 2017)..................18, 39

**Federal Statutes**

5 U.S.C. § 706(2) ..............................................................................................................53

33 U.S.C. § 1341(a)(2)...............................................................................................29, 30, 36

42 U.S.C. § 4332(2)(C).........................................................................................................37

**State Statutes**

Wis. Stat. § 943.143(2) ....................47

**Rules & Regulations**

33 C.F.R.
§ 230.10(a) ....................19
§ 323.2(c) ....................5
§ 323.2(d)(1) ....................5, 19
§ 323.2(d)(1)(iii) ....................5, 19
§ 323.2(f) ....................17
§ 333.15 ....................37
§ 352.2(a)(6) ....................16

40 C.F.R.
Part 230 ....................2
§ 121.14(a) ....................29, 36
§ 121.15(d) ....................30, 36
§ 121.15(e) ....................30
§ 230.1(c) ....................4
§ 230.5(j) ....................18
§ 230.10(c) ....................2, 26
§ 230.10(d) ....................18
§ 230.11 ....................27
§ 230.11(a) ....................27
§ 230.11(e) ....................2
§ 230.11(e) ....................27
§ 230.11(g)(1) ....................2, 12, 13, 27
§ 230.11(h) ....................17, 18, 26
§230.11(h)(1) ....................2, 19, 27
§§ 230.70–77 ....................18
§§ 230.91–98 ....................13, 18
§ 239.11(h)(2) ....................19

*Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66637 ....................36

**Treatises**

Treaty of LaPointe, 10 Stat. 1109 (1854) ....................29

**Other Authorities**

EPA, *Application of Region 5's CWA 401(a)(2) "May Affect" Screening Analysis for PolyMet's NorthMet Mining Project, June 4, 2021* (last accessed Sept. 14, 2026) ....................37

Letter from Karen Hyun, Secretary, WDNR, to Enbridge (Aug. 27, 2026). ................................22

# GLOSSARY

| | |
|---|---|
| **NEPA** | National Environmental Policy Act |
| **CWA** | Clean Water Act |
| **APA** | Administrative Procedures Act |
| **Corps** | U.S. Army Corps of Engineers |
| **Band** | Bad River Band of Lake Superior Chippewa |
| **1837 Treaty** | Treaty with the Chippewa, 7 Stat. 536 (1837) |
| **1842 Treaty** | Treaty with the Chippewa, 7 Stat. 591 (1842) |
| **1854 Treaty** | Treaty of LaPointe, 10 Stat. 1109 (1854) |
| **MNRD** | Mashkiiziibii Natural Resources Department |
| **WDNR** | Wisconsin Department of Natural Resources |
| **GLIFWC** | Great Lakes Indian Fish and Wildlife Commission |
| **Project** | Proposed Line 5 Segment Reroute Project |
| **HDD** | Horizontal Directional Drilling |
| **ATWs** | Additional Temporary Workspaces |
| **NGL** | Natural Gas Liquid |
| **IR** | Inadvertent Release or Inadvertent Return |
| **TAS** | Treatment As a State |
| **DCDD** | Draft Combined Decision Document (2024) |
| **WQC** | Water Quality Certification |
| **WQS** | Water Quality Standards |
| **BMPs** | Best Management Practices |
| **PHMSA** | Pipeline and Hazardous Materials Safety Act |

## INTRODUCTION

The Line 5 pipeline has been trespassing on the Bad River Band of Lake Superior Chippewa's Reservation since 2013, as affirmed by the Seventh Circuit. *Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy*, 184 F.4th 874, 902, 906 (7th Cir. 2026). Enbridge Energy's proposal to remedy its deliberate trespass is to construct the Line 5 Reroute Project (Project) completely upstream and directly around the Bad River Band's Reservation. Rather than uphold a short-term deadline (originally three years) to complete the Project, the Seventh Circuit provided language in dicta that Enbridge must have a "reasonable opportunity" to complete the Line 5 Reroute Project. *Id.* at 902. This "reasonable opportunity" does not, however, give Enbridge a pass to violate federal or state laws. The Band must also have a reasonable opportunity to hold state and federal agencies accountable to the laws designed to ensure environmental concerns are taken seriously and that agencies make their decisions based on public input and reasoned analysis.

In issuing this Clean Water Act Section 404 and Rivers and Harbors Act Section 10 Permit, the U.S. Army Corps of Engineers (Corps) failed to comply with federal laws, including the Clean Water Act (CWA), the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA). Since its proposal in 2020, the Band has raised serious concerns about the Project's environmental impact, but the Corps has not addressed any of these issues. While the Corps and Enbridge point to the number of pages in the record, the record shows very little evidence that the Corps actually considered or utilized any of the information it had on the Project's environmental harms. Nor does the record demonstrate that the Corps obtained or evaluated additional information it needed to assess the Project's environmental impacts. The Corps simply failed to seriously weigh and consider the Band's concerns and failed to assess the Project's impacts. Rather, the Corps skipped those substantive steps in favor of

hiding behind an improperly narrow interpretation of its responsibility. The Corps' evasion violates federal law, is contrary to the record, and this Permit must be vacated.

## ARGUMENT

### I. THE CORPS FAILED TO MEET THE CLEAN WATER ACT SECTION 404 STANDARDS AND REGULATORY GUIDELINES

The Corps arbitrarily avoided evaluating impacts of Project construction under the Section 404(b)(1) Guidelines. The Section 404(b)(1) Guidelines, 40 C.F.R. Part 230, require that the Corps substantively evaluate impacts to the aquatic ecosystem prior to issuing a permit. If, after applying the substantive standards in the 404(b)(1) Guidelines, the Corps finds that there will be significant adverse impacts to the aquatic ecosystem, it may not issue a permit. *Id*. § 230.10(c) ("no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States"). As part of this determination, the Corps must "[d]etermine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms." *Id.* § 230.11(e). The Corps must evaluate the cumulative effects of the Project on the aquatic ecosystem, which "are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." *Id.* § 230.11(g)(1). The Corps also must evaluate the secondary effects of the project on the aquatic ecosystem, which are "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." *Id.* § 230.11(h)(1).

Under the APA,

> [A]n agency decision [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of its decision that runs

> counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Courts must "conduct a 'searching and careful' review of the record to establish that the agency's decision is rational and based on consideration of all relevant factors." *All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 2d 121, 127 (D.D.C. 2009) (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). The relevant factors here are those outlined in both the Corps' own regulations and the Section 404(b)(1) Guidelines. As applied to the Section 404(b)(1) Guidelines, the Corps must also demonstrate that it "considered significant comments and criticisms [and] explain[] why it disagrees with them; it may not dismiss them without adequate explanation." *Id.* at 132 (citing *ARCO Oil & Gas Co. v. FERC*, 932 F.2d 1501, 1504 (D.C. Cir. 1991)).

The Corps has not conducted the substantive evaluations required by the Section 404(b)(1) Guidelines to determine whether the methods of construction, such as blasting or Horizontal Directional Drilling (HDD), will have significant adverse impacts on the aquatic ecosystem. Nor has the Corps reasonably explained why it declined to do so, despite the Band raising significant concerns since this Project was first proposed.

### A. The Corps Failed to Evaluate the Impacts of Blasting Under the CWA and the 404(b)(1) Guidelines

The Corps says little to explain its failure to look at the environmental impacts of blasting as a construction method. The Corps and Enbridge rely on the conclusory statement in the Final Combined Decision Document (CDD) that "[b]lasting does not result in regulated discharges of dredged or fill material, and the area proposed to be trenched would not change if blasting occurs." AR000624–25; Def.-Intervenor Enbridge's Mem. in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summary J. 19 (Doc. 24) (Enbridge Brief); Def. U.S. Army Corps

of Engineers' Mem. in Supp. of Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. 29 (Doc. 26) (Corps Brief). This scant statement, however, does not satisfy the Corps' duty under the 404(b)(1) Guidelines to evaluate blasting impacts on wetlands.

Wetlands are an ecosystem, which is exactly what the CWA and the 404(b)(1) Guidelines specifically contemplate regulating. 40 C.F.R. § 230.1(c) ("Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern"). Enbridge must disclose and evaluate the methods it will use to trench and blast through those regulated wetlands under both the CWA and NEPA. Parsing apart the construction method does nothing to alleviate what the law requires of the Corps, as both trenching and blasting in jurisdictional waters are regulated activities that impact aquatic ecosystems. Blasting underlying wetland layers is still blasting within the wetland; the wetland does not disappear just because there is bedrock underneath that must be excavated to lay the pipeline. Indeed, the substrate beneath the wetland, which is part of the wetland hydrology, can be precisely what makes many of these wetland areas unique. Without a disclosure of or analysis of blasting impacts on those wetlands, the Corps cannot make a determination that those impacts do not significantly adversely affect the aquatic ecosystem.

1. *The Corps has jurisdiction over and is required to evaluate the impacts of blasting in jurisdictional wetlands and waterways.*

The Corps violated the CWA in concluding that no significant adverse effects would occur under the Section 404(b)(1) Guidelines without any analysis of blasting's impact on aquatic resources. Blasting is not an incidental activity to pipeline construction. Rather, blasting is essential to Enbridge's construction plan: to physically blast within wetlands and waterways

where it cannot dig through the substrate to create the trench to lay the pipeline. The Corps concedes that side-casting trench materials and backfilling trenches within wetlands is a regulated activity. AR000592. Blasting within wetlands, including backfilling the trench with blasted rock, is similarly a regulated activity.

Blasting as a construction method within a wetland is a regulated activity under Corps regulations. Blasting will create smaller bits of rock or hardened "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). It will also occur within a wetland within the Corps permit area. After the blasted material is excavated and the pipe is laid, the trench will be backfilled "with approved materials to support and protect the pipeline from damage." AR003117. This could include "bedding material (e.g., crushed rock)" at the base of the pipe. AR003121. Enbridge testified that it will return the blast rock as backfill to the trench. AR006698; *see also* AR000705 ("The remainder of the backfill material will be native material."). This plainly fits into the Corps' regulatory definition of discharge of dredged material, which is "any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States," including "excavated material . . . which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." 33 C.F.R. §§ 323.2(d)(1) and (iii). Blasting is clearly an excavation method that creates excavated material, which is then later redeposited into the trench as backfill after the pipeline is laid.

The Corps also cannot avoid its regulatory duties to disclose and evaluate the impacts of project blasting by artificially segmenting construction between trenching wetland soils and excavating beneath the wetland via blasting. Both trenching and blasting occur within the delineated wetland boundaries, and both are an excavation and discharge of material within the

wetland itself. The Corps characterizes blasting as an activity that fractures rock in place, and then the rock is removed to excavate the trench. Corps Br. 29. However, this does not explain why blasting and replacing the blasted material into the wetland area is not considered a regulated activity.

Case law further supports that blasting to fracture the substrate of a wetland is similar to other activities involving excavation to rip through or alter the restrictive layer below a wetland. In *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, the Ninth Circuit determined that the act of "deep ripping" in wetlands can "destroy the hydrological integrity of these wetlands" and required a CWA permit. 261 F.3d 810, 813 (9th Cir. 2001), affirmed by an equally divided Court, 537 U.S. 99 (2002). The developer in *Borden Ranch* wanted to alter the restrictive layer of soil below the wetland to make the soil suitable for deep root systems and used the "deep ripping" technique specifically to "gouge[] through the restrictive layer, disgorging soil that is then dragged behind the ripper." *Id.* at 812. The developer did not "fill" the wetland but instead poked through the restrictive layer, which is similar to the blasting that Enbridge will conduct in the bedrock here. The Ninth Circuit found that "deep ripping" needed a CWA permit because of the impacts to wetlands. *Id.* at 814–15. Here, Enbridge is using blasting to achieve the same outcome as "deep ripping": altering the restrictive layer below a wetland. Not only does the plain language of Corps regulations define blasting as a regulated activity, but the Ninth Circuit has also found similar actions to be a regulated activity. This Court should follow that rationale here.

*Borden Ranch* also presented the question of enforcement against the developer for destroying wetlands, but enforcement of the CWA necessarily demonstrates the bounds of the Corps' jurisdiction and what the Corps can regulate. To the extent that opposing parties may try to differentiate *Borden Ranch* on the grounds that part of the Ninth Circuit's analysis involved

the definition of "pollutant" with respect to the developer's activity, that distinction is without a difference in this case. The court in *Borden Ranch* found the developer's argument that "deep ripping" only ripped the soil, rather than adding a pollutant, uncompelling: "While it is true, that in so doing, no new material has been 'added,' a 'pollutant' has certainly been 'added.' Prior to the deep ripping, the protective layer of soil was intact, holding the wetland in place. Afterwards, that soil was wrenched up, moved around, and redeposited somewhere else." *Id.* at 815. The same applies to blasting wetlands in this case. Here, pollutants will also be added through the blasting agents required to complete the activity. *See id.* (describing the regulation of pollutants under the Clean Water Act). From any angle, the act of blasting within wetlands is a regulated activity.

The Corps cannot escape its regulatory responsibility to evaluate the environmental impacts of blasting by artificially segregating the construction methods through wetlands. Both the Corps and Enbridge miss the point of *Stewart v. Potts*, which illustrates that blasting through streams and wetlands, which are within the Corps' jurisdiction, has environmental impacts that must be evaluated. The distinction that the Corps and Enbridge try to draw—between trenching through wetlands and blasting the underlying layer of those very wetlands to avoid evaluating impacts—is exactly what the court addressed in *Stewart.* 996 F. Supp. 668, 683 (S.D. Tex. 1998). Here, as there, the argument that "the Corps does not have jurisdiction to consider the environmental consequences . . . on jurisdictional wetlands rests on an artificial distinction." The activities here are also more direct than those in *Stewart*. There, the Corps attempted to avoid evaluating overall forest fragmentation resulting from wetland fill under NEPA, whereas here, blasting will directly impact the jurisdictional wetlands.

The Corps already has jurisdiction to evaluate the impacts of blasting on wetlands as a regulated activity. It does not need to expand its jurisdiction, contrary to Enbridge's argument that the Corps had no duty to do so. Enbridge Br. 19 (citing *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009)). Under both the Corps' own regulations and applicable case law, blasting through jurisdictional wetlands is a regulated activity under the CWA and must be evaluated under both the CWA 404(b)(1) Guidelines and NEPA.

*2. The Band raised significant concerns that blasting will have a negative impact on wetlands within the Project.*

The Band has consistently informed the Corps, via comments and expert reports, that blasting impacts to wetlands and waterways will change wetland hydrology and adversely affect the wetland ecosystem. However, the Corps does not address any of the concerns the Band raised in its final decision. The Band also consistently flagged that blasting information available for public comment was lacking. The General Blasting Plan attached to the Draft Combined Decision Document (DCDD), AR038190–203 (which remains the same for the final CDD), only roughly addressed in-stream blasting and contained a table of mileposts where blasting was likely, AR000996–97. The General Blasting Plan completely lacks any information on which wetlands are planned for blasting. AR024699–25069; AR025086. The only document that identified specific wetlands for blasting in the draft process was the wetland and waterbody crossing table. AR043988–90. Although the Band flagged that information as missing, the Corps did not provide that information as part of the record.

Based on this limited information, the Band's expert created maps to better identify the locations where blasting was expected to either change wetland hydrology or damage wetland ecology, and to visually depict blasting and its relation to water and wetland resources. The first

map shows visual markers for where blasting is likely to occur along the Project. The second map shows visual markers for seeps and wetland resources along the Project.




AR025082 (Fig. 9).




AR025081 (Fig. 8).

Despite the fact that the paucity of information on blasting was severely deficient for the purposes of public comment, the Band noted in detail that blasting in wetlands has a high potential to permanently alter wetland hydrology through expert reports. The wetlands proposed for blasting are in a unique region where changes to the substrate of the wetland can have hydrologic impacts. Most construction blasting is in the southern and eastern parts of the Project. The Band raised in comments that wetlands in this part of the Project "occur in shallow bedrock depressions and in hummocky till deposits." AR025077. Wetlands in this region are highly susceptible to hydrological alterations that can either drown a wetland if upward flow is uncontrolled or dry out the wetland if there is excess infiltration into sand, gravel, or bedrock beneath the wetland. *Id.*; *see also* AR025086 ("Blasting has the potential to increase total suspended solids (TSS) in wetlands, impact groundwater hydrology by creating new bedrock fractures which may dry up or drown wetlands, or change flow rates at seeps.")

The Band repeatedly flagged that specific information about wetlands within the pipeline route is lacking. For example, there are likely many seeps and smaller water movements within wetlands that do not show up on company maps. AR024703. The Band also identified several bioindicators for groundwater-fed wetlands, and yet wetlands containing those bioindicators were not valued as groundwater-fed wetlands. AR024710. The failure to include this information inhibited the Band's—and the Corps'—ability to fully assess the impacts that blasting, or any construction method, would have on these resources. Seeps, groundwater-fed wetlands, and high-quality wetlands occur along the portion of the Project that will be blasted. *See* AR025081 (Fig. 8).

At least two proposed wetlands to be blasted are fed by seeps, which directly link groundwater flow to the wetland they feed. AR024710 (Table) (identifying wirb1007f as a seep

wetland proposed for blasting, and wirb1002f as a seep wetland proposed for blasting). Blasting can change seep flow rates, which ultimately affect wetland hydrology. AR025086. The Band raised that several wetlands proposed for blasting are designated as high-quality wetlands, but the impacts of blasting on these wetlands, or whether blasting will change their designation as high-quality wetlands, are not disclosed or discussed. AR024737–38. Further, wetlands, especially those designated as high-quality, must be disclosed and evaluated in order to assess what mitigation is required. *Id.* ("Potential negative blasting impacts are missing in the discussion of mitigation or restoration."). Neither the DCDD nor the CDD discuss any of these environmental impacts to wetlands, despite the Band's repeated comments raising this issue.

*3. The Corps failed to consider the negative impacts of blasting on wetlands.*

Enbridge and the Corps do not address the specific, repeated concerns the Band raised about the impacts blasting will have on wetlands. The Corps simply argues it "did consider blasting's potential effects on aquatic resources as well as Enbridge's proposed avoidance and minimization measures," Corps Br. 30, but does not, and cannot, point to anywhere in the record where that analysis exists. The Corps and Enbridge citations on this point do nothing more than disclose that blasting will occur. The Corps points to a wetland and waterway crossing table, AR0001607–09, and the total number of acres and streams impacted, AR000624, 621, and claims that it did not act arbitrarily or capriciously. Corps Br. 30. Enbridge similarly cites the only place in the CDD that addresses blasting directly, AR000624–25, as well as the wetland and waterway crossing table and the total number of wetland acres impacted by blasting, and claims that this was enough to show the Corps "extensively considered" blasting impacts. Enbridge Br. 26. These citations are no more than disclosures that blasting will be happening; none of these citations actually analyze the environmental impacts of blasting.

The Corps then cites *Appalachian Voices v. U.S. Army Corps of Engineers* for the proposition that the Corps can use waterbody tables in evaluating crossing methods. Corps Br. 30. Its reliance falls short. In *Appalachian Voices*, the Corps made comparisons between construction crossing methods for purposes of an evaluation that the project was the least environmentally damaging practicable alternative under the 404(b)(1) Guidelines. 134 F.4th 410, 420 (6th Cir. 2025). What the Corps ignores here is that the *Appalachian Voices* court listed the information disclosed in the tables at issue in that case, which included dimensions, substrate type, location, and *potential crossing impact* of every waterbody within the pipeline's path. *Id*. Both Enbridge and the Corps cite the wetland and waterbody crossing table in Appendix 15 of the CDD extensively. AR001607–09. In the top row, AR001607, visible upon zooming in, there is no heading for the potential crossing impact of each crossing, much less for crossings involving blasting. Therefore, it is impossible to use the table to determine what the blasting impacts to wetlands and waterways actually are. [1]

Enbridge and the Corps' citations to the aggregate number of acres that will be blasted in the CDD are also not citations to an analysis of impacts to those acres, nor do they explain the significance of those aggregate numbers. This aggregate citation also glosses over the requirement that the Corps consider the cumulative effects on the aquatic ecosystem, which "are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). Blasting through individual wetlands throughout several miles of the pipeline route is the type of "cumulative effect of numerous such piecemeal changes

[1] The specific issue in *Appalachian Voices* concerned whether blasting was the least environmentally damaging practicable alternative for each crossing given the various pipeline construction methods. 134 F.4th at 420. The case did not dispute whether there is an obligation to evaluate the impacts of blasting as a construction method within the Corps' jurisdiction.

[which] can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." *Id.* Enbridge and the Corps both attempt to skirt the issue the Band raises: the total number of acres is not a disclosure or analysis of blasting impacts, nor is it representative of the number of discrete wetlands that will be blasted across several miles of the pipeline route.

Wetland features and wetland ratings must be accounted for when analyzing project impacts, especially because those impacts must be included in restoration and mitigation efforts. *See* 40 C.F.R. §§ 230.91–98. This glossing over of impacts was at issue in *Environmental Defense Fund v. U.S. Army Corps of Engineers*, and Enbridge's attempts to differentiate that case fall flat. Enbridge Br. 26. In *Environmental Defense Fund*, the Corps manipulated habitat models to make it look like the project would be fully mitigated, and the court found that the Corps' conclusions based on those models were arbitrary and capricious. 515 F. Supp. 2d 69, 83 (D.D.C. 2007) ("The agency cannot reliably conclude that the selected project has minimized adverse impacts on aquatic ecosystems to the extent practicable when its habitat mitigation calculations are infected with an underestimate of the floodplain habitat impacted.") (internal citations omitted). The Band here contends that the nature and the extent of impacts to individual wetlands—regardless of total acreage—are missing. Blasting impacts are not just a number attached to total acreage; they are specific to wetland features, functions, and ecology. That missing data means that impacts from blasting, even in the aggregate, are diluted because only acreage is considered. The Band has consistently stated throughout comments and in this litigation that the Corps cannot support a conclusion that construction impacts to wetlands and waterways would be minimal when the Corps reported only the number of acres impacted with no environmental evaluation of any ecological functions of these wetlands. Band's Mem. In

Supp. of Mot. for Summ. J. 22–35, ECF No. 22-1 (“Band Brief”). As with *Environmental Defense Fund*, the Corps’ conclusion of no adverse impacts is infected with the lack of qualitative analysis of blasting impacts on wetlands.

#### 4. *The Corps failed to respond to the Band’s significant concerns that blasting will adversely impact wetlands.*

The Corps and Enbridge further failed to address that backfilling the trench with bedrock can alter the hydrology and adversely affect connected wetlands. The Band’s experts raised concerns throughout the permitting process that the porous material backfilled into the trench—either sand, gravel, or the blasted bedrock—can create a “French drain,” which is usually a constructed feature designed to purposely drain an area. This could allow water to pool in those porous areas and change hydrology, or alter surface-groundwater interactions, resulting in negative impacts to the wetland above. AR024719, 36.

Rather than actually evaluate and analyze the environmental impacts of this issue, the Corps simply stated that trench breakers would remedy the Band’s concerns. Corps Br. 23; *see also* AR024719. But trench breakers are not fully effective if there are fractures within the bedrock, which is a risk with blasting. AR004969; *see also* AR024719. Yet the Corps does no analysis whatsoever of whether trench breakers used in the proposed manner would alleviate the Band’s concerns. Nor does the Corps analyze the impacts in the event that the trench breakers fail as a preventative measure.

The Corps similarly failed to analyze whether the corrective actions Enbridge championed, such as grading or recontouring, would address changes to wetland hydrology. AR004959–60. Grading or recontouring is not effective when subsurface groundwater flow paths or groundwater-surface water interactions have been altered. AR004959–60. Again, there is no

analysis of the impact grading or recontouring will have on the wetland, or whether those methods are effective.

Lacking any concrete analysis in the CDD, the Corps and Enbridge both cite to a very narrow range of pages in the administrative record in an attempt to demonstrate that the Corps did respond to the Band's concerns, and that the Corps was allowed to rely on Enbridge's response with no analysis whatsoever. Enbridge Br. 26–27; Corps Br. 31–32. However, these citations are only to the two paragraphs in the CDD, the wetland and waterbody crossing table, and the Corps' response to comments. AR002032–88. The CDD and the wetland and waterbody crossing table contain no analysis of whether or not impacts from blasting can be mitigated or remediated. As explained in the Band's initial brief, the Corps' response to comments also does not contain this analysis either and relies solely on Enbridge's responses to the Corps. Enbridge cites to the Corps' regulation on processing permits, but the language of that regulation only gives the applicant a period of time to respond to Corps inquiries; it does not relieve the Corps from the duty to actually look at and evaluate the information it receives from the applicant. Enbridge Br. 27 (citing 33 C.F.R. § 325.2(d)(5) (timing of processing applications)).

Enbridge's reliance on *River Road Alliance, Inc. v. U.S. Army Corps of Engineers* for the contention that the Corps can adopt Enbridge's rebuttal wholesale with no analysis is misplaced. In *River Road*, the court rejected the argument that the Corps had to prepare a feasibility study with alternative sites, which involved determining business needs and landowner permissions. 764 F.2d 445, 453 (7th Cir. 1985). The Band agrees that "[t]he Corps is not a business consulting firm[,]" *River Road*, 64 F.2d at 453, but it is a federal agency tasked with making substantive findings "on the probable effect of the proposed work on the public interest including conformity with the guidelines published for the discharge of dredged or fill material into waters of the

United States," 33 C.F.R. § 352.2(a)(6). The Corps' decision must be supported by the administrative record. *Alliance to Save the Mattaponi*, 606 F.Supp.2d at 127. Here, unlike in *River Road*, the Corps has simply regurgitated Enbridge's technical responses to environmental concerns, rather than business plans, with no analysis. This is arbitrary and capricious.

The Corps' failure to conduct its own analysis of blasting impacts to wetlands and waterways is a fatal error under the CWA and is an abdication of the Corps' responsibility to comply with the Section 404(b)(1) Guidelines. The caselaw the Corps cites to argue the contrary does not support its argument. The cited portions of both the *Red Lake Band* and *Seven County* decisions examined agency NEPA review. In *Red Lake Band*, the Corps relied on a state environmental impact statement to support its NEPA findings, which the Corps did not do in this case. *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 55–56 (D.D.C. 2022). *Seven County* is a NEPA decision that acknowledged that the CWA differs from NEPA in that it imposes substantive requirements. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 180 (2025) ("Unlike a plethora of other federal environmental statutes (such as the Clean Air Act, the Clean Water Act, etc.), NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project"). Enbridge's reliance on *Covad Communications Company v. FCC* also falls short. Enbridge Br. 27. The court in *Covad* recognized that "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors," 450 F.3d 528, 550 (D.C. Cir. 2006) (citing *Thompson v. Clark,* 741 F.2d 401, 409 (D.C. Cir. 1984)). None of the cited cases relieve the Corps of its duty to evaluate impacts to jurisdictional wetlands under the 404(b)(1) Guidelines, nor do they

demonstrate that the Corps has met its responsibility under the APA to support its decision based on evidence in the administrative record.

The Corps simply failed to respond to the Band's comments that raised significant concerns, and the Corps failed to analyze blasting impacts on wetlands and waterways. The Corps' failure to analyze the impacts of blasting violates the CWA 404(b)(1) Guidelines, the CWA, and is arbitrary and capricious.

### B. The Corps Failed to Evaluate the Impacts of HDD Inadvertent Releases under the CWA and the 404(b)(1) Guidelines.

In this case, Enbridge will construct the pipeline using HDD. To facilitate that construction, it must place equipment, including timber matting, directly in jurisdictional wetlands right next to the HDD entry and exit locations, which qualifies as a discharge of fill material. 33 C.F.R. § 323.2(f); *see also* AR000592. And because inadvertent releases (IRs) from HDD construction are foreseeable, the Corps needed to evaluate the impacts of an IR on the jurisdictional wetland as a secondary impact on the aquatic ecosystem under the 404(b)(1) Guidelines. 40 C.F.R. § 230.11(h).[2]

The Corps must evaluate the impacts that HDD has on adjacent wetlands. Its attempt to differentiate the purpose of placing timber matting within jurisdictional wetlands from the activity of HDD construction in order to escape evaluating HDD's impact fails. Just because Enbridge can theoretically complete HDD crossings without placing timber matting in jurisdictional wetlands does not mean that the Corps can ignore that the timber matting is

[2] If the timber matting was placed in a wetland to facilitate an activity that did not have immediate or foreseeable impacts, the Corps would be in a different posture. For example, if timber matting were placed in a jurisdictional wetland to serve as a space for equipment to sit, and an unmanned truck rolled off that timber matting and fell onto the pipeline and caused it to leak 1.3 million gallons of natural gas liquids, the Corps would have a colorable argument that that was not foreseeable or a connected activity.

specifically placed at HDD entry and exit locations to facilitate HDD construction that may adversely impact the wetland sitting right under the timber matting. If Enbridge were to complete the construction within jurisdictional wetlands without timber matting, the Corps would still have to evaluate the impact that the construction equipment would have on those wetlands. The Corps' hypothetical that "such an interpretation of the CWA and 404(b)(1) Guidelines would likely dissuade applicants from proposing minimization measures like matting at all," Corps Br. 34, is directly contradictory to several other requirements regarding minimization and mitigation in the Guidelines. *See, e.g.*, 40 C.F.R. § 230.5(j) (Corps procedures include "[i]dentify[ing] appropriate and practicable changes to the project plan to minimize the environmental impacts of discharge"), *id.* § 230.10(d) ("no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem"), *id.* §§ 230.70–77, 230.91–98 (actions to minimize adverse effects and compensatory mitigation for loss of aquatic resources). Indeed, such an argument implies the Corps would abandon all its duties under the regulatory Guidelines.

1. *The Corps has jurisdiction to evaluate the impacts of inadvertent releases on wetlands adjacent to HDD construction.*

The Guidelines make clear that the Corps must evaluate secondary impacts, which do not result from the actual placement of fill. 40 C.F.R. § 230.11(h). This is not an expansion of the Corps' jurisdiction, and the connection between placing matting (or anything) in jurisdictional wetlands to facilitate HDD construction, and especially in the entry and exit locations of HDD drilling where HDD accidents happen, is not as disconnected as Enbridge and the Corps try to make it seem. Enbridge's citation to *Wendling Quarries, Inc. v. U.S. Army Corps of Engineers* is also not persuasive. No. 3-16-CV-83-CRW-CFB, 2017 WL 8678693, at *2 (S.D. Iowa Nov. 30, 2017) (citing *Green Acres Enters. v. United States*, 418 F.3d 852, 856–67 (8th Cir. 2005) (part of

a long line of cases regarding the Corps' interpretation of "incidental fallback," which is a specific definition codified in Corps permitting regulations); *see also* 33 C.F.R. § 323.2(d)(1)(iii). What constitutes "incidental fallback" is not at issue in this case, and the Corps has not made any references to incidental fallback or whether it is relevant in this record.

The connection between placing the matting in jurisdictional wetlands and the act of HDD construction is not as attenuated as the Corps claims. At the very least, the Corps had to evaluate the impact of IRs as a secondary effect under the Guidelines, which "are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, *but do not result from the actual placement of the dredged or fill material*." 40 C.F.R. §230.11(h)(1) (emphasis added). The Guidelines provide analogous examples, such as surface runoff from developments on fill. *Id*. § 239.11(h)(2). In those examples, the Corps may not have jurisdiction over the development on the fill, but it would still need to evaluate it. The Guidelines also clearly state that "…[a]ctivities to be conducted on fast land created by the discharge of dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands." *Id*. This example further illustrates that the activity on top of the fill, whether it is fast land or timber matting, may have secondary impacts to be considered.

The caselaw the Corps cites fails to support its position. *Audubon Society of Greater Denver v. U.S. Army Corps of Engineers* does not support the Corps' conclusion that the timber matting is incidental to the Project and that it "need only address alternatives to the proposed discharge." Corps Br. 34; 908 F.3d 593, 608 (10th Cir. 2018). The dispute in *Audubon Society* was the interpretation of 33 C.F.R. § 230.10(a) and the scope of the Corps' analysis for alternatives to the project, not the incidental nature of the impact. *Audubon Society*, 908 F.3d at

605–06 (describing the Corps' and the Audubon Society's interpretations of 40 C.F.R. § 230.10(a) and the language "practicable alternative to the proposed discharge"). Nothing in *Audubon Society* addresses the Guidelines' requirement to evaluate secondary impacts of a proposed discharge, which is the issue here. *Orutsararmiut Native Council v. U.S. Army Corps of Engineer*s likewise does not support the proposition that secondary effects are from the fill itself. Corps Br. 35; 751 F. Supp. 3d 971, 989 (D. Alaska 2024). In *Orutsararumiut*, the district court in Alaska found that the increase in barge traffic resulting from a port built for mining operations is not a secondary effect of the port fill. 751 F. Supp. at 989. Even without opining on whether the district court in Alaska was correct, the chain of activities at issue in *Orutsararumiut* is much more drawn out than the situation at issue here.

Further, the Band is not asking the Corps to issue permits for IRs. Corps Br. 35–36; Enbridge Br. 29–30. The Band has consistently asked, however, for the Corps to collect information, disclose, and analyze the impacts that IRs will have on adjacent wetlands as required under the Section 404(b)(1) Guidelines.

2. *Impacts from HDD IRs are foreseeable and must be disclosed and evaluated.*

If discharge of dredge or fill material, in this case the timber mats, were placed in a wetland to directly facilitate any activity that could have a foreseeable impact on the wetland, those impacts would need to be disclosed and evaluated pursuant to the 404(b)(1) Guidelines. The Band's assertions that IRs are foreseeable are not far-fetched, and it is deliberately obtuse for the Corps to conclude otherwise. The Band submitted examples of the numerous IRs that occurred during the Enbridge Line 3 pipeline project in Minnesota. AR003383, 3405, 3446; AR009116, 19, 25, 28; AR024642, 44, 47; AR026159 (IRs occurred at 12 of the 19 (63%) HDD water crossings); AR025097–100 (table of the 28 IRs that occurred during Line 3 construction).

Significantly, of the 28 IRs that occurred during the Line 3 construction, 13 of them occurred in wetlands. AR005399; *see also* AR025097–100. Impacts from IRs are neither hypothetical nor rare.

Nonetheless, despite actual examples from the same project proponent on a nearby pipeline, the Corps' only response was that it simply disagrees that IRs are foreseeable, without explanation. Corps Br. 35. Given Enbridge's history, the Corps' position strains credulity. The Corps' conclusory statement also contradicts Wisconsin Department of Natural Resources' (WDNR) Findings of Fact ¶ 60(j) in the state water quality certification (WQC) for the Project, stating that "[i]t is likely that the Project will experience an inadvertent release (IR) during one or more of the proposed trenchless installations," and that "[m]ost IRs occur near entry and exit workspaces[.]" AR000062.[3] Even if the Corps disagreed with WDNR's findings in the WQC, it needed to explain its reasoning for doing so under the APA.[4] *State Farm*, 463 U.S. at 43 (an agency decision is arbitrary and capricious if the explanation of its decision runs counter to the evidence before the agency).

Unfortunately, the Band is currently in the unique position of witnessing and being directly harmed by IRs that have happened during the construction of this very pipeline Project. The Band has been notified of, and the WDNR has reported, at least five IRs that have occurred throughout the Line 5 Reroute construction. 2nd Tillison Decl. ¶ 14. HDD construction under

---

[3] Although WDNR found that the severity of an IR would be reduced by monitoring and comprehensive restoration as part of its WQC, the agency nonetheless found IRs likely. This matter is also actively under review in Wisconsin state court. *Bad River Band of Lake Super. Chippewa Indians v. Wis. Dep't of Nat. Res.*, Case Nos. 2026-CV-08, 2026-CV-10 (Wis. Cir. Ct. Iron Cnty.).

[4] The Corps' claim also goes directly against publicly available information from Enbridge at the time the Band was preparing comments. AR005399 ("Enbridge states on their website regarding the HDD construction process, '[IRs] are not unusual or unexpected'").

Vaughn Creek resulted in multiple incidents. One incident on June 27, 2026, resulted in approximately 1500–1900 gallons of drilling fluid being directly released into a forested wetland, with some drilling fluid flowing into Vaughn Creek. *Id.* ¶ 1. And after an unmanned truck rolled into an excavation site and caused the Line 5 pipeline to leak approximately 1.3 million gallons of natural gas liquids (NGLs) (such as propane and butane), WDNR sent a letter requesting that Enbridge halt construction, citing the NGL spill and being "immensely frustrated by other recent noncompliance events."[5] *Id.* ¶ 5. For this particular Project, IRs were not only foreseeable, but they are currently happening in a manner that affects wetlands adjacent to HDD construction sites.

*3. HDD IRs will adversely affect wetlands adjacent to HDD construction.*

The Band and its contracted experts consistently flagged that both HDD construction and IRs can negatively impact wetlands and waterways on or adjacent to HDD entry/exit locations. The Corps did not address any of the Band's concerns, nor did it explain why it declined to do so.

There is a foreseeable risk of an HDD IR within or right next to the wetland, which can also be made worse by the presence of matting. AR005451 ("For HDD construction obvious risks are HDD failure, and inadvertent releases of drilling fluid. Timber mats employed to work on wetland soils will become a source of sediment release during any runoff event . . . During rain events or other runoff events these soils will wash away and travel toward the waterbody. Any spills from [HDD] chemicals will similarly be at risk to wash off the mats.").

---

[5] Letter from Karen Hyun, Secretary, WDNR, to Enbridge (Aug. 27, 2026), *available at* https://dnr.wisconsin.gov/sites/default/files/topic/EIA/Enbridge/Enbridge_Liquid_NG_Spill_Letter_270826.pdf.

The Band also raised concerns that IRs would adversely impact water quality within wetlands and waterbodies. The drilling fluid itself is an adverse impact on "sensitive areas, such as waterbodies or wetlands, resulting from the high concentration of suspended solids in the released drilling fluid." AR005398. The Band's experts also identified where Enbridge's own reports indicate that the concentration of sediment discharged from an IR can be significant and impact any adjacent water. AR026161–62. Enbridge documents stated that total suspended solids concentrations from an IR "would be expected to be high (more than 20,000 micrograms per liter)." *Id.* (citing DCDD Appendix 7, AR038204–296). "As an example of a foreseeable discharge quantity from IRs, based on the observed IR of 9,000 gallons at the Line 3 replacement project, and using a release concentration of 20,000 mg/L, that release would result in approximately 0.75 tons of bentonite being discharged into a WOTUS[.]" AR026162. Even this cursory calculation demonstrates that IRs can profoundly affect wetland water quality.

The Band's experts also noted that the modeling Enbridge conducted on HDD IRs was generally insufficient. AR005434–36 (summary of HDD modeling and expert evaluation of Enbridge modeling). The flaws identified in the modeling of a potential IR near the Bad River demonstrate that many of Enbridge's assumptions about the impact of an IR were discounted. AR005430. For example, the Bad River is a faster river than other waters that will be crossed by HDD and has a steady flow rate. *Id.* For waterbodies with less flow, or wetlands with almost zero flow, this results in less dilution potential of the drilling fluid, which was not accounted for in Enbridge's modeling of an IR in the Bad River. *Id.* As such, an IR in a wetland will have much higher sedimentation and turbidity, which can have profound impacts on wetland ecosystems.

Band experts also identified specific high-quality wetlands or wetlands with high functional values near HDD locations. AR024709 (seep wetland wasd021f has an HDD exit in

the wetland area); AR024710 (wasa139f has matting associated with HDD construction); AR024738 (table listing high-quality wetlands and construction methods through high-quality wetlands). Because wetlands are ecosystems, high-quality wetland complexes are especially susceptible to adverse construction impacts. One example is the Trout Brook area, which will have a large construction matting footprint to accommodate HDD construction. AR024730-31. The Trout Brook area contains "soft soils, mucky mineral soils, seeps and surface water and high groundwater processes[.]" AR024731. "This is a water rich area and disturbances from any inadvertent release of HDD fluids, as well as sedimentation from construction and travel on timber mats have multiple flow paths to reach the reservation waters." AR005483. Although the Band flagged high-quality wetlands as specific areas of concern and at risk of an IR, neither Enbridge nor the Corps provided any analysis of IRs into these areas.

The Band also flagged several concerns about HDD construction under the Potato River, which is one of the locations that has already experienced an IR during Project construction. The cumulative list of concerns "increases the risk of hydrofracture, drilling fluid loss to the surface or fractured rock aquifers, and general construction challenges that will increase surface and subsurface soil and bedrock disturbance. No alternate plan is proposed in the event that the HDD approach fails." AR025090 (also citing Enbridge's feasibility assessment that "We anticipate that this will be a challenging crossing." AR044367.). Unfortunately, the crossing has been challenging with at least one IR to date. Had the Corps addressed the Band's concerns prior to permitting, the impacts the IR will have on wetlands would have been evaluated, disclosed, and considered as part of the permitting process.

#### 4. *The Corps failed to consider the negative impacts of HDD IRs on wetlands.*

Despite the amount of evidence the Band sent the Corps that IRs are likely to happen, and that IRs will have a direct adverse impact on wetlands, the Corps failed to seriously consider and analyze those impacts. This failure to consider these important aspects construction renders the Corps' decision arbitrary and capricious. *State Farm*, 463 U.S. at 43. The Corps' citations to portions of the CDD where it considered temporary impacts of wetland fill, Corps Br. 33–34, are not evaluations of the secondary impacts that HDD construction and IRs could have on adjacent wetlands. Enbridge also cites the general sections of the CDD containing the wetlands analysis, AR000623–25, and a section on cumulative and secondary effects, AR000644–45; Enbridge Br. 29–30, but again, these evaluations do not discuss the secondary impact that HDD construction and IRs could have on adjacent wetlands. There is no discussion in the CDD, or in the Administrative Record, about the specific impacts of IRs on wetlands adjacent to HDD entry and exit locations. The Corps simply failed to consider the Band's significant concerns on this issue.

The Corps also erroneously suggests that the Corps and Enbridge addressed the likelihood of IRs. Corps Br. 34 (citing AR008874–75; AR063588). But neither citation to the record addresses the likelihood of IRs. Enbridge's response to public comments, AR008874–75, substantively addresses only water quality sampling, testing, and IR containment procedures in the event an IR occurs. It says nothing about the likelihood of IRs. Enbridge's response to a Corps data request suffers the same deficiency. AR063588. The response in its entirety is as follows: "Enbridge has worked with its HDD contractor to develop site-specific inadvertent release response plans for the proposed trenchless crossings (HDD and Direct Pipe). Those plans are included as Attachment 2-A." *Id.* Enbridge echoes that it will implement IR response plans and that it has made design modifications to reduce the risk of IRs. Enbridge Br. 30. But again,

neither the Corps nor Enbridge points to where they disclosed the likelihood of IRs, much less the impacts they have on adjacent wetlands. The Corps argument is simply not supported by the administrative record.

The Corps cannot sincerely put on blinders and ignore that HDD construction will happen in and directly adjacent to regulated wetlands and also ignore that HDD construction has foreseeable IRs that cause adverse impacts on those same wetlands. The Corps cannot disconnect the wetland from the activity, and the Corps' failure to evaluate the impacts of the activity on the wetland is contrary to the 404(b)(1) Guidelines. 40 C.F.R. § 230.11(h). The Corps also does not cure its failure to address impacts of IRs on wetlands by implementing a Permit Condition that addresses only the process Enbridge must follow after an IR occurs. Corps Br. 34 (citing AR000015). The Corps' decision to exclude analyzing impacts resulting from HDD construction in or adjacent to wetlands is arbitrary and capricious. The Corps also does not provide an explanation for its failure to do so, in light of the Band's record evidence, which further renders its decision not reasonably supported and contrary to the administrative record. *State Farm*, 463 U.S. at 43.

### C. The Corps cannot reasonably conclude that there will be no significant impacts under the 404(b)(1) Guidelines without evaluating the impacts of blasting and HDD construction on jurisdictional wetlands.

Although the Corps argues that a finding of significant degradation must be related to the proposed discharge under the Guidelines, the regulations are clear in section 230.10(c) that "no discharge of dredged or fill material shall be permitted which will cause *or contribute to* significant degradation of the waters of the United States." (emphasis added). 40 C.F.R. § 230.10(c). Further, the "[f]indings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests . . . with special emphasis on the persistence and permanence of the effects outlined in those subparts." *Id.* And

the factual determination, as laid out in the Guidelines, includes a determination of "the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms," *Id.* § 230.11(e), the cumulative impacts attributable to the collective effect of a number of individual discharges of dredged or fill material, *id.* § 230.11(g)(1), and secondary effects associated with a discharge of dredged or fill material, not resulting from the actual fill material itself. *Id.* §230.11(h)(1). The plain language of the regulatory guidelines requires considering this information in combination to determine whether there will be significant degradation to the aquatic ecosystem.[6]

**D. The Corps failed to support its factual determinations under the Guidelines.**

The Corps also failed to support its factual findings that the Project will not have adverse effects on the aquatic ecosystem. The Corps' conclusion that the Project will not affect area substrate is belied by the record. The Band's arguments regarding the impacts of blasting and HDD, outlined above, are examples of where the Corps failed to even look at the environmental impacts of those construction methods. As such, the Corps cannot reasonably conclude that HDD and blasting will not have an adverse impact on substrate within wetland ecosystems as required by the 404(b)(1) Guidelines. 40 C.F.R. § 230.11(a). And without a valid secondary and cumulative effects analysis, the Corps cannot make a determination that the Project will not have adverse effects on hydrology or other environmental factors the Guidelines contemplated. *Id.* § 230.11

[6] This application of the Guidelines does not disturb this district court's decision in *Red Lake*. Again, the question and the analysis in *Red Lake Band* were not as closely connected as the action here. In *Red Lake Band*, the district court rejected the argument that a potential oil spill implicated a finding of significant adverse effects under 40 C.F.R. § 230.10(c) because it was not related to the proposed discharge. 636 F. Supp. 3d at 68. Here, the proposed discharge is immediately tied to adverse impacts on the aquatic ecosystem, adverse cumulative impacts, and adverse secondary impacts on jurisdictional wetlands.

Even where the Corps and Enbridge claim to have evaluated the factual determinations, such as impacts to substrate, the Corps does not contend with the extensive documentation the Band submitted regarding the impacts of matting on wetlands. For wetland ecosystems, the Band's experts noted that the matting placed to facilitate HDD construction can compact wetland soils. AR005452 ("the areas of HDD installation with mucky organic soils will experience compaction following woody species removal and heavy timber mat use which will change soil properties"). *See also* Band Br. 31 (citing AR024646; AR026165; AR027043–44; AR005529–30, 55, 84; AR003399–3403). The Corps' failure to evaluate the impacts of blasting and HDD also renders its other factual determinations useless, as the Corps is missing key information on the factors the 404(b)(1) Guidelines specifically contemplate. The Corps' failure is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

## II. THE CORPS' CLEAN WATER ACT 401(A)(2) DETERMINATION WAS ARBITRARY AND CAPRICIOUS

The Corps in this case has failed to act reasonably and reasonably explain its action as the APA requires. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Band is entitled to a review of the full record and a reasonable explanation for the Corps' decision. *See, e.g.*, *Ohio v. EPA*, 603 U.S. 279, 293–94 (2024) (petitioners likely to prevail on arbitrary and capricious claims where agency failed to adequately address concerns raised during notice and comment). "Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010). The agency needs to consider contradictory evidence, including evidence that fairly detracts from the evidence supporting its position. *Genuine Parts Co. v. Env't Prot.*

*Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018) (quoting *AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001)).

The project at issue threatens the water resources of almost the entirety of the Band's watershed, which was reserved via treaty as a permanent homeland. *See, e.g.*, AR006741–42; Treaty of LaPointe, 10 Stat. 1109 (1854) (1854 Treaty). This unusual situation requires careful examination to ensure the Corps reasonably considered the relevant evidence and reasonably explained its decision, including reckoning with contradictory evidence. *See Genuine Parts Co.*, 890 F.3d at 346. Here, it did not.

As soon as EPA notified the Band that the Project may affect its waters, it became the Band's responsibility—and the Band's alone—to determine whether the Project's discharges will violate its water quality standards. 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.14(a). Since the Band's Reservation was established, off-reservation activities such as logging, agriculture, and dredge and fill of wetlands have degraded the watershed, increasing sedimentation, pollution, and runoff into the Band's waterways and affecting water clarity, aquatic and wildlife habitat, and suitability for cultural and spiritual practices. AR006239–40. All these considerations, plus the Band's 500 years of experience in the watershed, informed the Band's decision. *See, e.g.*, AR009096–9135, AR006289–6291.

Once the Band determined that the Project would violate its water quality requirements, AR006775–8631, the Corps held an evidentiary hearing, AR002459–62. The Band's testimony and evidence covered the current conditions on the ground and the reasons why it determined the Project would violate its water quality requirements related to mercury, sediment, non-local beings (invasive species), and anti-degradation, among others. AR002461–62. The Band has occupied the watershed for hundreds of years and understands the effects of upstream

development—including linear development projects exactly like the one at issue—on the watershed. AR006239–40, 52–53, 57; AR006289–6291. The Band devoted an enormous amount of time and resources to documenting the location of affected waters, the connectivity of this Project to its watershed, and the past, current, and future effects Enbridge's operations and this Project's discharges have had and will have on the Band's waters. *See* 1st Tillison Decl., ECF No. 22–3.

Once the Band, as a downstream jurisdiction, presented evidence of how the Project's discharges will violate its water quality requirements, the Corps was required to decide what conditions should apply, if any, to the permitted Project to ensure compliance with the Band's water quality requirements. 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.15(d)–(e); *see Fond du Lac Band of Lake Superior Chippewa v. Wheeler*, 519 F. Supp. 3d 549, 564 (D. Minn. 2021) ("The Band is not comparable to a private litigant who seeks to use a lawsuit to force a federal agency to remedy private harms. The Band is considered a state for purposes of § 1341(a)(2) and its federally approved water-quality standards are part of the federal law of water pollution control." (cleaned up)). By failing to fully consider the Band's evidence and failing to explain its reasons for doing so, the Corps violated the requirements of the APA.

**A. The Corps Failed to Consider All Evidence and Failed to Reasonably Explain Its Decision**

The Corps purports to resolve all the issues raised in the 401(a)(2) hearing in a nine-page decision memo, but leaves significant factual issues unresolved and unexplained, preventing review of the reasons underlying the Corps' decision. AR002099–107. The Corps' decision memo relies almost entirely upon EPA's analysis, which does not incorporate any information provided to EPA by the Band on May 6, 2025, any information presented at the hearing, or any information submitted thereafter. AR006746, 773; *see* AR008660–703, 715–59. Recognizing

this, EPA suggested to the Corps that further analysis and technical review of the Band's report on water resources would be useful to the Corps prior to making a final determination, *id.*, but the Corps neither took this step nor clarified why it failed to do so. The Corps also failed to address the Band's evidence of impact to specific waterways, AR002100–2017, and failed to resolve outstanding factual disputes related to the effectiveness of Wisconsin's WQC conditions, AR002107.

1. *The Corps' decision did not address the Band's evidence of under-identification of water resources or provide a reasonable explanation for its failure to do so.*

The Corps failed to analyze the Band's evidence that the waterways, wetlands, and hydrologic connectivity between the Project and the Band's waters were severely underestimated. The Corps stated only that the evidence "did not demonstrate that discharges from the project . . . would result in a violation of the Band's water quality requirements." *Id.* Despite underestimation of water resources and hydrologic connectivity being a major issue throughout the 401(a)(2) hearing, *see, e.g.*, AR006247–51, none of the Corps' record citations in its brief show any kind of analysis of the Band's evidence, even a rejection of it, outside of the context of the mercury pollution analysis. Corps Br. 41; *see* AR002111 (showing that EPA did not consider the GLIFWC report); AR002115 (merely summarizing GLIFWC's hearing testimony); AR002101 (affirming that the Corps considered the GLIFWC report only in the context of violation of the Band's mercury standard). And the portions of the record related to wetland delineation, AR002038; AR037800–44398; AR059177, are based on information gathered between 2020–2023, the exact information with which the Band and the GLIFWC report take issue—concerns which, once again, the Corps does not address. *See* AR080595–617 (letter from GLIFWC to Army Corps documenting errors in 2020 Approved Jurisdictional Determination); AR067664–81 (March 22, comment on 404 permit); AR067314–18 (pointing

out problems with data); AR027203–93 (MNRD Wetlands Report); AR027673–84 (MNRD WQS report).

Enbridge likewise fails to demonstrate that the Corps met its burden under the APA. Enbridge cites the Wisconsin administrative law judge's (ALJ) decision on state permitting issues, the CDD for the Project, and the WDNR Environmental Impact Statement. Enbridge Br. 38; AR000085; AR000623; AR022089. None of these documents show that the Corps considered the Band's evidence that water resources and hydrologic connectivity were severely underestimated, that the models and assessments the Corps relied upon were inaccurate, or that the Corps analyzed the GLIFWC report as evidence of the Band's assertions. In fact, it was impossible for the Corps' October 2025 decision memo to consider the Wisconsin ALJ decision issued in February 2026. Accordingly, none of the record citations show that the Corps analyzed the GLIFWC report, the Band's assertions that the water resources and hydrologic connectivity were underestimated, or in any way applied or evaluated the Band's evidence. This lack of analysis violates the APA, as courts "must consider the whole record upon which an agency's factual findings are based, including 'whatever in the record fairly detracts' from the evidence supporting the agency's decision." *Genuine Parts Co.*, 890 F.3d at 312. Again, the only exception is the one mention of the GLIFWC report in the context of the mobilization of mercury into an already impaired environment. AR002101. The Corps' brief recognizes this was specific to the context of mercury, not of hydrologic connectivity or water resources across the board, contrary to Enbridge's assertions. *See* Corps Br. 41; Enbridge Br. 37, n.25; AR002101. Otherwise, the Corps' decision is devoid of analysis of this issue and the Band's relevant evidence.

While Enbridge's experts may have analyzed the GLIFWC report and reached conclusions at odds with the Band's experts, the Corps does not address or reconcile the competing evidence or expert testimony, or any contrasting conclusions, as the APA requires. *See* Enbridge Br. 37–38; AR002907, 78–80; *see United Mine Workers of Am.*, 626 F.3d at 94. As mentioned previously, the Corps declined to follow EPA's suggestion that the Corps seek additional technical review from the Corps' Engineer Research and Development Center to assist in evaluating the Band's information and also failed to address the issue or explain why it chose not to follow EPA's recommendation—notable because the Corps otherwise relied so heavily upon EPA's analysis. AR006746; AR002107; *see also* AR005624–6032.

The Corps was required to at least address the Band's ongoing assertions about the waterways and hydrologic connectivity and resolve the dispute between the Band and Enbridge with regard to the conclusions each party's experts reached about the evidence. Enbridge Br. 36–40. *See United Mine Workers of Am.*, 626 F.3d at 94 (An agency's failure to resolve objections, or at best its attempt to address them in a conclusory manner, is fatal to its decision); *see also Butte Cty. v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action.").

*2. The Corps' decision failed to address impacts to specific waters.*

The Corps addressed none of the Band's multiple, detailed analyses of how the Project would impact specific waterways. *See, e.g.*, Band Br. 41–43. The Corps and Enbridge argue that each watershed need not be analyzed individually and again repeat the conclusory statement that the Band failed to meet its burden of showing any violations. Enbridge Br. 42–44, Corps Br. 40–44. These arguments fail.

At the hearing, the Band offered testimony explaining why each watercourse differed, and how each would be affected differently by the Project's discharges based on each waterway's characteristics, uses, impairments, and the nature and location of the discharges. AR006262; AR006324; AR006503–6527; AR005500–5610. Each waterway has specific designated uses, water quality criteria, and supports certain species and cultural practices for Band members. AR005500–5610. MNRD's approach to waterway impacts and health differs greatly from Enbridge's sub-basin model approach. But the Band is entitled to approach water resource management differently than the state and federal governments. *City of Albuquerque v. Browner*, 97 F.3d 415, 423 (10th Cir. 1996) (ability to regulate on-reservation waters, including by setting standards or limits that are more stringent than those imposed by the federal government, is derived from inherent Indian tribal sovereign authority).

As discussed above, in this proceeding the Corps was required to assess the effects of the Project's discharges on the water resources of an entire jurisdiction. The Band approached the analysis comprehensively and with a practical understanding of how the watershed will be affected both as a whole and on a water-by-water basis—even a species-by-species basis. *See, e.g.*, AR006282–301; AR006461–6502; AR006506–26. This is how the Band understands and applies water science and ecological science within its jurisdiction, and the evidence supporting their knowledge and experience was entitled to consideration. The Corps' refusal to consider the Project's effects on any individual waterways in its decision, and its failure to even mention any specific waterway, or why individual waterways need not be considered, showed a blatant disregard for the Band's evidence and expertise. *See State Farm*, 463 U.S. at 43 ("[A]n agency decision [is] arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem . . .").

### 3. *The Corps failed to address evidence of the ineffectiveness of Wisconsin's Water Quality Certification conditions and failed to explain its reasoning.*

The Corps' determination that Wisconsin's WQC Conditions will ensure compliance with the Band's water quality requirements was conclusory and unresponsive to the Band's reasons for asserting that the conditions, including best management practices (BMPs), are likely to be ineffective. AR002013, 16. Again, the Corps relies largely on EPA's incomplete analysis, which, in turn, relies on Wisconsin's WQC. AR006752. The Corps' decision memo and EPA's analysis do no more than acknowledge the Band's case studies and then dismiss them entirely, stating that they do not show any downstream impacts. AR006753–54, 58–59, 69–70. But the case studies were not the only evidence the Band provided, and the Corps was required to consider the whole record. *Genuine Parts*, 890 F.3d at 312.

The Band has provided extensive support for issues it has raised that require proper analysis and response. Band witnesses described the problems that discharges from linear construction projects can and do cause, while detailing specific areas on-Reservation that are vulnerable to water quality violations because of the actual conditions of each site or waterbody. They supported their assertions with evidence of problems—both immediate and long-term—that were caused by actual projects, some conducted by Enbridge in this very same watershed, supported by photos and LIDAR data. For good measure, the Band supported its on-the-ground experience with peer-reviewed research. *See* AR006282–301; AR006459–502; AR006503–27; *see also* AR005441–499; AR00550–610; AR005611–623; AR005624–6032.

The Corps' decision, and the EPA analysis upon which it relies, dismisses all the Band's evidence by saying the Band failed to quantify its determinations or support them with data. AR002012–3, AR002874, AR006751. And Enbridge argues that BMPs are effective but merely lists what the BMPs are, much like EPA's analysis, again without responding to the Band's

concerns. AR002860–66; AR006753–73. The record shows that the Band explained that many of the conditions the Corps and EPA rely upon are vague, unenforceable, and ineffective. *See, e.g.*, AR006282–88; AR006289–94; AR005445–48, 51–64. The Band also explained that due to inadequate and inaccurate identification of water resources, lack of information with regard to construction methods and locations, and the Band's inability to access areas on private land in order to document on-the-ground conditions, it was impossible for the Band to accurately determine the full impacts of the project on the Band's waters. AR006278–81; AR009096–135.

The Corps failed to grapple with the Band's evidence and failed to explain why the experience, expertise, knowledge of the watershed, and documented failures of the BMPs *within that same watershed* are entitled to no consideration.

*4. The Corps must consider all discharges from the Project.*

A downstream jurisdiction may only object to violations of its water quality requirements caused by the discharges from a project. 33 U.S.C. § 1341(a)(2); 40 C.F.R. § 121.14(a); *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66637. Enbridge and the Corps attempt to narrow the scope of review, asserting that the Corps may consider only those discharges that are regulated under the federal permit at issue. Enbridge Br. 33–34; Corps Br. 40–41. But they cite no support for their position, nor could they, because it is incorrect.

The Corps has authority to impose "permit conditions [that] may be necessary to ensure that *any discharge from the project* will comply with the neighboring jurisdiction's water quality requirements." 40 C.F.R. § 121.15(d) (emphasis added). If the imposition of conditions cannot ensure compliance with applicable water quality requirements, the Corps may not issue the permit. 33 U.S.C. § 1341(a)(2). As explained in *Arkansas v. Oklahoma*, nothing in the CWA limits the federal agency from mandating an upstream jurisdiction's compliance with a

downstream jurisdiction's water quality standards. 503 U.S. 91, 105 (1992). Once a downstream jurisdiction determines a project may affect its waters, resolution of the disagreement between jurisdictions becomes a federal matter. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 490–91 (1987); *Fond du Lac v. Wheeler*, 519 F. Supp. 3d at 564. Accordingly, and as reflected by the record in this case, when making a determination pursuant to CWA Section 401(a)(2), the Corps has authority to consider matters outside its regulatory jurisdiction to ensure compliance with the Band's downstream jurisdiction's water quality requirements.[7]

## III. THE CORPS VIOLATED NEPA

NEPA requires that the Corps take a "hard look" at the Project's reasonably foreseeable environmental impacts.[8] 42 U.S.C. § 4332(2)(C); 33 C.F.R. § 333.15; *Indian River Cnty., Fla. v. U.S. Dep't of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019). This includes direct effects, or those effects that are "plainly anticipated" because of the Permit, *see Oregon Wild v. U.S. Forest Serv.*, 819 F. Supp. 3d 1185, 1207 (D. Or. 2026), as well as indirect effects, which can "extend outside the geographical territory of the project or might materialize later in time," *Seven Cnty.*, 605 U.S. at 187. The Corps' decision to exclude certain environmental effects from the scope of its NEPA analysis must be "reasonably explained," *id.* at 180, "at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument," *N.M. ex rel. Richardson v.*

---

[7] *See, e.g.*, EPA, *Application of Region 5's CWA 401(a)(2) "May Affect" Screening Analysis for PolyMet's NorthMet Mining Project, June 4, 2021*, https://www.epa.gov/sites/default/files/2021-06/documents/polymet-401a2-analysis-document-20210604-15pp.pdf (last accessed Sept. 14, 2026).

[8] The Corps wrongfully characterizes the Band's opening NEPA arguments as "fail[ing] to acknowledge the scope of the Corps' authority." Corps Br. 15. However, the Band's NEPA arguments make clear that the Corps' NEPA scope unreasonably excluded evaluation of direct and indirect effects of the Project. Band Br. 12-13 ("The Corps violated NEPA by ignoring the impacts of . . . Wisconsin's felony trespass law, on Band members' ability to participate in treaty-protected practices in the ceded territory."); *id.* at 16 ("The Corps violated NEPA by disclaiming responsibility for reviewing the Project's oil spill impacts."); *id.* at 18 ("The Corps did not take a hard look at the impacts of blasting as a construction method.").

*Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (citations omitted). And if the Corps chooses to analyze a given effect, it cannot "dispel serious doubts about its methods by explaining that it could have forgone such [an analysis] in the first place." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1048 (D.C. Cir. 2021) (*Standing Rock II*).[9]

Here, Enbridge and the Corps argue that the Corps was not required to consider the effects of blasting, oil spills, or restrictions on tribal usufructuary rights over the ceded lands. Enbridge Br. 12–22; Corps Br. 15–27. Both parties further argue that the Corps analyzed those effects anyway, and that its analysis was reasonable. *Id*. Enbridge and the Corps are wrong on both fronts, and the Corps' analysis violated NEPA.

### A. The Corps Did Not Take a Hard Look at Impacts of Blasting Activities Required to Construct the Project

Enbridge and the Corps do not dispute that blasting must happen to complete construction through regulated wetlands and waterways. Enbridge Br. 26; Corps Br. 9, 11, 23. Nor do the parties dispute that blasting is a direct effect "plainly anticipated" from the Permit. *Id.*; AR000015; AR000621 ("Instream blasting is anticipated for pipeline construction in 17 streams"); AR001607–09. Instead, Enbridge argues that blasting would not result in discharge of dredge and fill material and so the Corps need not have conducted any NEPA analysis of this effect. Enbridge Br. 19. Alternatively, both Enbridge and the Corps argue that Enbridge's General Blasting Plan, the CDD, and the Permit Condition do in fact satisfy NEPA's hard look requirement. Enbridge Br. 19–21; Corps Br. 22–26. Both arguments miss the mark.

Enbridge's argument as to the Corps' jurisdiction misstates the Corps' CWA regulations and its NEPA responsibilities. As an initial matter, the Corps' choice to conduct some analysis—

[9] Enbridge argues the Band requests a heightened NEPA review. Enbridge Br. 13. Nowhere in the Band's Motion for Summary Judgment or in this brief does the Band request such a review.

through the General Blasting Plan and Permit Condition—cements that the Corps must respond to the Band's legitimate criticisms of its blasting analysis. *Standing Rock II*, 985 F.3d at 1048. But independent of this choice, the Corps' NEPA responsibility to consider blasting impacts exists where the Corps' regulations plainly define construction blasting as creating dredged material within the Corps' jurisdiction. *Supra* Sec. I.A.1. Even if the bedrock itself were somehow distinct enough from the wetlands for the purpose of discharge of dredge and fill materials (which it is not), the "handling of extracted materials" during blasting would still be "subject to the Corps' CWA oversight, [even] if only to ensure that the materials are not released into . . . waters and/or wetlands." *Sierra Club v. U.S. Army Corps of Eng'rs*, 2020 WL 7389744, at *2 (D. Me. Dec. 16, 2020), *aff'd,* 997 F.3d 395 (1st Cir. 2021) (confirming that HDD construction activities fall within the Corps CWA regulation). The case Enbridge cites in support of its argument, Enbridge Br. 19, even affirms that the "excavation of tree roots could result in CWA discharge." *Wendling Quarries, Inc.*, No. 3-16-CV-83-CRW-CFB, 2017 WL 8678693, at *2. And apart from the Corps' specific regulations, NEPA requires the Corps to consider information that would be "useful[] . . . to the [Corps'] decisionmaking process" when approving the Project. *Seven Cnty.*, 605 U.S. at 183. Enbridge's suggestions that the Corps has no jurisdiction to consider the environmental impacts of blasting as part of its NEPA analysis, "even though it has jurisdiction to consider the impacts of the wetlands which co-exist" with the bedrock being blasted, is "asinine on its face, and an impermissible abdication of a federal agency's duties under NEPA." *Stewart*, 996 F. Supp. at 682–83.

Enbridge and the Corps' arguments for why the Corps' "analysis" of blasting impacts actually satisfied NEPA fail. First, Enbridge and the Corps point to portions of the record to argue sufficient environmental review was conducted before the Permit was issued. Enbridge Br.

19–21; Corps Br. 22–24. However, the issue here is that no environmental review *at all* was conducted for blasting activities. The Wetland and Waterbody Crossing Table and the General Blasting Plan did not "quantify, minimize, or mitigate the short- and long-term impacts of blasting." AR067669. And the record cited by Enbridge and the Corps does not illustrate how trench breakers or other measures will be sufficient to mitigate blasting impacts where no attempt at general or site-specific review of potential blasting-location bedrock and hydrology has been conducted. *Supra* Sec. I.A.4. The cases Enbridge cites do not change the fact that these portions of the record do not satisfy the Corps' NEPA responsibilities to assess direct environmental effects *before* approving a permit. Enbridge Br. 20 (citing *Seven Cnty.*, 605 U.S. at 183 (addressing permissible exclusion of indirect environmental effects, not requirements for consideration of direct construction impacts); *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (holding that the agency violated NEPA by failing to assess interrelated projects)).

Second, Enbridge and the Corps argue that the Permit Conditions requiring mitigation satisfy NEPA. Enbridge Br. 19–21; Corps Br. 23. However, as explained in the Band's Motion for Summary Judgment, a permit condition is no substitute for pre-decisional environmental review required by NEPA. Band Br. 20. Mitigation cannot satisfy NEPA without an understanding of baseline environmental conditions. *Blue Mountains Biodiversity Project v. Trulock*, No. 2:21-CV-01033-HL, 2023 WL 3645966, at *14 (D. Or. Apr. 27, 2023), *aff'd sub nom. Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. 23-3049, 2024 WL 4814553 (9th Cir. Nov. 18, 2024) ("without the baseline there is no way of knowing how significant the impact on that environmental component will be"); *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). Enbridge's reliance on *Ctr. for Biological Diversity*

*v. FAA* does not mean the Corps is relieved of evaluating impacts prior to making a permitting decision. 804 F. Supp. 3d 86, 105 (D.D.C. 2025) (NEPA satisfied where agency implemented mitigation measures *in conjunction* with sufficient pre-decisional environmental review). The Corps and Enbridge's attempts to distinguish caselaw in the Band's motion do not change that requirement either. Corps Br. 25; Enbridge Br. 21. The Corps and Enbridge argue that *State of Idaho ex. rel. Idaho Pub. Utilities Comm'n v. ICC*, 35 F.3d 585 (D.C. Cir. 1994), and *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001), do not apply because the agency in those cases was required to prepare an EIS. Corps Br. 25; Enbridge Br. 21. But the "same [hard look] standard is applied regardless of whether the significance determination is made in an EIS or EA," *Defs. of Wildlife v. Ballard*, 73 F. Supp. 2d 1094, 1102 (D. Ariz. 1999) (internal quotation marks removed). Thus, the Corps failed to take a hard look at the environmental effects of blasting and violated NEPA.

**B. The Corps Did Not Take a Hard Look at the Project's Oil Spill Risks and Effects**

The Corps must engage with the Band's materials or articulate a reason it chose not to do so at the time of its decision. The Corps did neither. Enbridge and the Corps do not dispute that the Corps completely ignored the Band's submitted criticisms of Enbridge's 2023 spill analysis. See AR026306–7036; see also AR063001–505 (2023 Spill Report). Corps Br. 22; Enbridge Br. 39. Instead, they argue that the agency satisfied NEPA because it did not even need to adopt the 2023 Spill Report, or, in the alternative, that the 2023 Spill Report, *see* AR063001–505, met the Corps' NEPA requirements without having to address the Band's materials. Both arguments miss the point.

First, the Corps and Enbridge misunderstand the Corps' NEPA obligations. The Corps argues it could exclude the Band's critiques of the 2023 Spill Report from its NEPA scope because (i) the Corps is entitled to deference in establishing the scope of its NEPA review and

(ii) the Pipeline and Hazardous Materials Safety Administration's (PHMSA) regulation of pipeline operation, but these are not sufficient reasons to exclude operational risks from the Corps' review. As an initial matter, the Corps adopted Enbridge's 2023 Spill Report as part of its NEPA analysis. It cannot now "dispel serious doubts" about the 2023 Spill Report "by explaining that it could have forgone such [an analysis] in the first place." *Standing Rock II*, 985 F.3d at 1048.

The Corps must also evaluate the oil spill risks and effects on regulated wetlands and downstream areas, independent of the choice to adopt the 2023 Spill Report. This is because information on these impacts would be "useful[] . . . to the [Corps'] decisionmaking process" when approving the Project. *Seven Cnty.*, 605 U.S. at 183. Here, the Corps' statutory and regulatory responsibility is to evaluate the Project's adverse effects on aquatic resources under the CWA and the 404(b)(1) Guidelines. *Supra* Part I. Here, the Project's "defined purpose and need" is to transport around "540,000 barrels per day (bpd) of petroleum products including 460,000 bpd of crude oil and 80,000 bpd of natural gas liquids" through regulated wetlands and waterways. AR000595, 600. The transport of oil is not a result that "might somehow or someday follow" from the Permit. *Seven Cnty.*, 605 U.S. at 190. It is the entire point of the Project and immediately relevant to the Corps' statutory responsibilities under CWA. And for that reason, the Corps has a NEPA obligation to evaluate these impacts. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 134 (D.D.C. 2017) (*Standing Rock I*) (the Corps' oil spill analysis violated NEPA because it "only discussed the effects of <u>construction</u> . . . it said nothing about the effects of a <u>spill</u>"); *Standing Rock II*, 985 F.3d at 1049.

The Corps' requirement to review oil spill risks exists independent of PHMSA's pipeline-operation regulations. This is because PHMSA only addresses pipeline safety after construction

is complete and is not required to conduct any pre-construction environmental review. *Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 140, 141 (D.D.C. 2014), *aff'd sub nom. Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31 (D.C. Cir. 2015) ("PHMSA had no duty under NEPA or otherwise to conduct an environmental review of the [pipeline] as a matter of law" before construction began). There is no other agency for the Corps to pass the buck to, nor would the Corps intrude on any other agency's authority by considering these issues before construction. *Cf. Sierra Club v. FERC*, 153 F.4th 1295, 1308 (D.C. Cir. 2025) (holding that FERC, in approving a gas pipeline, was not required to treat a power plant the Tennessee Valley Authority had already approved as a connected action). Indeed, even the caselaw cited by the Corps and Enbridge supports that the Corps must assess oil spill risks and effects as part of its NEPA evaluation. *Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*, No. 2:21-CV-00161, 2023 WL 6226387, at *25–26 (S.D. Tex. July 27, 2023), *aff'd*, 132 F.4th 872 (5th Cir. 2025) (plaintiffs forfeited NEPA claims as to oil spill effects where "no commentor suggested that the Corps had any responsibility to address these risks" but that "Enbridge considered the risk of oil spills from the specific activity of dredging, filling, and construction" in any case); *Red Lake Band*, 636 F. Supp. 3d at 65 (holding that the Corps satisfied NEPA because it "considered both . . . the spill risk at Lake Superior watershed as well as Plaintiffs' comments on that issue" (internal quotes omitted)).[10] Accepting Enbridge and the Corps' arguments would create a regulatory twilight zone, where construction of pipelines could begin

[10] The Corps also cites *Sierra Club, Inc. v. Bostick*, in support of its argument that the Corps could exclude reasonably foreseeable oil spill risks and effects from its analysis. Corps Br. 21 (citing *Bostick*, 787 F.3d 1043, 1052 (10th Cir. 2015)). But there, the court held the Corps' NEPA scope did not need to include "analysis for the entire Gulf Coast Pipeline" because the Corps was merely issuing verifications. *Bostick*, 787 F.3d at 1051. The Band is not requesting the analysis of the entirety of Line 5 nor is the Corps issuing verifications here.

without any pre-permit regulatory environmental review of oil spill risks and effects.[11] Thus, as courts have recognized, the Corps has a "legal obligation to perform an independent review of the oil spill risks from the project." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. CV 18-23-SDD-EWD, 2020 WL 1450750, at *12 (M.D. La. Mar. 25, 2020) (the Corps cannot simply "rubber stamp" submissions or rely solely on information provided by others).

Second, the Corps and Enbridge offer a variety of arguments attempting to play up the 2023 Spill Report. But the parties' "post-hoc rationalizations" in their briefs do not satisfy the Corps' responsibility to assess the Band's materials at the time of its NEPA analysis. *N.M. ex rel. Richardson*, 565 F.3d at 704. As to its failure to model the transport of NGLs and assess impacts on spill recovery, the Corps says nothing. Enbridge responds by highlighting a single sentence from its 2023 Spill Report that "there was no need to address a spill of those products because NGLs 'would very quickly convert from liquid to gas[], and [do] not have the same potential for traveling downstream' and threatening aquatic resources." Enbridge Br. 18 (citing AR080330). But that single sentence amounts to lip service as to the impacts of NGLs upon the natural environment, saying nothing about impacts from explosions. AR026311–12; AR027040–41. And that sentence says absolutely nothing about the impacts of NGL leaks on the recovery efforts for leaks of other crude oils the Project will transport, which is the primary issue that the Band's expert raised. AR026311–12. These concerns were not only foreseeable but have now materialized. Enbridge's recent leak of 1.3 million gallons of NGLs during Project construction illustrates the complexities that NGL leaks introduce to accident cleanup. 2nd Tillison Decl. ¶¶ 3–

---

[11] Enbridge also cites a state case about whether state officials could "effectively shut down Line 5 entirely" to support its arguments that the Corps did not need to evaluate oil spill risks as part of its NEPA evaluation. Enbridge Br. 16 (citing *Enbridge Energy, Ltd. P'ship v. Whitmer*, 813 F. Supp. 3d 777, 799 (W.D. Mich. 2025)). That case does not deal with NEPA, and a shutdown order is not at issue here.

7, Attachs. 2–4. The Corps never responded to those concerns in its CDD, and Enbridge cannot seriously claim that this single sentence in its 2023 Spill Report justifies the Corps' choice to completely ignore impacts from the transport of NGLs. *See Pawnee Nation of Okla. v. U.S. Bureau of Indian Affairs*, No. 4:16-cv-00697, at 34–35 (N.D. Okla. Aug. 6, 2026) (concluding that an agency's "argument that [a single line] encompasses" the agency's analysis of a "reasonably foreseeable indirect effect" is an "improper post-hoc rationalization") (Attachment 1).

As to the failure to make the elevation profile public, Enbridge and the Corps claim that public disclosure of the elevation profile used to calculate the oil spill risks is not required because the elevation profile is not "relevant to the environmental impacts" of the permitted activities. Enbridge Br. 18; Corps Br. 22. As discussed above, oil spill risks and potential effects that now exist because of the Project are indeed "relevant to the environmental impacts" of the permitted activities. *Supra* Sec. III.B. The Band and the EPA recognized as much, AR026311–12, AR032108, and so have courts. *See, e.g.*, *Standing Rock I*, 255 F. Supp. 3d at 134. Enbridge alternatively claims that the 2023 Spill Report did include "elevation information." Enbridge Br. 18, n.12. That response mischaracterizes the Band's criticism, which requested that the *elevation profile* referenced in the 2023 Spill Report be made public. Band Br. 17 (citing AR026311). That elevation profile is a key input required to understand the 2023 Spill Report's spill duration calculations and the full-bore release "volumes for each hypothetical release location along the pipeline." AR063038; AR063070; AR063363. The missing profile contains "pertinent information utilized to supplement oil spill planning effectiveness evaluation efforts." AR026311. Without it, the Corps deprived the Band of adequate opportunity for engagement

with the Corps permitting process, in violation of NEPA. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 22-91-M-DLC, 2025 WL 3268655, at *11 (D. Mont. Nov. 24, 2025).

Finally, the Corps did not respond to the Band's critique of the 2023 Spill Report's optimistic assumptions about response and recovery times in the event of an oil spill or leak. Enbridge attempts to justify its favorable assumptions on oil spill response by highlighting different portions of the administrative record. Enbridge Br. 18. But these record citations, again, amount to an impermissible post-hoc rationalization. *N.M. ex rel. Richardson*, 565 F.3d at 704. The Band disputed those justifications, AR063038–39; AR026310, 878–80, 994–7001, and the Corps did not respond when issuing its CDD. The failure to do so at the time it issued the CDD violates NEPA. *Sierra Club v. Watkins*, 808 F. Supp. 852, 868 (D.D.C. 1991) (holding that, given disputed evidence concerning the possibility of severe accidents, an agency may not simply "refus[e] to include certain low probability risks"—it must at least "admit that such accidents are possible," determine the probability of occurrence, and "discuss[ ] their potential effects"). Next, the Corps disclaims the NEPA responsibility to review operational effects and states it was not required to expand the scope of its NEPA review to provide an in-depth analysis of potential oil spill impacts. Corps Br. 22. These responses are flawed where the Corps' NEPA scope must include an analysis of the oil spill risks and effects of the project, *supra* Sec. III.B; and the Band did not ask for an "in-depth analysis," just adequate engagement with three identified flaws of the 2023 Spill Report that the Corps chose to adopt. The Corps' failure to do so violates NEPA.

### C. The Corps Failed to Take a Hard Look at Impacts to the Band's Access to Ceded Territory

The Project is "energy provider property" and subject to Wisconsin's criminal trespass law. Wis. Stat. § 943.143(2) (felony trespass law).[12] The Project will thus discourage Band members from accessing ceded territory within and just beyond the right-of-way (ROW), and in some cases outright prevent them from doing so. *See* Stone Decl. ¶ 33, ECF No. 22-6 ("I do not trust that I will be safe from prosecution if I were to harvest from [the public lands near the Project] now"); AR002455. The Corps violated NEPA by failing to engage with historical data showing consistent prosecution of Band members' practice of usufructuary rights in ceded territory, AR027771–80; AR024693–94, and failing to consider "legally enforceable mechanisms to ensure perpetual access to reserved rights in or around project ROWs," AR032087–88; Band Br. 13–16. These failures made it "impossible to effectively evaluate" the effects of the Project "on access to Treaty resources." AR032087–88.

Enbridge disagrees, arguing that the Corps properly excluded the impediments to Band access from its NEPA evaluation. Enbridge Br. 12–13. In the alternative, Enbridge and the Corps argue that the Corps actually did take a hard look at impediments to access of the ROW and ceded territory. Enbridge Br. 13–15; Corps Br. 16–20. Enbridge and the Corps are wrong on both fronts.

First, Enbridge argues the Corps could exclude an assessment of impacts upon Band members' access to ceded territory because (i) Wisconsin controls the initiation of criminal enforcement proceedings and (ii) in any case, the trespass law is not enforceable as to the Band's

[12] In Wisconsin, those who "intentionally enter[] an energy provider property"—like a "property that is part of [a] . . . natural gas [or] oil . . . distribution system" — "without lawful authority and without consent of the energy provider" are "guilty of a Class H felony." Wis. Stat. § 943.143(2).

members because of dicta in a state case and Enbridge's consent to Tribal access. Enbridge Br. 12–13. Again, where the Corps considered some aspects of this issue, Corps Br. 16, it was required to consider all important aspects of the problem, including the history of state prosecution of Band members' practices in ceded territory and potential legal mechanisms to address these effects. *Standing Rock II*, 985 F.3d at 1048.

But the Corps must also assess these impacts independent of its choice to adopt some analysis of access impacts. The Project will open up the possibility of state prosecution, and Band members will choose not to access ceded territory as a result, irrespective of whether prosecution takes place. Stone Decl. ¶ 33, ECF 22-6; AR002455; AR024693–94. And that chilling effect on access to ceded territory is entirely reasonable given the history of prosecution in ceded territory. AR027771–80. These impediments to access were a relevant and reasonably foreseeable effect of the Project requiring the Corps to engage with important aspects of the problem. *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 605–06 (9th Cir. 2010); *see Pawnee Nation,* No. 4:16-cv-00697, at 31–32 (agency violated NEPA for failing to consider various foreseeable indirect effects, including the "risks posed by locating the wells so close to private homes"); *Ctr. for Biological Diversity v. FAA*, 804 F. Supp. 3d at 105. Enbridge and the Corps' attempts to distinguish caselaw cited by the Band does not change this result. Enbridge Br. 13–15; Corps Br. 19. The *Te-Moak* court applied the "regular hard look standard," Enbridge Br. 13 n.6, and concluded the agency violated NEPA when it failed to consider effects that would "impede both physical and visual access" to tribal resources. *Te-Moak Tribe*, 608 F.3d at 606 n.14 (9th Cir. 2010). *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1522 (W.D. Wash. 1996), *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 314–315 (D.D.C. 2016), and *Ctr. for Biological Diversity v.*

*FAA*, 804 F. Supp. 3d at 105, then provide examples of agencies that complied with NEPA by properly addressing foreseeable effects upon access of tribal resources and potential increased criminalization within their respective NEPA evaluations. The throughline of these cases is that the Project's reasonably foreseeable effects upon the Band's access of ceded territory must be included within the Corps' NEPA scope.

Enbridge's second basis for this argument is also flawed. Dicta in a state-court opinion does not confine the Corps' NEPA responsibilities. Enbridge Br. 15, n.9 (citing Decision and Order Regarding Mot. to Stay at 8–9, *Bad River Band of Lake Superior Chippewa Indians v. Wis. Dep't of Nat. Res.*, Case Nos. 2026-CV-08, 2026-CV-10 (Wis. Cir. Ct. Iron Cnty. May 15, 2026) (Doc. No. 192)). And Enbridge's promise to ensure Band access to the corridor is not a permit condition, nor is it legally binding. Enbridge does not control Wisconsin's criminal prosecution procedures, and the Corps cannot rely on Enbridge's non-legally binding promise to ignore materials the Band submitted as to the Project's anticipated impacts. *See Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1053 (N.D. Cal. 2015) (concluding that agency's reliance upon a permit-applicant's unenforceable promise for mitigation was arbitrary and capricious); *cf. Apache Stronghold v. United States*, 782 F. Supp. 3d 756, 766–67 (D. Ariz. 2025) (granting preliminary injunction in part because "[n]othing about [defendant's] broad 'commitment' to public access is legally binding").

Enbridge and the Corps' alternative argument that the Corps actually did take a hard look at impediments to accessing the ROW and ceded territory is belied by the record. Enbridge and the Corps point to portions of the record where the Corps (i) determined that it lacked jurisdiction to get involved in state criminal proceedings; (ii) received a promise from Enbridge to consent to Band member access of the ROW; and (iii) consulted with EPA and the Band

regarding these access concerns and responded to those concerns. Corps Br. 17–19; Enbridge Br. 13–15. However, none of these arguments address or explain the Corps' key NEPA violation on this front: failure to engage with the history of state prosecution and consider "legally enforceable mechanisms to ensure perpetual access to reserved rights in or around project rights-of-way." AR032087–88.

First, Enbridge and the Corps cite portions of the record detailing the Corps' explanations for why it lacked jurisdiction to enforce Wisconsin's trespass law. Enbridge Br. 14–15; Corps Br. 17–18. However, these portions of the record are not a hard look at this indirect effect of the Project. *Id.* As explained, *supra* Sec. III.C, state jurisdiction over prosecution misses the point, as that does not relieve the Corps of its NEPA responsibility to evaluate reasonably foreseeable indirect effects of the Project. The Corps might have satisfied NEPA had it addressed important aspects of the problem, including the history of state prosecution and "legally enforceable mechanisms to ensure perpetual access to reserved rights in or around project rights-of-way." AR032087–88. But it ignored those key materials without adequate explanation for doing so, violating NEPA. *See Friends of the Bitterroot v. Burgum*, No. CV 24-169-M-DLC, 2026 WL 1660439, at *12 (D. Mont. June 9, 2026) (holding that the agency violated NEPA when it did not account for the foreseeable negative aspects of indirect effects when explaining its rationale for excluding those effects from its NEPA evaluation).

Second, Enbridge and the Corps argue that the Corps complied with its NEPA obligations when it concluded the trespass law will not apply to Band members exercising usufructuary rights in Enbridge's ROW because Enbridge "will not impede the lawful exercising of the right to hunt, fish, or gather on property open to the public" and "has consented to tribal access." Enbridge Br. 15 (stating the Wisconsin trespass only applies to those entering the ROW "without

consent of the energy provider"); *see also* Corps Br. 17. But the record reflects, AR032087–88, and courts have confirmed, that reliance upon an unenforceable promise as mitigation is insufficient to satisfy NEPA. *See Klamath-Siskiyou Wildlands*, 99 F. Supp. 3d at 1053.

Finally, Enbridge and the Corps cite consultation with the Band and EPA as evidence of compliance with its NEPA obligations. Enbridge Br. 14–15; Corps Br. 16. But agency and tribal consultation do not cure an otherwise insufficient NEPA analysis. *Standing Rock I*, 255 F. Supp. 3d. at 111, 134. The cases that the Corps and Enbridge cite do not change that. In *Fuel Safe Washington v. FERC*, the action agency completed its NEPA analysis and actually "responded to the EPA." 389 F.3d 1313, 1332 (10th Cir. 2004). The Corps did not do so here. It argues that it "considered and responded to [EPA's] comments on this topic," but tellingly, the Corps did not cite any portion of the record when making this claim. Corps Br. 19. *Red Lake Band*, too, involves an action agency that independently completed an adequate NEPA analysis. 636 F. Supp. 3d at 59; *see* Enbridge Br. 14. The Corps did not consider "legally enforceable mechanisms to ensure perpetual access to reserved rights in or around project rights-of-way," AR032087–88, or the Band's submitted history of Wisconsin prosecution of Band members' practice of usufructuary rights in ceded territory, AR027722, 24693–94. Hence, its consultation does not cure its NEPA deficiencies.

**D. The Corps Failed to Assess Environmental Justice Impacts**

The Corps prepared an environmental justice review as part of its DCDD. AR037926–31. Once the Corps adopted that analysis as part of its NEPA process, it could not simply scrap that review without any explanation. *See Nat. Res. Def. Council v. Hughes*, 437 F. Supp. 981, 990 (D.D.C. 1977). However, the Corps removed that analysis from its CDD without any explanation, violating NEPA. *Id.* The Band expended tremendous effort engaging with this analysis to further the Corps' assessment and understanding of the Project's potential to continue

the decades-long trend of "human trafficking and violence against women by employees and contractors on fossil fuel projects" and to assess additional impacts from "greenhouse gas emissions, potential spills, increased flooding, and water quality degradation." AR024682–83; AR024682–83. The Corps does not address any of the issues the Band raised, in violation of NEPA and the APA. Enbridge and the Corps' record cites do not explain the removal of the environmental justice section, nor do they contain the same substantive analysis. Enbridge Br. 21; Corps Br. 26–28.

## IV. THE BAND HAS STANDING TO BRING ITS CLAIMS

The Band has standing to bring all its claims. *San Carlos Apache Tribe v. U.S. Forest Serv.*, 803 F. Supp. 3d 879, 905 (D. Ariz. 2025) ("[t]he bottom line is that correcting the alleged statutory violation . . . will create some possibility that the alleged injury-causing event . . . will not occur"), *aff'd sub nom. Arizona Mining Reform Coal. v. U.S. Forest Serv.*, 170 F.4th 879 (9th Cir. 2026), and *aff'd sub nom. Arizona Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641 (9th Cir. 2026); *Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. CIV.A. 14-0032-WS-M, 2014 WL 5307850, at *6 (S.D. Ala. Oct. 16, 2014) (confirming that plaintiff had standing to challenge the Corps' verifications under Section 404 and that "some form of effective relief could be fashioned []whether by this Court or by the Corps on remand[] . . ..."). The Band submitted declarations with its Motion for Summary Judgment and with this brief that establish the Band's standing and the harms the Project will inflict on the Band and its members. The Court may consider these declarations for these purposes. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1010 (S.D. Cal. 2003); *W. Watersheds Project v. Bureau of Land Mgmt.*, 971 F. Supp. 2d 957, 968 (E.D. Cal. 2013). Enbridge's surface-level claim challenging the Band's standing to raise CWA or NEPA injuries, which it raised only in a footnote, is wrong.

## V. VACATUR IS THE APPROPRIATE REMEDY

Vacatur of agency action is appropriate where the agency acted unlawfully. 5 U.S.C. § 706(2); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460–66 (2024) (Kavanaugh, J., concurring); *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 382 (D.C. Cir. 2026). Remand without vacatur is considered an "exceptional remedy," and is available only where the agency is likely to be able to rehabilitate its rationale and where disruptive consequences of an interim change are great. *Id.* (quoting *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518–19 (D.C. Cir. 2020)); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). This atypical remedy is not justified here.

First, the Corps is unlikely to be able to justify its decision on remand. The Corps here violated both the Clean Water Act and the APA. The Court may thus find vacatur appropriate under either or both of those statutes, without relying on defects in the Corps' NEPA review. *See, e.g.*, *Pawnee Nation*, 4:16-cv-00697 (N.D. Ok. Aug. 6, 2026) (vacating upon finding that agency violated APA and NEPA, among other violations); *Washington Area Bicyclist Ass'n v. Burgum*, 2026 WL 1078218, at *2, *31 (D.D.C. Apr. 21, 2026) (vacatur proper remedy under APA where agency acted arbitrarily and capriciously, including in application of NEPA); *supra* Part II. This case also contains ample "reason to believe that the agency might disapprove the project" once it completes the required NEPA analysis. *Seven Cnty.*, 605 U.S. at 185. The Corps failed to meet the Clean Water Act's substantive requirements for evaluation of aquatic ecosystem impacts, and failed to reasonably explain its determination that the Project would not impact the Band's Reservation waters. The Corps failed to adequately consider in its NEPA analysis the Project's impacts from blasting, oil spill risks, and access limitations for Band members to ceded territory. *Supra* Sec. I.A–B, Sec. III.D. And while the Corps included

discussion of various issues raised by the Band in its initial NEPA analysis, it later omitted those concerns entirely when approving the Project. *Supra* Sec. III.D. A full, proper evaluation of these issues could lead the Corps to change its decision and disapprove the Project upon further review.

Second, vacatur would not be unduly disruptive. The recent Seventh Circuit decision in *Bad River Band v. Enbridge* removed any short-term deadline for Enbridge to end operation of the pipeline through the Band's Reservation. 184 F.4th at 906–07. The risks that the Corps and Enbridge allege to energy production, energy costs, or relations with Canada are thus inapposite. *See* Corps Br. 45; Enbridge Br. 45. There is no risk of oil flow interruptions, because the pipeline through the Reservation will continue to operate for the foreseeable future. *Bad River Band*, 184 F.4th at 902. Vacatur is appropriate when remand alone "would give the . . . incentive to allow 'build[ing] first and conduct[ing] comprehensive reviews later.' [The court] certainly do[es] not wish to encourage such an approach." *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (quoting *Standing Rock II*, 985 F.3d at 1052).

Further, the Seventh Circuit decision does not change that the Corps must follow the law when permitting Enbridge's Project. Any "reasonable opportunity" that Enbridge may have to complete the Project, *Bad River Band*, 184 F.4th at 902, must comply with applicable state and federal laws. The Band, for its part, is entitled to its own reasonable opportunity to ensure those laws are followed. Both the Corps and this Court have the time—and the obligation—to ensure the law is followed as Enbridge proceeds with this Project.

For the foregoing reasons, vacatur is appropriate in this case. Further briefing is unnecessary to decide this remedy and is therefore not in the interests of judicial economy. Further briefing is also discouraged because Enbridge could proceed with construction while

remedy briefing is pending. If this Court finds for the Band on any count, it will be imperative that construction be paused until the legal defects in the Corps' permitting process are addressed. If construction proceeds, the harm the Band seeks to prevent continues. An immediate decision on remedy would thus be appropriate here if this Court finds for the Band.

## CONCLUSION

For the foregoing reasons, the Band respectfully requests that the Court grant its motion for summary judgment and vacate the Corps' CWA Section 404 permit for the Project and its related decisions. The Band also requests any and all other relief as appropriate.

Respectfully submitted this 14th day of September 2026.

*/s/Stefanie Tsosie*
Stefanie Tsosie*
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, WA 98104
Phone: (206) 343-7340
Fax: (720) 550-5757 or
7205505757@egoldfax.com
E-mail: stsosie@earthjustice.org

Gussie Lord (DC Bar No. 1009826)
Joseph V. Langkilde III (DC Bar No. 90006198)
EARTHJUSTICE
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
Phone: (202) 667-4500
E-mail: glord@earthjustice.org
jlangkilde@earthjustice.org

Christopher Meyer (NY State Bar No. 6015028)
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
Phone: (212) 845-7376
E-mail: cmeyer@earthjustice.org

**Admitted Pro Hac Vice*